# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

LOREE McCORMICK-RICE,
CASSIDY RICE, through her next friend Loree McCormick-Rice,

     Plaintiffs,

v.

CHARLES DESHAZER, in his official and individual capacity,
DILLON COMPANIES, INC. d/b/a KING SOOPERS, INC., a Kansas corporation, and
EARNEST SANDS,

     Defendants.

---

## COMPLAINT

---

     Plaintiffs Loree McCormick-Rice and Cassidy Rice, by and through their attorneys, David A. Lane and Marcel Krzystek of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint as follows:

### INTRODUCTION

     1.     This is an action for damages against Aurora police officer Charles Deshazer, King Soopers security guard Earnest Sands, and King Soopers for an assault committed against Plaintiff on June 17, 2006.  Plaintiffs allege that Defendant Deshazer violated their First and Fourth Amendment rights when, knowingly and with deliberate indifference to their constitutional rights, unlawfully seized and applied grossly excessive force against them, at least in part as retaliation for Plaintiffs' exercise of their First Amendment rights.  Security guard Sands, an agent of King Soopers, participated in the unlawful seizures and pushed and kicked

Plaintiff Cassidy Rice, who was only twelve years old at the time.  Defendant Deshazer's conduct under color of state law proximately caused the deprivation of Plaintiffs' federally protected rights.  Defendant Sands' conduct occurred during the course and scope of his employment as a security guard for King Soopers.  Defendants' conduct, done willfully and wantonly, gives rise to Plaintiffs' constitutional and supplemental and pendant state claims.

## JURISDICTION & VENUE

2.   This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343 and 2201.  Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by 42 U.S.C. § 1988.  Jurisdiction for Plaintiffs' supplemental state law claims is conferred by 28 U.S.C. § 1367.

3.   Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the state of Colorado, and all of the parties are residents of the state.

## PARTIES

4.   At all pertinent times mentioned herein, Plaintiff Loree McCormick-Rice was a citizen of the United States of America and a resident of Aurora, Colorado.

5.   At all pertinent times mentioned herein, Plaintiff Cassidy Rice was a citizen of the United States and a resident of Aurora, Colorado.  Cassidy Rice is the daughter of Plaintiff Loree McCormick-Rice.

6.   At all pertinent times mentioned herein, Defendant Deshazer was employed as a law enforcement officer for the city of Aurora and was acting under color and authority of state law,

2

and in his official capacity as an Aurora police officer.

7.    At all pertinent times mentioned herein, Defendant Sands was employed by King Soopers as a security guard.

8.    At all pertinent times mentioned herein, Defendant Dillon Companies, Inc., d/b/a King Soopers, was a Kansas corporation doing business in the state of Colorado.

## FACTUAL BACKGROUND

9.    On June 17, 2006, Plaintiff Loree McCormick-Rice, a fifty-one-year-old African-American woman, was loading groceries into her vehicle at King Soopers in Aurora.  With her was her daughter and Plaintiff Cassidy Rice, who was twelve-years-old at that time.

10.    McCormick-Rice was lawfully parked in a handicapped zone as she has a hang-tag based upon her severe disability (asthma) which requires that she frequently be on oxygen.

11.    At that time, Aurora police officer Deshazer was apparently working in the parking lot.  Deshazer approached the McCormick-Rice's vehicle and gruffly questioned her about the location of her handicapped parking permit.

12.    McCormick-Rice responded that the permit was hanging off of the mirror, where it should be.  After Deshazer looked again and saw the permit, he moved down the row to the next car.

13.    At that time, a white woman was loading her groceries and was parked unlawfully in a handicapped spot.  Deshazer not only did not ticket her, he never looked for her non-existent hang tag.  As he continued on his way, the unidentified white woman commented to McCormick-Rice that it was "amazing" that McCormick-Rice got hassled about her hang tag, while she, as a white woman, was ignored although parked illegally.  McCormick-Rice

3

responded to the effect that some things will never change.  At that point, Deshazer muttered in a voice loud enough for McCormick-Rice, her daughter Cassidy, and the white woman to hear the epithet "fucking niggers."

14.    McCormick-Rice and Cassidy obtained the phone number for the white woman, and went into King Soopers to protest the fact that King Soopers had a guard on their payroll who had just called them "fucking niggers."  Being quite upset, McCormick-Rice and Cassidy spoke to management at King Soopers.  However, it became evident that they would not get any relief and they left the store.

15.    As Plaintiffs exited the King Soopers and began to drive away, Deshazer was in his vehicle and cursed at them.  In response, McCormick-Rice cursed back, and Deshazer followed them in his vehicle.

16.    When McCormick-Rice and her daughter reached the far, dark end of the parking lot, Deshazer activated his overhead lights in an effort to pull them over.  McCormick-Rice, realizing that it was Deshazer, told him that she was not about to stop in such an isolated spot and would pull over back in the front of the well-lit King Soopers.  McCormick-Rice began to turn around when Deshazer cut her off.

17.    At that point, Cassidy jumped out of the car to run for help.  Deshazer got out of his car and yelled at the young girl to get back in the car.

18.    Deshazer ran to Cassidy and jerked her arm so hard that he broke her collar bone.  Deshazer then began to choke Cassidy, while McCormick-Rice screamed for help.  At some point several other officers appeared on the scene, as did Defendant Sands.

19.    Deshazer and the officers continued to manhandle both McCormick-Rice and

4

Cassidy.  Defendant Sands also kicked Cassidy.  Ultimately, Cassidy was taken into custody and McCormick-Rice was released from the scene.

20.  Both McCormick-Rice and Cassidy were charged with resisting arrest and failing to obey an order.  Both entered pleas on not guilty.

21.  Cassidy, upon her release from custody, was taken to Children's Hospital, where she learned that she had suffered a fractured shoulder as a result of Defendants' conduct.

22.  All charges against Loree McCormick-Rice and Cassidy were dismissed upon motion of the Aurora City Attorney on November 27, 2006.

## FIRST CLAIM FOR RELIEF

### (42 U.S.C. § 1983 Fourth Amendment Violation – Excessive Force)
### (Against Defendants Deshazer and Sands)

23.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

24.  At all times relevant to the allegations in this complaint, Defendant Deshazer acted under color of state law.

25.  At all times relevant to the allegations in this complaint, Defendant Sands engaged in state action by acting in concert with one or more state actors. *Dennis v. Sparks*, 449 U.S. 24 (1980).  Defendant Sands acted as a willful participant in joint action with the municipality and one or more of its agents.

26.  Defendants are persons under 42 U.S.C. § 1983.

27.  Plaintiffs had a constitutionally protected right to be secure in their persons against unreasonable seizures of the person.

28.     Defendants unlawfully seized the Plaintiffs by means of excessive physical force and thereby unreasonably restrained them of their freedom.

29.     Defendants' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

30.     Defendants' actions, as described above, were motivated by an intent to harm Plaintiffs.

31.     As a direct result of Defendants' unlawful actions as described above, Plaintiffs suffered actual physical and emotional injuries in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (42 U.S.C. § 1983 Fourth Amendment Violation – Unlawful Seizure)
### (Against Defendants Deshazer and Sands)

32.     Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

33.     The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to freedom from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America and 42 U.S.C. §1983 in that Plaintiffs were unlawfully physically seized by the Defendants without probable cause to believe they had committed any offense.

34.     Defendants intentionally, knowingly, recklessly, and excessively subdued, restrained, detained and falsely arrested Plaintiffs without any reasonable suspicion or probable cause. 35.     Defendants' conduct proximately caused significant injuries, damages, and economic losses to Plaintiffs.

6

### THIRD CLAIM FOR RELIEF
### (42 U.S.C. § 1983 First Amendment Violation – Retaliation For Free Speech)
### (Against Defendant Deshazer)

36.     Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

37.     Defendant Deshazer attacked Plaintiffs when they verbally protested the abusive racial epithet uttered at them by Defendant Deshazer.

38.     Based upon the fact that they protested this mistreatment verbally, Plaintiffs were retaliated against by the Defendant, who physically seized them by employing grossly excessive force, breaking Cassidy's shoulder, without probable cause or reasonable suspicion.

39.     Plaintiff's speech was related to matters of public concern.

40.     Defendant's acts of physically attacking and falsely arresting Plaintiffs were motivated by Plaintiffs' exercise of constitutionally protected conduct.

41.     Defendant's adverse actions caused Plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to engage in such constitutionally protected activity.

42.     Defendant's conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

43.     Defendant's acts were done under color of state law.

44.     Defendants engaged in the conduct described by this Complaint intentionally, knowingly, willfully, maliciously, and in reckless disregard of Plaintiffs' federally protected constitutional rights.

45.     Defendants' conduct proximately caused significant injuries, damages and losses

to Plaintiffs.

## FOURTH CLAIM FOR RELIEF
### (42 U.S.C. § 1983 Conspiracy - First and Fourth Amendment Violations)
### (Against all Defendants)

46.     Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

47.     Plaintiffs had federally protected constitutional rights under the First Amendment to be free from retaliation for constitutionally protected speech and conduct.

48.     Plaintiffs had federally protected constitutional rights under the Fourth Amendment to be free from unreasonable seizures and excessive force.

49.     Defendants Deshazer, Sands, and King Soopers, through one or more of its agents, including Defendant Sands, conspired to violate the First and Fourth Amendment rights of Plaintiffs.  Specifically Defendants conspired to arrest and physically abuse and injure Plaintiffs after they verbally protested the abusive racial epithet uttered at them by Defendant Deshazer.

50.     Defendant King Soopers condoned and ratified Deshazer's conduct when it failed to take any remedial measures in response to Plaintiffs' complaint.  Furthermore, Defendant King Soopers, through one or more of its agents, including Defendant Sands, actively participated in the retaliatory conduct.

51.     Defendants' conduct proximately caused significant injuries, damages and losses to Plaintiffs.

## FIFTH CLAIM FOR RELIEF
### (Common Law Battery)
### (Against all Defendants)

8

52.     Plaintiffs hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

53.     Defendants unlawfully seized the Plaintiffs by means of excessive physical force and thereby unreasonably restrained them of their freedom.

54.     Defendants acts resulted in physical contact with the Plaintiffs.

55.     Defendants intended to make harmful or offensive physical contact with the Plaintiffs, and the contact was harmful or offensive to Plaintiffs.

56.     Defendants' conduct proximately caused significant injuries, damages and losses to Plaintiffs.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in their favor and against the Defendants, and grant:

(a)     Appropriate declaratory and other injunctive and/or equitable relief;

(b)     Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)     All economic losses on all claims allowed by law;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law;

(f)     Pre- and post-judgment interest at the lawful rate.

(g)     Any further relief that this court deems just and proper, and any other relief as

allowed by law.

PLAINTIFFS REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this ___ day of December, 2006.

KILLMER, LANE & NEWMAN, LLP

s/ David A. Lane

David A. Lane
Marcel Krzystek
1543 Champa Street, Suite 400
Denver, CO 80202
Attorneys for Plaintiff
(303) 571-1000
dlane@killmerlane.com
mkrzystek@killmerlane.com

# EXHIBIT B

Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2    CIVIL ACTION NO. 07-cv-00355-RPM-MEH

3    _____

4    DEPOSITION OF:  CHUCK DeSHAZER
     EXAMINATION DATE:  NOVEMBER 28, 2007

5    _____

6    LOREE McCORMICK-RICE, CASSIDY RICE, through her
     next friend Loree McCormick-Rice,

7

8    Plaintiff,

9    v.

10   CHARLES DESHAZER, in his official and individual
     capacity, DILLON COMPANIES, INC. d/b/a KING

11   SOOPERS, INC., a Kansas corporation, and EARNEST
     SANDS,

12

13   Defendants.

14   _____

15          PURSUANT TO NOTICE, the deposition of
     CHUCK DeSHAZER was taken at 9:29 a.m. on

16   November 28, 2007, at 1543 Champa Street, Suite
     400, Denver, Colorado, before Kathy L. Davis,

17   Certified Realtime Reporter and Notary Public in
     and for the State of Colorado, said deposition

18   being taken pursuant to the Federal Rules of
     Civil Procedure.

19

20

21            Kathy L. Davis
          Certified Realtime Reporter

22

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3         DAVID A. LANE, ESQ.
           QUSAIR MOHAMEDBHAI, ESQ.
 4         Killmer, Lane & Newman, LLP
           1543 Champa Street, Suite 400
 5         Denver, CO 80202
           (303) 571-1000
 6
 7    FOR THE DEFENDANTS KING SOOPERS and SANDS:
 8         STEPHEN HIGGINS, ESQ.
           JIM M. MESECK, ESQ.
 9         White & Steele, P.C.
           950 17th Street, Suite 2100
10         Denver, CO 80202-2804
           (303) 296-2828
11
12    FOR DEFENDANT DESHAZER:
13         DAVID R. OSBORNE, ESQ.
           Hamilton and Faatz, P.C.
14         1600 Broadway, Suite 500
           Denver, CO 80202-4905
15         (303) 830-0500
16         PETER RUBEN MORALES,
                ASSISTANT COUNTY ATTORNEY
17         City Attorney's Office, Civil Division
           City of Aurora, Colorado
18         15151 East Alameda Parkway, 5th Floor
           Aurora, CO 80012
19         (303) 739-7030
20
21    Also Present:  Earnest Sands
22
23
24
25
```

1                    I N D E X

2   EXAMINATION BY:                              PAGE

3   Mr. Lane ...................................    4
    Mr. Morales ...............................  136
4   Mr. Osborne ...............................  141
    Mr. Higgins ...............................  146
5   Mr. Lane ..................................  153
6          I N D E X   O F   E X H I B I T S
7   DEPOSITION                          PAGE FIRST
    EXHIBIT NO.   DESCRIPTION                APPEARS
8
         1      Criminal Discovery - Loree .......  120
9               McCormick-Rice
10       2      Criminal Discovery - Cassidy .....  126
                Rice
11
         9      Diagram by DeShazer of parking ...   48
12              lot
13      10      Bird's eye view diagram by .......   64
                DeShazer of entire parking lot
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                   P R O C E E D I N G S
 2                   CHUCK DeSHAZER
 3            The deponent herein, being first duly
 4    sworn to testify to the truth in the above cause,
 5    was examined and testified on his oath as
 6    follows:
 7                   E X A M I N A T I O N
 8    BY MR. LANE:
 9            Q      Sir, could you state your name
10    and spell your name for the record, please.
11            A      It's Chuck DeShazer.  D-e capital
12    S-h-a-z-e-r.
13            Q      All right.  And Mr. DeShazer,
14    have you ever had your deposition taken before?
15            A      No.
16            Q      Okay.  Let me give you some
17    ground rules here as to how this all works.
18    Obviously, you've just taken an oath to tell the
19    truth.  And that oath has exactly the same force
20    and effect as if you were on the witness stand in
21    court at a trial, okay?  There's no judge sitting
22    here, but this is a legal proceeding authorized
23    by the court, and everything you say today
24    eventually could work its way out in a trial on
25    the matter that we're here on, okay?  Do you
```

1    how far down the side of the store, but I

2    activated the lights on the car and drove to the

3    entrance to the parking lot and blocked the

4    entrance.

5             Q      Okay.  What happened then?

6             A      Both our windows were down.  And

7    I instructed her to leave.  And she said that she

8    was going to go back to where there were

9    witnesses.  And I told her, You're not coming

10   back on the lot.  If you want to pull to the curb

11   on the other side of the street, I'll be more

12   than happy to talk with you, but you're not

13   coming back on the lot.

14            Q      What did she claim she wanted

15   witnesses for?

16            A      I don't know.

17            Q      Well, that would be a non

18   sequitur, then?  Do you know what I mean when I

19   say that would be a non sequitur?

20            A      No, sir.

21            Q      What that means is that's just a

22   random statement out of the blue that had no

23   connection to anything, then; is that right?

24   Meaning, witnesses to what?

25            A      I assumed it was the interaction.

Page 95

1          Q      What happened then?

2          A      Several things.  A lot of things

3     happened.  I remember, as -- I'm trying to work

4     Loree's fingers off of Cassidy's neck, and --

5     while I'm holding onto Cassidy.  Loree's on her

6     back.  Cassidy's on her side laying on top of her

7     mother.

8               And I remember the armed security

9     guards coming up and --

10         Q      Which ones?  Who?

11         A      Mr. Kuebler and Mr. Sands.

12         Q      Okay.

13         A      And Mr. Sands came up, and he put

14    his hand on my left shoulder, and he said, Do you

15    need help, Sarge?  If you need help, tell me you

16    need help, and I can help.

17              And it was about at that time when I

18    was able to break Loree's grip off of Cassidy and

19    pull her away from her mother.  And I asked

20    Mr. Sands to just keep her away from me, meaning

21    Loree.

22         Q      Okay.  So what did Mr. Sands do

23    at that point?  And is Mr. Sands -- for the

24    record, is he present today?

25         A      Yes, he is.

Page 96

1          Q        Can you identify him?

2          A        He's seated to my right,

3     wearing -- wearing a leather jacket.

4          Q        Okay.  And so what did he do?

5          A        I honestly -- at that point, I

6     didn't know.  Because when I pulled Cassidy away,

7     my back was to them.

8          Q        Did you see him make physical

9     contact with Loree?

10         A        I never did.

11         Q        Okay.  So what happened then?

12         A        When I got Cassidy away from her

13    mother, she was -- she was in a seated position.

14    And when I was trying to get her onto a -- into a

15    prone position, using verbal commands, On your

16    belly, On your belly, and trying to pull her over

17    onto her belly, she kept spinning on her butt and

18    keeping her legs between me and her, which is a

19    potential weapon.

20         Q        Her legs were a potential weapon?

21         A        Yes.

22         Q        So what did do you about this

23    potential weapon?

24         A        I escalated my use of physical

25    force.

1          Q      To do what?

2          A      Pulled her into a prone position

3    and handcuffed her.

4          Q      Okay.  Had other officers

5    responded at this point?

6          A      No.

7          Q      Okay.  What happened then?

8          A      I ordered Cassidy to stay in a

9    prone position by the car so that I knew exactly

10   where she was.  And I started to get up.

11            And as soon as I got up, she started to

12   get up.  So I pushed her back down and again

13   ordered to her to stay in a prone position and

14   not to move.  And when I got up the second time,

15   it appeared that she was going to stay in that

16   position.

17            And then I went to the van, and Loree

18   was now seated in the van.

19         Q      Okay.  And what was she doing in

20   the van?

21         A      She had the cell phone -- her

22   cell phone to her ear.

23         Q      Who was controlling Cassidy at

24   this point?

25         A      Nobody.

1    Q    So Cassidy was just sitting in

2  the parking lot in cuffs?

3    A    She was laying down when I left

4  her in cuffs.

5    Q    Okay.  All right.  Weren't you

6  afraid she was going to get up and run away?

7    A    It was a concern.  But I was more

8  concerned about her moving around and that her

9  mom's van was still running.  And with her mom

10  being in the driver's seat, I didn't want her to

11  get run over.

12    Q    Okay.  So what happened then?

13    A    When I saw that the -- that Loree

14  was in the van -- she was on -- she had the cell

15  phone to her ear.  I don't know if she was

16  talking to anybody.  And I ordered her out of the

17  van, advising her she was under arrest.

18    Q    What was she under arrest for?

19    A    Interference, obstruction.

20    Q    How did she -- oh, with the tug

21  of war with Cassidy?  That was the obstruction

22  interference?

23    MR. OSBORNE:  Once again, I'll

24  object.  Form of the question.

25    A    When she tried to interfere with

1   my arrest of Cassidy.

2          Q      (BY MR. LANE)  By doing what?

3          A      By grabbing her around the neck

4   and pulling.

5          Q      Okay.  Any marks that would have

6   been on Cassidy's neck, you're claiming, were put

7   there by Loree; is that right?

8          A      They weren't done by me or any

9   other officer that I know of.

10         Q      Okay.  And in fact, you would

11  argue that any injuries suffered by Cassidy were

12  the result of Loree pulling on Cassidy?

13                MR. OSBORNE:  Object as to form.

14         Q      (BY MR. LANE)  Is that correct?

15                MR. MORALES:  Same objection.

16         A      I did not do anything that I

17  believe would cause any type of injury to

18  Cassidy.

19         Q      (BY MR. LANE)  Okay.  Okay.  So

20  what happened then?

21         A      The van was still running.  Loree

22  wasn't going to get out.  She refused to move.

23  She didn't give any verbal indication.  She just

24  didn't make any physical movement in attempt to

25  get out.

1          So I reached into the van to shut the

2     van off.  And Loree laid down across the front

3     seats of the van.  And I knew that other officers

4     were responding, so I decided that I would just

5     remain outside the van and wait for another

6     officer to get there to assist me in arresting

7     Loree.

8          Q     How did you know Loree didn't

9     have a gun in the van, was going to blow your

10    brains out?

11         A     I didn't.

12         Q     Well --

13         A     But I remained --

14         Q     -- had you been concerned about

15    that possibility, you would have taken steps to

16    make sure that she was out of the van then; isn't

17    that correct?

18         A     I felt reasonably comfortable,

19    because as I stood by the door of the van, she

20    had the cell phone to her ear, even as she laid

21    across the front seat.  And I had her -- her left

22    hand was in plain view, so if she reached for

23    anything, I was in a position where I could back

24    towards the back of the car, if she produced a

25    handgun.

1          Q       I see.  Okay.  So what happened

2    then?

3          A       I just remained there.  I ordered

4    her a total of at least two times, maybe three

5    times, to get out of the van.  She refused to

6    comply with any of those orders.  So I just

7    waited for other officers to arrive.

8          Officer Michelle Hanley arrived, and

9    she asked me what I needed.  And I had told her

10   to secure Cassidy in a car.  And she did that.

11   And then she came back to the van.

12         Q       And then what happened?

13         A       Then I ordered Loree out two more

14   times, advising her that she was under arrest

15   each time.  And I actually thought she was going

16   to start complying, 'cause she sat up in the

17   seat.

18         And I said, Come on.  It's time -- we

19   can't -- it's over.  It's done.  Let's get out.

20   And she started to lay back down in the seat

21   again.  And I reached in and grabbed her by her

22   left arm and pulled her from the van.

23         Q       Okay.  What did she do?

24         A       She stood up and then collapsed.

25         Q       Okay.  What happened then?

1    truck is out of the way, what's going on now?

2              A      I'm standing by the door.   This

3    is where I'm telling her that she's under arrest,

4    to get out of the car --

5              Q      All right.

6              A      -- two, maybe three times.

7              Q      This is at approximately 21:53 of

8    the videotape.   The King Soopers truck gets out

9    of the way.   Now, this is Michelle --

10             A      This is Officer Hanley, yes.

11             Q      -- Michelle Hanley showing up?

12             A      She asked -- at this point, she

13   said, What do you need?  And I said, Secure her

14   in a car, meaning Cassidy.   She understood what I

15   meant, 'cause she secured Cassidy in the car.

16             Q      Okay.   So who -- at 21:54 and I

17   guess about 14 or 13, Loree gets pulled out of

18   the car, right?

19             A      Yes.

20             Q      And she immediately collapses; is

21   that correct?

22             A      Yes.

23             Q      All right.   Who assisted you in

24   pulling her out of the car?

25             A      No one.

Page 146

1           room.)

2                   E X A M I N A T I O N

3    BY MR. HIGGINS:

4           Q      Officer, my name's Steve Higgins,

5    and I represent Dillon Companies, Inc., doing

6    business as King Soopers, and Ernie Sands, who is

7    the security guard that was involved in this

8    incident.  I just have a few questions for you.

9    This occurred on June 17th, 2007; is that

10   correct?  This incident?

11          A      2006.

12          Q      '6.  '6.  I'm sorry.  And it was

13   at a King Soopers store or shopping center

14   located at 15250 East Mississippi?

15          A      Yes, sir.

16          Q      And how many times do you think

17   you'd been to that parking lot?

18          A      For the purpose of working --

19          Q      Yes.

20          A      -- the secondary job?

21          Q      Correct.

22          A      I believe I started the job in

23   March, and I had worked almost every Saturday

24   night since March.

25                 (Mr. Mohamedbhai reentered the

```
 1                    deposition room.)
 2            Q      Is this a high-crime-rate area?
 3            A      It is.
 4            Q      Was there another officer that
 5    also worked that particular parking lot or that
 6    particular shopping center?
 7            A      On the same night?
 8            Q      Any night.
 9            A      My understanding was they also
10    employed an officer for Friday nights, four hours
11    a night.
12            Q      When you say "they," who is they?
13            A      The property management company.
14            Q      How did you get the job there?
15            A      It was referred to me by another
16    officer.
17            Q      And did you sign a contract with
18    Dunton Realty for your services?
19            A      No.  If I remember correctly, I
20    had to do a 1099 for them.  But I didn't see
21    anybody from the company themselves.  It was all
22    done via fax.
23            Q      Do you know the person's name
24    that you dealt with?
25            A      I didn't deal with anybody at
```

Page 148

1    Dunton.  I was instructed by the officer who gave

2    me the job -- he provided me a log sheet, an

3    invoice, and then I obtained a 1099 on my own.

4            And I was instructed by the officer who

5    referred me the job to complete the log sheet on

6    a weekly basis and then to fax the log sheet and

7    a invoice to Dunton Realty on a weekly basis.  I

8    subsequently learned later they preferred I

9    didn't do it on a weekly basis.  They preferred I

10   did it -- I save up two or three weeks, maybe a

11   month, and then fax it all together.

12           Q    Did you ever fax anything to

13   Dillon Companies, Inc., or King Soopers?

14           A    No.

15           Q    Did you know that you were

16   getting paid by Dunton Realty?

17           A    Yes.

18           Q    Did you know you were working for

19   Dunton Realty?

20           A    Yes.

21           Q    You were not working for Dillon

22   Companies, Inc., were you?

23           A    No, sir.

24           Q    Did you take any directions from

25   anybody at King Soopers or Dillon Companies,

Page 149

1    Inc., with reference to your job --

2              A       No, sir.

3              Q       -- in the parking area?

4              A       No, sir.

5              Q       What kind of uniform were you

6    wearing the night in question?

7              A       The issued Aurora Police blue

8    uniform.

9              Q       Dark blue?

10             A       Dark blue with a black leather --

11   or faux leather gun belt.

12             Q       Does it say -- do you have arm

13   patches that say Aurora Police Department?

14             A       We do now, but I don't remember

15   if at the time we did.

16             Q       Did you identify yourself to

17   Loree Rice at any time that you were a police

18   officer?

19             A       Not that I recall.

20             Q       In your mind, was it obvious that

21   you were a police officer?

22             A       In my mind, yes.

23             Q       If someone was to give you

24   direction as to what to do at this parking lot,

25   who would that person have been?

Page 150

1        A       I assume that there would have
2   been a manager at Dunton.
3        Q       Would this other officer also be
4   a person who would give you directions in what to
5   do?
6        A       No, 'cause he had turned the job
7   over to me.
8        Q       Okay.  And you were just there to
9   enforce the laws in the parking area?
10       A       Yes, sir.
11       Q       Did you actually go into the King
12  Soopers store --
13       A       To enforce laws?
14       Q       -- at any time?  Yes.
15       A       No.  I did go in and purchase,
16  you know, food on occasion when I was out there.
17       Q       It's my understanding that
18  Mr. Sands and Mr. Kuebler didn't know you before
19  this incident; is that correct?
20       A       On a personal level, no, other
21  than in passing to say hi as I would go in and
22  get a bottle of water or something.
23       Q       They never gave you any
24  directions as to what to do out in the parking
25  lot?

1    A    No.  There -- Mr. Kuebler did ask

2  if I would check handicap parking, because he had

3  received complaints -- as he explained it to me,

4  he had received complaints from patrons for

5  people violating the handicap parking.

6    Q    Other than that, did you ever

7  have any meetings with Mr. Kuebler or Mr. Sands

8  or King Soopers with reference to what you were

9  doing out on this lot?

10    A    No.

11    Q    Before Mr. Kuebler mentioned to

12  you that there was a conversation with Loree

13  Rice, had you told any of the security officers

14  what confrontation you had had with her?

15    A    No.

16    Q    So it would be safe to assume

17  they didn't know what had transpired out there

18  between you and Loree Rice?

19    A    Yes, that would be correct.

20    Q    Did Mr. Reddick appear to be

21  concerned about the possibility that maybe the

22  "N" word was said out in the parking lot?

23    A    Yeah.  Yes, he did.

24    Q    The tickets that you write for

25  handicap parking, are they actually written on

1     Aurora -- official Aurora documents?

2              A     Yes.

3              Q     The decision to make -- or to

4     charge Loree Rice and her daughter with crimes,

5     whose was that?

6              A     Mine.

7              Q     The decision to arrest her, whose

8     decision was that?

9              A     My decision.

10             Q     Did you ever see the King Soopers

11    security guards ever touch either of -- either

12    Cassidy Rice or Loree Rice?

13             A     No.

14             Q     And when you requested help from

15    the security officers, did you believe that was

16    something that might be necessary?

17             A     Yes.

18             Q     Would you expect them to help you

19    if you needed help?

20             A     The way Mr. Sands termed it to me

21    when he put his hand on my shoulder, I -- I

22    believed in my mind that I had to request help

23    from him before he could intervene.  Whether that

24    was a company policy or whatever, just the way he

25    phrased the terminology, it appeared to me that I

1    had to request help before he would become

2    involved.

3              Q     So at no time were you -- were

4    you ever conspiring with anybody with Dillon

5    Companies or King Soopers to somehow racially

6    charge someone with a crime in the parking lot?

7              A     No, sir.

8              Q     Did you ever have any meetings

9    with any King Soopers representatives at any time

10   with reference to your duties out in the parking

11   lot?

12             A     I'm sorry?  Any meetings?

13             Q     Yeah.  Any meetings with any --

14             A     No, sir.

15             MR. HIGGINS:  That's all I have.

16   Thank you.

17             E X A M I N A T I O N

18   BY MR. LANE:

19             Q     Let me do a couple of quick

20   followups here.  Who -- based on your

21   observations, who employed Mr. Sands?

22             A     King Soopers.

23             Q     Okay.  And Mr. Sands and

24   Mr. Kuebler -- Kuebler?  I don't know what his

25   name is.  They both came out of King Soopers; is

Page 154

1    that right?

2              A      Yes.

3              Q      And Mr. Sands asked you if you

4    needed help; is that correct?

5              A      Yes.

6              Q      And he was acting in his capacity

7    as a King Soopers employee at that point in a

8    security uniform, based on your observations?

9              A      I believe so.

10             Q      Okay.  Did he touch Loree Rice,

11   to your knowledge?

12             A      No.

13             Q      Did you say you needed help?

14             A      Yes.

15             Q      Okay.  What did he do to help?

16             A      When I was able to get Cassidy

17   away from Loree, I asked him to make sure she

18   stays away from me.

19             Q      That who stays away from you?

20             A      Loree.

21             Q      Okay.  So did he?

22             A      He stepped in between us.

23             Q      Okay.

24             A      And --

25             Q      Did --

1       A    I don't know.  My back was to

2    them at the time.  I can only -- based on what I

3    see in the video.

4       Q    So if Loree Rice says yes, he did

5    go hands-on with her, you wouldn't know one way

6    or the other, would you?

7       A    No.  Not when my back was turned,

8    no.

9       Q    Okay.  And if you were using

10   excessive force, which I understand your position

11   is you were not, but if you were and he assisted

12   you in using excessive force -- you understand,

13   as a police officer, a theory of complicity; is

14   that correct?

15              MR. OSBORNE:  I'm going to

16   object.  That calls for a legal conclusion.

17              MR. MORALES:  Same objection.

18       Q    (BY MR. LANE)  Well, let me

19   backtrack.  If my associate here and I go into a

20   liquor store, pull out guns, and rob the liquor

21   store, you understand that the getaway car driver

22   who's part of the plan is as guilty of robbing

23   the liquor store as he and I, right?

24       A    Yes.

25       Q    Okay.  You learn that in the

1    police academy, don't you?

2         A    Yes.

3         Q    When someone is engaged in an

4    unlawful activity and somebody is assisting them

5    in that unlawful activity, they're both equally

6    culpable in the eyes of the law.  You understand

7    that, don't you?

8              This is not a trick question.  This is

9    not a law school exam.  This is your common

10   sense.  It's what you do every day on the

11   streets.  You know that to be true, don't you?

12        A    I --

13        Q    Their sentence may be less.  They

14   may have all kinds of mitigation.  But if we're

15   pulling an armed robbery, I don't care whether

16   you're sitting five blocks away in a getaway car

17   or you're standing in the cash register with a

18   gun in the guy's face, you're equally guilty in

19   the eyes of the law, right?

20        A    In the eyes -- yes, in the eyes

21   of the law.

22        Q    Okay.  So you understand, then,

23   that if Sands -- if you were acting unlawfully --

24   and I understand you say you were not.  But if

25   Sands was helping you act unlawfully, you

 1    understand, in a complicity theory, then Sands

 2    would be equally culpable with you, right?

 3                    MR. OSBORNE:  Same objection.

 4                    MR. MORALES:  Same objection.

 5    Mischaracterizes, because one, you're asking

 6    about criminal law, and now you're asking about

 7    civil, at least my understanding of what you're

 8    doing.

 9           A     One, there was no excessive force

10    used.  And two, Mr. Sands, to my knowledge, never

11    touched her.

12           Q     (BY MR. LANE)  Well, you've

13    already said maybe he did, maybe he didn't.  You

14    don't know.

15           A     I didn't say that.

16           Q     You said you didn't see him touch

17    Loree Rice.  You said your back was to him.

18    Isn't that correct?

19           A     My back was to him.

20           Q     So whether he did or did not, you

21    don't know?

22           A     I do based on the video.

23           Q     Based on the video?

24           A     Yes.

25           Q     Well, you've seen that video how

1    many times?

2              A       Numerous times.

3              Q       Okay.  And it's your testimony

4    that just based on watching the video, he didn't

5    touch anybody?

6              A       Yes, sir.

7              Q       He didn't touch either Loree or

8    Cassidy?

9              A       I never saw him touch either one

10   of them.

11             Q       Okay.  Was his presence there

12   designed to keep Loree away from you?

13             A       Yes.  He did assist in that

14   regard.

15             Q       All right.

16             MR. LANE:  No further questions.

17             MR. MORALES:  Thanks.

18             MR. LANE:  Okay.  Thank you all.

19             (The deposition concluded at

20             12:23 p.m.)

21

22

23

24

25

Page 159

```
 1                    A F F I D A V I T

 2

 3   STATE OF COLORADO        )

                             )    ss.

 4   COUNTY OF DENVER         )

 5               I have read my deposition, and the same

 6   is true and accurate, save and except for changes

 7   and/or corrections, if any, as indicated by me on

 8   the amendment sheet(s) attached hereto as

 9   indicated.

10

11   Amendment sheet(s) attached [ ]

12   No changes; no amendment sheet attached [ ]

13

14

15   _____
                    CHUCK DeSHAZER
16

17      SUBSCRIBED AND SWORN TO before me on this

18   _____ day of _____, 2007.

19      My commission expires: _____.

20

21

                _____
22                    NOTARY PUBLIC

23   in and for the State of _____.

24   kd

25
```

Page 160

1                    C E R T I F I C A T E

2

3

4    STATE OF COLORADO        )
                              )    ss.
5    COUNTY OF DENVER         )

6

7            I, Kathy L. Davis, Certified Realtime
     Reporter and Notary Public in and for the State
8    of Colorado, duly appointed to take the
     deposition of CHUCK DeSHAZER, certify that prior
9    to the examination the deponent was duly sworn to
     testify to the truth in the matters in
10   controversy between the parties herein; that the
     deposition was taken in shorthand by me at the
11   time and place aforesaid and was thereafter
     reduced to typewritten form by me and processed
12   under my supervision, the same consisting of 159
     pages; and that the same is a full, true, and
13   complete transcription of my machine shorthand
     notes.  I further certify that I am not related
14   to, employed by, nor counsel to any of the
     parties herein, nor otherwise interested in the
15   events of the within cause.

16           A transcript review of this deposition
     was requested and is available to the deponent as
17   notified by me.

18           IN WITNESS WHEREOF, I have affixed my
     notarial seal this 2nd day of December, 2007.  My
19   commission expires April 29, 2009.

20

21

22        _____
                    Kathy L. Davis
23          Certified Realtime Reporter

24

25

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-00355-RPM-MEH

LOREE McCORMICK-RICE,
CASSIDY RICE, through her next friend Loree McCormick-Rice,

      Plaintiffs,

    v.

CHARLES DESHAZER, in his official and individual capacity,
DILLON COMPANIES, INC., d/b/a KING SOOPERS, INC.,
a Kansas corporation, and ERNIE SANDS,

      Defendants.

---

## AFFIDAVIT OF ERNEST SANDS

---

I, Ernest Sands, being duly sworn, swear and affirm as follows:

1.    My name is Ernest Sands. I am over the age of 18 and competent to make this Affidavit. I have personal knowledge of the facts set forth herein.

2.    I was employed by Dillon Companies, Inc. d/b/a King Soopers, Inc. as a security guard at the King Soopers grocery store in Aurora, Colorado where the subject dispute took place on June 17, 206.

3.    On the date of the incident with the Plaintiffs in the King Soopers parking lot, I was wearing a standard issued King Soopers security guard light blue uniform.

4.   Up until the conclusion of the incident in the parking lot with the Plaintiffs and Officer Charles Deshazer, I had never previously met, spoken with or interacted with Officer Deshazer.

5.   At the time of the incident, I did not even know whether Officer Deshazer was on duty with the Aurora Police Department or that he had been employed by the property manager, Dunton Realty, to provide security services in the parking lot.

6.   The King Soopers grocery store monitors the parking lot with surveillance security cameras.

7.   Shortly after I was informed by shoppers passing by that a police officer may need help in the parking lot, I ran to the area of the stop.  Our outdoor store surveillance camera captured my entire involvement with Office Deshazer's stop of the Plaintiffs.

8.   The King Soopers surveillance video is part of the evidence of this case.

9.   The King Soopers surveillance video has not been altered or manipulated in any way.

10.   At no time did I ever come into physical contact with Plaintiff Loree McCormick-Rice.  I never struck, touched or kicked Ms. McCormick-Rice in any manner, including restraining her or placing her in handcuffs.  I never searched Ms. McCormick-Rice's person, vehicle or possessions.

11.     At no time did I touch, kick or in any other way come into physical contact with Plaintiff Cassidy Rice.  I never restrained, handled, placed in handcuffs or arrested Ms. Rice.  I never searched Ms. Rice's person or possessions.

12.     I have watched the surveillance video of the incident on several separate occasions.  At no time does the surveillance video show that I struck, touched or in any other way come into physical contact with either Plaintiff or in any way harm either Plaintiff.

13.     I was personally present during the deposition testimony of Plaintiff Loree McCormick-Rice when she testified on the record that I never touched her and she never saw me touch her daughter Plaintiff Cassidy Rice.

14.     I never uttered any racial slurs or used any racial epithets during the entire time I encountered the Plaintiffs.  I find such language to be personally offensive.

15.     My only conversation with Officer Deshazer was to ask him if he needed help. He commanded me to watch Loree McCormick-Rice while he arrested Cassidy Rice.  That is all I did.

Further Affiant sayeth not.

Ernest Sands

STATE OF COLORADO      )
                       )      ss.
COUNTY OF DENVER       )

Subscribed and sworn to before me this 3rd day of April, 2008, by Ernest Sands.

Witness my hand and official seal.

My commission expires:   1-22-2010

Notary Public

**STACEY B. BOTT**
NOTARY PUBLIC
STATE OF COLORADO

My Commission Expires Jan. 22, 2010
White and Steele, PC
950 17th St 21st Floor
Denver CO 80202-2804

4