# EXHIBIT  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-cv-00355-RPM-MEH

---

DEPOSITION OF:  CHUCK DeSHAZER
EXAMINATION DATE:  NOVEMBER 28, 2007

---

LOREE McCORMICK-RICE, CASSIDY RICE, through her
next friend Loree McCormick-Rice,


Plaintiff,

v.

CHARLES DESHAZER, in his official and individual
capacity, DILLON COMPANIES, INC. d/b/a KING
SOOPERS, INC., a Kansas corporation, and EARNEST
SANDS,


Defendants.

---

        PURSUANT TO NOTICE, the deposition of
CHUCK DeSHAZER was taken at 9:29 a.m. on
November 28, 2007, at 1543 Champa Street, Suite
400, Denver, Colorado, before Kathy L. Davis,
Certified Realtime Reporter and Notary Public in
and for the State of Colorado, said deposition
being taken pursuant to the Federal Rules of
Civil Procedure.



                Kathy L. Davis
            Certified Realtime Reporter

Page 2

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3      DAVID A. LANE, ESQ.
        QUSAIR MOHAMEDBHAI, ESQ.
 4      Killmer, Lane & Newman, LLP
        1543 Champa Street, Suite 400
 5      Denver, CO 80202
        (303) 571-1000
 6
 7  FOR THE DEFENDANTS KING SOOPERS and SANDS:
 8      STEPHEN HIGGINS, ESQ.
        JIM M. MESECK, ESQ.
 9      White & Steele, P.C.
        950 17th Street, Suite 2100
10      Denver, CO 80202-2804
        (303) 296-2828
11
12  FOR DEFENDANT DESHAZER:
13      DAVID R. OSBORNE, ESQ.
        Hamilton and Faatz, P.C.
14      1600 Broadway, Suite 500
        Denver, CO 80202-4905
15      (303) 830-0500
16      PETER RUBEN MORALES,
        ASSISTANT COUNTY ATTORNEY
17      City Attorney's Office, Civil Division
        City of Aurora, Colorado
18      15151 East Alameda Parkway, 5th Floor
        Aurora, CO 80012
19      (303) 739-7030
20
21  Also Present:  Earnest Sands
22
23
24
25
```

Page 3

```
 1          I N D E X
 2  EXAMINATION BY:              PAGE
 3  Mr. Lane ...............................   4
    Mr. Morales ...........................  136
 4  Mr. Osborne ...........................  141
    Mr. Higgins ...........................  146
 5  Mr. Lane ...............................  153
 6     INDEX OF EXHIBITS
 7  DEPOSITION            PAGE FIRST
    EXHIBIT NO.  DESCRIPTION        APPEARS
 8
     1  Criminal Discovery - Loree .......  120
 9        McCormick-Rice
10   2  Criminal Discovery - Cassidy .....  126
          Rice
11
     9  Diagram by DeShazer of parking ...  48
12        lot
13  10  Bird's eye view diagram by .......  64
          DeShazer of entire parking lot
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2              CHUCK DeSHAZER
 3          The deponent herein, being first duly
 4  sworn to testify to the truth in the above cause,
 5  was examined and testified on his oath as
 6  follows:
 7          E X A M I N A T I O N
 8  BY MR. LANE:
 9      Q    Sir, could you state your name
10  and spell your name for the record, please.
11      A    It's Chuck DeShazer.  D-e capital
12  S-h-a-z-e-r.
13      Q    All right.  And Mr. DeShazer,
14  have you ever had your deposition taken before?
15      A    No.
16      Q    Okay.  Let me give you some
17  ground rules here as to how this all works.
18  Obviously, you've just taken an oath to tell the
19  truth.  And that oath has exactly the same force
20  and effect as if you were on the witness stand in
21  court at a trial, okay?  There's no judge sitting
22  here, but this is a legal proceeding authorized
23  by the court, and everything you say today
24  eventually could work its way out in a trial on
25  the matter that we're here on, okay?  Do you
```

Page 5

```
 1  understand that?
 2      A    Yes.
 3      Q    Okay.  You've testified many
 4  times in many proceedings in your capacity as a
 5  police officer, I presume?
 6      A    Yes.
 7      Q    So you understand that your
 8  answers have to be oral so that the court
 9  reporter can take them down accurately?
10      A    Yes.
11      Q    In this deposition, because there
12  is no judge sitting here, your lawyers will
13  undoubtedly object from time to time to certain
14  questions that I've asked you.  And they're
15  simply preserving their rights to make a record
16  on the record here.  There's no judge to rule, so
17  the rule is that you answer the question unless
18  your lawyer specifically instructs you not to
19  answer the question.  Okay?
20      A    Okay.
21      Q    If you don't understand a
22  question that I've asked you, you have every
23  right in the world to ask me to clarify it, to
24  explain it, to rephrase it so that you can be
25  certain that you understand what it is that I'm
```

2  (Pages 2 to 5)

Page 6

```
 1   asking you.  And there won't be any confusion or
 2   ambiguities on the record that way, okay?
 3       A    Okay.
 4       Q    If you need to take a break, you
 5   can take a break anytime you want.  You can
 6   consult with your lawyer anytime you want, with
 7   one exception, and that is, the local rule says
 8   that if there is a question pending, you have to
 9   answer the question before you can then get up
10   and say, I need to take a break, I need to talk
11   to my lawyer, whatever, okay?
12       A    Okay.
13       Q    You have to answer the question,
14   and then you can come back.  You can amend it,
15   you can change it.  If you think about something,
16   you know, an hour from now, you realize, Gee, I
17   answered a question incorrectly an hour ago, or
18   I'd like to expand on an answer that I gave an
19   hour ago, you can go back and supplement and do
20   whatever you need to do, okay?
21       A    Okay.
22       Q    Now, let me ask you this:  Do you
23   know what the subject matter of the inquiry here
24   is?
25       A    Yes.
```

Page 7

```
 1       Q    Okay.  What is your understanding
 2   of what this case is about?
 3       A    About an incident that occurred
 4   on June 17th.
 5       Q    What happened on June 17th?
 6       A    The arrest of Loree
 7   McCormick-Rice and her daughter, Cassidy.
 8       Q    Okay.  You are the defendant in a
 9   lawsuit here, correct?
10       A    Yes.
11       Q    What do you believe the
12   allegations against you in this lawsuit are?
13       A    Excessive force.
14       Q    Okay.  What are Loree and Cassidy
15   claiming you did; do you know?
16       A    Not every allegation, no.
17   Generally, used too much force to effect an
18   arrest, caused an injury.
19       Q    Okay.  When I last spoke with
20   your lawyer, there was some issue being raised
21   about a federal grand jury doing an investigation
22   in this case.  Are you aware of a federal grand
23   jury doing an investigation in this case?
24       A    Yes.
25       Q    Has that investigation concluded,
```

Page 8

```
 1   to your knowledge?
 2       A    No.
 3       Q    Okay.  Let me -- your lawyer had
 4   raised an issue of Fifth Amendment privilege
 5   previously.  Are you aware of that fact?  In
 6   other words --
 7       A    No, I wasn't.
 8       Q    Okay.  All right.  Let me, then,
 9   backtrack.  Will you explain to me what you were
10   doing on the day in question.  Where were you
11   employed in that parking lot at that point?  Who
12   was your boss?  Let's start there.
13       A    Well, the employer was Dunton
14   Realty.
15       Q    All right.  And your primary
16   employment is with the Aurora Police Department;
17   is that correct?
18       A    That's correct.
19       Q    How long have you been with the
20   Aurora Police Department?
21       A    December 30th will be 11 years.
22       Q    Okay.  And as part of your job
23   with Aurora, they allow you to what is commonly
24   known as moonlight; is that correct?
25       A    We refer to the term as secondary
```

Page 9

```
 1   employment.
 2       Q    Also known as moonlighting,
 3   right?
 4           MR. OSBORNE:  Object as to form.
 5       Q    (BY MR. LANE)  Right?
 6           MR. OSBORNE:  Asked and answered.
 7       A    It is known as secondary
 8   employment in the police department.
 9       Q    (BY MR. LANE)  Have you ever
10   heard it called moonlighting?
11       A    Only in the papers.
12       Q    Okay.  So what was your job with
13   this realty company?
14       A    It was to provide security in the
15   parking lot of the King Soopers lot, primarily --
16   the primary store there is King Soopers.  There's
17   also a strip mall on the west side of that
18   complex.  And to make sure that the patrons of
19   the businesses had free ingress and egress, and
20   to take care of anything that occurred in the
21   parking lot.
22       Q    Okay.  Is your job simply to
23   enforce the laws of the City of Aurora, the State
24   of Colorado, and the United States of America?
25       A    Yes.
```

3  (Pages  6 to 9)

Page 10

1        MR. OSBORNE:  Object as to form.
2    Q    (BY MR. LANE)  Go ahead.
3    A    Yes.
4    Q    You're not there to implement
5 King Soopers' policies or anything of that
6 nature, are you?
7    A    No.
8    Q    Is this parking lot private
9 property?
10   A    Yes.
11   Q    In your knowledge as a police
12 officer, is it -- are the laws of -- are traffic
13 laws enforceable in a private parking lot?
14   A    Some are.
15   Q    For example, what are some
16 examples of some laws that are enforced in a
17 private parking lot?
18   A    Careless driving, reckless
19 driving, driving under the influence of alcohol.
20 And the area of parking is fire lane and handicap
21 parking.
22   Q    Okay.  And for example, what laws
23 are not enforceable in a private parking lot?
24 Can you give me an example of some of those?
25   A    A failure to use a turn signal,

Page 11

1 speeding, taking a right-of-way, a turn --
2    Q    Why did you stop Loree -- I'm
3 sorry.  Why did you stop Loree McCormick-Rice?
4    A    I contacted her in regards to a
5 handicap placard.
6    Q    No.  No.  But why did you stop
7 her car ultimately?
8    A    I didn't stop her car.
9    Q    Okay.  Did you activate your
10 flashing lights in that parking lot?
11   A    Yes.
12   Q    Were you behind her when you did
13 that?
14   A    No.
15   Q    Did you order her to stop?
16   A    In a traditional traffic stop?
17 No.
18   Q    Well, let me ask it this way.
19 Her car got -- her car stopped in the parking
20 lot, didn't it?
21   A    Yes.
22   Q    You were following behind her at
23 some point, were you not, in the parking lot, in
24 your car?
25        MR. OSBORNE:  Object as to form.

Page 12

1    A    Yes.
2    Q    (BY MR. LANE)  You activated your
3 lights, did you not?
4    A    Yes.
5        MR. OSBORNE:  Object as to form.
6    Q    (BY MR. LANE)  Isn't it required
7 that when a police officer is behind a motorist
8 and that police officer activates their lights,
9 that the motorist is required to stop?
10       MR. OSBORNE:  Object as to form.
11   A    Yes.
12   Q    (BY MR. LANE)  All right.  Did
13 she stop after you activated your lights?
14   A    Yes.
15   Q    So would you agree that it would
16 be a reasonable thing for a normal person to do,
17 when a police officer is following behind them
18 and they activate their lights, to stop?
19       MR. OSBORNE:  Object as to form.
20       MR. MORALES:  Same objection.
21   A    Yes.
22   Q    (BY MR. LANE)  Okay.  Now, you've
23 just testified that you did not stop Loree
24 McCormick-Rice; is that correct?
25       MR. OSBORNE:  Object as to form.

Page 13

1    A    Correct.
2    Q    (BY MR. LANE)  All right.  Do you
3 have any opinion as to why it was she stopped?
4    A    Because to pursue -- for her to
5 move any further, she would have had to hit my
6 patrol car.
7    Q    Did you pull your patrol car in
8 front of her?
9    A    Yes.
10   Q    Did you block her way?
11   A    Yes.
12   Q    Well, isn't that stopping her?
13       MR. OSBORNE:  Object as to form.
14   A    Yes.
15   Q    (BY MR. LANE)  Well, you just
16 told us you didn't stop her, didn't you?
17   A    Yes.
18   Q    All right.  Correct me if I'm
19 wrong, but you have now said you did not stop
20 her, and now you've said you did stop her.  Did
21 you or did you not stop her?
22   A    I stopped her from reentering the
23 parking lot.
24   Q    Okay.  All right.  Whose car was
25 that that you were in?

Attorneys Service Center
475 Seventeenth Street, Denver, CO   80202

Page 14

```
 1        A    The city of Aurora's.
 2        Q    All right.  And you were in --
 3   were you in a City of Aurora police officer's
 4   uniform?
 5        A    Yes.
 6        Q    Would there be any way that a
 7   citizen could simply look at you and know that
 8   you were engaging in secondary employment as
 9   opposed to your primary employment?
10        MR. OSBORNE:  Object as to form.
11        A    No.
12        Q    (BY MR. LANE)  So you had an
13   official City police car and an official City
14   uniform on during your entire contact with Loree
15   and Cassidy Rice; is that correct?
16        MR. OSBORNE:  Object as to form.
17   Compound question.
18        A    I'm sorry.  Repeat your --
19        Q    (BY MR. LANE)  During your entire
20   interaction with Loree McCormick-Rice and her
21   daughter Cassidy, you were wearing the official
22   uniform of the Aurora Police Department, weren't
23   you?
24        A    Yes.
25        Q    And you were driving in an
```

Page 15

```
 1   official Aurora police car; is that correct?  It
 2   was unmarked, but it had flashing lights, and it
 3   was owned by the City of Aurora, correct?
 4        A    Yes.
 5        Q    Okay.  So no one, as far as
 6   you're able to ascertain, would have known
 7   whether you were or were not engaged in secondary
 8   employment at that moment or in your primary
 9   employment at that moment; is that correct?
10        MR. OSBORNE:  I'll object as to
11   form.
12        A    I don't know what other people
13   would have thought.
14        Q    (BY MR. LANE)  I'm asking you.
15   Was there any -- were you wearing an Welcome to
16   King Soopers badge; were you wearing an Aurora
17   Police badge?
18        A    Aurora Police badge.
19        Q    Okay.  Can you think of any way
20.  that a reasonable person could look at you in
21   your uniform in that car and know, one way or the
22   other, whether you were or were not acting in
23   your official capacity as a police officer for
24   Aurora or in your secondary role as security for
25   the parking lot?
```

Page 16

```
 1        MR. OSBORNE:  I'm going to object
 2   as to form.  Calls for speculation as to what
 3   other people would think.
 4        A    I don't know what other people
 5   would think.
 6        Q    (BY MR. LANE)  Okay.  Now, I want
 7   you to understand something here.  This is all
 8   going to go in front of a jury at some point.
 9   You know that, right?
10        A    Yes.
11        Q    Unless we settle this case.  And
12   we're going to use this transcript.  I will --
13   I'll give you straight-up, heads-up warning right
14   now, if you deviate from your testimony at trial,
15   compared to what you say today, or what you've
16   said in the past, I'm going to use this to show a
17   jury in federal district court what your
18   testimony is today, compared to what it's been,
19   compared to what it was on the witness stand.
20   You know, you've been through that drill before
21   with defense attorneys in criminal cases, haven't
22   you?
23        A    Yes.
24        Q    Okay.  It's the same deal here.
25   You understand that, don't you?
```

Page 17

```
 1        A    Yes.
 2        Q    Okay.  So when you tell me
 3   something like, I don't know what anybody would
 4   think by looking at me when I'm driving an Aurora
 5   police car unmarked with flashing lights on it
 6   and wearing an Aurora uniform, I'm going to show
 7   that to a jury, that Officer DeShazer sat here
 8   under oath and said he doesn't know if anybody
 9   would know he was working secondary employment or
10   primary employment, when the fact is, you know
11   that when somebody looks at you and you're
12   wearing an Aurora police uniform, driving an
13   Aurora police car, there is nothing there that
14   would cause any reasonable person to know one way
15   or the other whether or not you're engaged in
16   secondary employment or primary employment,
17   right?  You know that?
18        MR. MORALES:  Object to the
19   commentary.
20        MR. OSBORNE:  Yeah, I'm going to
21   object to the commen- -- you know, Mr. Lane, if
22   you want to ask the question of what he thinks
23   other people --
24        MR. LANE:  That's what I just
25   did.
```

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 18

1 MR. OSBORNE: -- are -- what's
2 going on in their head --
3 MR. LANE: Mm-hmm. Yeah.
4 MR. OSBORNE: -- I think that
5 calls for speculation. He doesn't know what
6 other people are thinking. I mean, if you want
7 to ask the question of, you know, is it
8 reasonable for people to assume that you're
9 working for the Aurora Police Department, that's
10 fine. I think he would answer that question.
11 But it's impossible for him to guess as to what
12 other people are thinking.
13 MR. LANE: Well, it's really not.
14 MR. MORALES: Actually, you
15 already asked him the question, and he answered
16 it before, about whether or not anybody looking
17 at him could tell the difference.
18 MR. LANE: Okay.
19 MR. MORALES: So you already have
20 your answer.
21 Q (BY MR. LANE) Now, do you want
22 to answer the question. Is there any way -- the
23 question that I asked you -- I'll ask it one more
24 time. Is there any way a reasonable person could
25 look at you in an Aurora police uniform driving

Page 19

1 an Aurora car with flashing Aurora lights and
2 know that you are in your secondary job as
3 opposed to your primary job?
4 MR. OSBORNE: Object as to form.
5 MR. MORALES: Same objection.
6 A I don't know what other people
7 would think.
8 Q (BY MR. LANE) Okay. Fair
9 enough. We'll just leave it at that, then.
10 'Cause it would be speculation for you, wouldn't
11 it, to guess whether a reasonable person
12 observing you would have some way of knowing
13 whether you were on duty or off duty, right?
14 That would just be speculation on your part,
15 wouldn't it?
16 A Yes.
17 Q Okay. All right. You were
18 making money for this real estate company -- or
19 from this real estate company at the time of your
20 contact with Loree McCormick-Rice, correct?
21 MR. OSBORNE: Object as to form.
22 A Yes.
23 Q (BY MR. LANE) When you're using
24 an Aurora police vehicle in your private job, do
25 you have to reimburse Aurora for use of the

Page 20

1 vehicle for your secondary job?
2 A No.
3 Q Is that one of the perks of your
4 job?
5 A No.
6 Q Okay. Well, you had an official
7 Aurora police car, right?
8 A Yes.
9 Q Did Aurora just let you have that
10 because they're good guys?
11 A No.
12 Q Well, why is it that you had an
13 official police vehicle with you on your job
14 where you were earning private income?
15 A 'Cause I stopped at the station
16 and got it.
17 Q Well, is that pursuant to policy?
18 A No, it's not.
19 Q Why did you stop at the station
20 and take an Aurora police vehicle?
21 A Because I was working in a
22 parking lot, and the lot's fairly good-sized, and
23 I wanted to be able to maneuver around the
24 parking lot without sacrificing my gas, and also
25 for the ability to be identified as a police

Page 21

1 officer there, if need be.
2 Q So it was your goal that you
3 wanted people to think you were on duty as a
4 police officer, right?
5 A If I had to contact them.
6 Q Okay. So you'd rather burn
7 Aurora's gas than your gas, right?
8 A Yes.
9 Q All right. And is Aurora okay
10 with that?
11 A No.
12 Q Well, what happened?
13 A I received discipline for it.
14 Q What was the discipline?
15 A A written reprimand.
16 Q Did you have to reimburse Aurora
17 for using their car in a moonlighting capacity?
18 A No.
19 MR. OSBORNE: Object as to form.
20 A No.
21 Q (BY MR. LANE) Okay. All right.
22 Describe for me what time, if you recall, that
23 you went on duty on the day in question.
24 A I believe it was about 7 p.m.
25 Q All right. And what you were you

6 (Pages 18 to 21)

Page 22

1 doing at that point when you started your shift?
2      A    Sitting in the parking lot,
3 watching people in the parking lot.
4      Q    Okay.  Did there come a time when
5 you noticed Loree McCormick-Rice or Cassidy?
6      A    Yes.
7      Q    When was that?
8      A    About 9:35.
9      Q    How did you notice them?
10      A    I was checking the handicap
11 parking spots to make sure that the vehicles
12 parked there were in compliance.  And when I
13 checked the first car and walked around the front
14 of it, I didn't see the handicap placard on
15 Loree's car.
16      Q    You did not?
17      A    No.
18      Q    Okay.  Where was Loree at that
19 point?
20      A    She was on the driver's side of
21 the vehicle by the sliding door.  It would be the
22 rear door of that car, sliding door.
23      Q    What was she doing?
24      A    Putting groceries in the car.
25      Q    Okay.  So describe what happened.

Page 23

1      A    When I came around the front of
2 the first car, the -- I learned later that the
3 handicap placard was edged in my direction, so I
4 couldn't see it.  So after I looked at the
5 rearview mirror, I looked at the front plate to
6 see if there was any handicap emblem on the front
7 plate.  There wasn't.
8          And when I got to about the driver's
9 door, I asked Loree if she had a handicap
10 placard.  She pointed towards the mirror and
11 said, It's right there.  And since I was at a
12 different angle, I was able to see it.  And I
13 moved on.
14      Q    All right.  So what happened
15 then?  Now, let me -- before I ask that, there
16 was nothing unusual about that interaction, was
17 there?
18      A    No.
19      Q    You were polite, weren't you?
20      A    Yes.
21      Q    She responded appropriately,
22 didn't she?
23      A    Yeah.
24      Q    Okay.  Where was Cassidy at that
25 point?

Page 24

1      A    She was on the passenger side of
2 the car.
3      Q    Was she outside the vehicle or
4 inside the vehicle?
5      A    I don't remember.
6      Q    Was it light out or dark out?
7      A    It was dark.
8      Q    Were they in a well-lit part of
9 the parking lot?
10      A    Yes.
11      Q    You would agree that parts of the
12 parking lot are better lit than other parts of
13 the parking lot?
14          MR. OSBORNE:  Object as to form.
15      A    Yes.
16      Q    (BY MR. LANE)  And near the front
17 of that King Soopers shop, there are more lights
18 than there are in the outlying areas of the
19 parking lot?
20      A    Yes.
21      Q    Okay.  So you then move on down
22 the row.  What happens then?
23      A    There's a total of five spaces
24 there, and I moved to the very end, the one
25 closest to the front of the store.  And there was

Page 25

1 a Mazda 626 parked there that wasn't properly
2 placarded or plated.  So I began to issue that a
3 ticket.
4      Q    Okay.  And what happened then?
5      A    While I was issuing the ticket --
6 I shouldn't say "issuing."  While I was writing
7 the ticket, Loree came over, and she stated,
8 What, you can see -- you can see her handicap
9 placard, but you can't see mine?  And I said, No.
10 I saw yours.  It's okay.  Go ahead and leave.  Or
11 I didn't say, Go ahead and leave, but I said, No,
12 you're okay.
13      Q    Okay.  So what happened then?
14      A    The driver of the Mazda came out
15 of the store, and I obtained her driver's
16 license, issued her that parking ticket in
17 person.  And I turned to start to walk back to my
18 car.  And Loree contacted me again, and she made
19 another statement -- what was that?  Oh, maybe I
20 should keep my oxygen in the front seat next
21 time.
22      Q    So let me ask you about this
23 Mazda 626.  Can you describe the driver.
24      A    I believe they were of Middle
25 Eastern descent, but I don't know for sure.

7  (Pages 22 to 25)

Page 26

1      Q    So presumably, somewhere in the
2  Aurora muni court, there should be a ticket
3  written out of that parking lot at right around
4  the time that this whole thing went down,
5  correct?
6      A    Yes.
7      Q    Were these people in a position
8  to have seen any interactions with you and Loree
9  McCormick-Rice?
10     A    I don't believe so.
11     Q    Okay.  Did you see another woman
12 there?
13     A    At what point?
14     Q    After you walked away from Loree.
15     A    No.  The only other woman I
16 remember seeing was the driver of the first car
17 that I saw.
18     Q    What documents have you read in
19 order to prepare yourself for today's deposition?
20     A    I've got my report, and I read
21 the interrogatories that I had to answer.  And I
22 reviewed some municipal code.
23     Q    Okay.  Did you read the
24 transcript of the hearing that resulted in the
25 case being dismissed in Aurora muni court?

Page 27

1      A    No.  I did not read any
2  transcript.
3      Q    Have you read any statements made
4  by Loree McCormick-Rice?
5      A    I read some in newspaper
6  accounts, and I did receive a copy of that
7  transcript, but I haven't read it.
8      Q    Okay.  Okay.  Let's continue,
9  then.  So you're giving a ticket to these people
10 with the Mazda.
11     A    Correct.
12     Q    And Loree then comes over and
13 says, Maybe next time I should keep my oxygen in
14 the front seat --
15     A    Yes.
16     Q    -- or words to that effect?
17     A    Yes.
18     Q    Did you understand what she meant
19 by that?
20     A    She was being very sarcastic in
21 her tone when she said it.  And what I took it to
22 mean was her oxygen that would -- that I had seen
23 hanging on her passenger seat, that she thought
24 it would be more easily visible to me if she had
25 placed it on the front seat.

Page 28

1      Q    Okay.  Were you puzzled by why
2  she's telling you this?
3      A    No.
4      Q    Okay.  So what did you say?
5      A    I said, Maybe it's time for you
6  to leave.
7      Q    Why did you say that?
8      A    Because it was time for her to
9  leave.
10     Q    Why was it time for her to leave?
11 She can stay in that parking lot as long as she
12 wants, can't she?
13     A    Yes.
14     Q    Okay.  Why was it time for her to
15 leave?
16     A    It was a suggestion.
17     Q    Why were you making that
18 suggestion?
19     A    Because I thought it was time for
20 her to leave.
21     Q    Why?
22     A    Because her conduct was bordering
23 on -- what would be a good word? -- antagonistic.
24     Q    Okay.  So you said, Maybe it's
25 time for you to leave?

Page 29

1      A    Yes, sir.
2      Q    And what did she say?
3      A    She didn't say anything, as I
4  recall.
5      Q    What did she do?
6      A    I'm not sure.
7      Q    Do you know if -- have you done
8  any investigation as to Loree McCormick-Rice's
9  background?
10     A    No.
11     Q    Do you know whether she has a
12 history of getting into scuffles, tiffs,
13 arguments with cops?
14     A    I have no idea.
15     Q    Okay.  So is it your belief that
16 she simply was sort of copping an attitude with
17 you for unknown reasons?
18     A    I would say that -- yeah.  I
19 don't know why -- what the reason was behind it
20 at the time.
21     Q    But she had an attitude?
22     A    Yes.
23     Q    Okay.  So you said, Maybe it's
24 time to leave -- or, It's time for you to leave,
25 and she didn't say anything?

8  (Pages 26 to 29)

Page 30

1    MR. OSBORNE:  Object as to form.
2  Asked and answered.
3    A    I said something to the effect
4  of, Maybe it's time for you to leave.  I didn't
5  order her to leave.
6    Q    (BY MR. LANE)  Okay.  And what
7  did she say or do?
8    A    I don't know.  I went to -- I did
9  not hear her say anything, and I walked to my
10  car.
11    MR. OSBORNE:  Same objection.
12  Asked and answered.
13    Q    (BY MR. LANE)  Where was your
14  car?
15    A    Just north of the handicap spots
16  in the parking lot.
17    Q    Okay.  What were you going to do
18  in your car?
19    A    Leave.
20    Q    Was your shift over?
21    A    No, not leave the parking lot;
22  leave the immediate area.
23    Q    Okay.  Did you used to normally
24  park your car in a particular area?
25    A    Yes.

Page 31

1    Q    Where was that?
2    A    I tried to park centralized in
3  the lot so I could see both sides of the parking
4  lot.
5    Q    Give me a ballpark.  I've seen
6  the videotape.  I've been to the store.  What is
7  your best estimate as to the length and width of
8  the parking lot?
9    MR. OSBORNE:  I'm going to object
10  as to lack of foundation.
11    A    I have no idea.
12    Q    (BY MR. LANE)  No idea?  Well,
13  it's bigger than this room.  It's less big than
14  all of downtown.  I mean . . . .
15    MR. OSBORNE:  Once again, I'm
16  going to object as to foundation.
17    Q    (BY MR. LANE)  Just ballpark me.
18  I know you're not carrying around a tape measure
19  with you, but what's your best estimate as to the
20  size of this lot?
21    A    Maybe 200 yards east to west and
22  100 yards north to south, but I'm not sure.
23    Q    Okay.  Would you characterize it
24  as a big parking lot?
25    A    Yes, I would.

Page 32

1    Q    Okay.  Okay.  So you were going
2  back to your car.  What happened then?
3    A    I got in my car and drove north
4  through the parking lot and then back around by
5  the front of King Soopers.
6    Q    Okay.  So what happened then?
7    A    There's a stop sign there in
8  front of King Soopers.  And while I was stopped,
9  one of the uniformed security guards came out and
10  told me that -- asked me if I had had -- excuse
11  me -- any words with the lady in the minivan.
12    Q    Who was the security guard that
13  did that?
14    A    It was Jeff Kuebler.
15    Q    Okay.  And you knew him because
16  you worked with him, right?
17    A    No.  I had only seen him.  I
18  don't work with him.
19    Q    Well, okay.  You would see -- how
20  often would you work at this parking lot?
21    A    Almost every Saturday night.
22    Q    Just once a week?
23    A    Yes, sir.
24    Q    Okay.  Did you become friendly
25  and familiar with the King Soopers security staff

Page 33

1  while you were working in the parking lot?
2    MR. OSBORNE:  Object as to form.
3    A    No.
4    Q    (BY MR. LANE)  Okay.  So he came
5  out and asked you if you'd had words with this
6  woman in the minivan?
7    A    Yes.
8    Q    And what did you say?
9    A    I said, I just verified that she
10  had a handicap placard.
11    Q    All right.  And so what did he
12  say?
13    A    He said that she was in the store
14  complaining that she had been called the "N"
15  word.
16    Q    Okay.  And what did you say?
17    A    I said that wasn't true.
18    Q    Okay.  Have you seen the
19  surveillance videotape from King Soopers of Loree
20  and Cassidy in the store?
21    A    Yes.
22    Q    All right.  You would agree that
23  Loree looks -- you can't hear it, right?  There's
24  no sound attached to that, right?
25    A    No.

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 34

1        Q     But you would agree that she is
2    waiving her arms and looking agitated about
3    something?
4             MR. OSBORNE: Object as to form.
5        A     Yes.
6        Q     (BY MR. LANE) Is it your belief,
7    as you sit here right now, that Loree
8    McCormick-Rice is lying about you referring to
9    her as a "nigger"?
10            MR. OSBORNE: Object as to form.
11       A     Absolutely.
12       Q     (BY MR. LANE) Okay.  It's your
13   belief that she's flat-out lying about that, not
14   that she's mistaken about it, but it's just a big
15   lie?
16            MR. OSBORNE: Object as to form.
17       Q     (BY MR. LANE) Is that your
18   belief?
19       A     Yes.
20            MR. OSBORNE: Same objection.
21       Q     (BY MR. LANE) Okay.  Have you
22   ever used that word?
23       A     Yes.
24       Q     All right.  In conjunction with
25   what?

Page 35

1        A     In telling a story.
2        Q     All right.  Have you ever used it
3    in a derogatory fashion, referring to African
4    Americans?
5        A     Not that I recall.
6        Q     No time in your entire life?
7        A     I'm sure there has been, but I
8    don't recall it.
9        Q     So you said that that was not
10   true.  What happened then?
11       A     Mr. Kuebler or Kuebler asked me
12   to stick around, because he said his manager
13   would want to talk to me.
14       Q     All right.  Had you been planning
15   to leave at that point?
16       A     No.
17       Q     What time was your shift over?
18       A     11.
19       Q     So you still had several hours
20   left to work?
21       A     Yes.
22       Q     Okay.  And what did you say when
23   the security guard asked you to stick around?
24       A     No problem.
25       Q     Okay.  What happened then?

Page 36

1        A     I went down and parked in front
2    of the store to the west of the door.
3        Q     Okay.  And then what?
4        A     A short time later, the head
5    clerk came out and contacted me.
6        Q     Who was the head clerk; do you
7    know?
8        A     I believe his name is Russ
9    Reddick.
10       Q     Okay.  And what did Russ
11   Reddick -- were you in your car at this point?
12       A     Yes.
13       Q     And what did Russ Reddick say to
14   you?
15            MR. OSBORNE: Object as to form.
16       A     He looked frustrated, and he
17   asked what the -- what conversation happened
18   between us.  And I just told him that I verified
19   that she had a handicap parking placard.  And he
20   asked for a business card, because he said it
21   sounded like she was going to make a complaint to
22   his boss.  So I provided him a business card and
23   told him that -- to tell his boss that it was
24   a -- over a parking issue and that the store had
25   nothing to do with it.

Page 37

1        Q     (BY MR. LANE) Did you tell
2    either one of the King Soopers security people
3    that Loree Rice -- Loree McCormick-Rice had
4    displayed some attitude toward you?
5            MR. HIGGINS: Object to form.
6        A     No.
7        Q     (BY MR. LANE) Did you tell
8    anybody at King Soopers that you had told her,
9    Maybe it's time for you to leave?
10       A     No.
11       Q     Did you tell anybody at King
12   Soopers at that point that you and she had had a
13   somewhat unfriendly exchange?
14       A     No.
15       Q     You would characterize it,
16   though, as a somewhat unfriendly exchange,
17   wouldn't you?
18       A     Yes.
19            MR. OSBORNE: Object as to form.
20       Q     (BY MR. LANE) I mean, it wasn't
21   overtly hostile, was it, but it was, you know --
22   wouldn't be characterized as friendly?
23            MR. OSBORNE: Object as to form.
24   Asked and answered.
25       A     I would characterize it as her

10  (Pages 34 to 37)

Page 38

1  being unfriendly.  I was professional.
2      Q    (BY MR. LANE)  Right.  But I
3  mean, she shows you some attitude.  You show her
4  back some attitude with, Maybe it's time for you
5  to leave.  You would agree that they were both
6  about on the same plane, wouldn't you?
7          MR. OSBORNE:  Object as to form.
8      A    No.
9      Q    (BY MR. LANE)  Okay.  Were you --
10  you wouldn't -- you wouldn't walk up to somebody
11  loading groceries at King Soopers --
12          MR. LANE:  Can you kind of keep
13  that available, because I'm going to want to show
14  that eventually.
15          MR. MOHAMEDBHAI:  Yeah.
16      Q    (BY MR. LANE)  You wouldn't just
17  walk up to somebody loading groceries at King
18  Soopers without some provocation and just look at
19  somebody and say, Maybe it's time for you to
20  leave, would you?
21      A    No.
22      Q    Okay.  The reason you said that
23  is because she -- of what she said to you, right?
24      A    Yes.
25      Q    And in fact, you'd imagine that

Page 39

1  King Soopers wouldn't be very happy with you if
2  you were just randomly picking out people loading
3  groceries in their car and walking up to them and
4  saying, Maybe it's time for you to leave?
5          MR. OSBORNE:  Object as to form.
6      Q    (BY MR. LANE)  That wouldn't
7  probably make your bosses happy, would it?
8          MR. OSBORNE:  Object as to form.
9      A    No, it probably wouldn't.
10      Q    (BY MR. LANE)  Okay.  The only
11  reason you -- so what you had done is you said
12  something to her that was not particularly
13  friendly?  You would agree with that, wouldn't
14  you?
15          MR. OSBORNE:  Object as to form.
16      A    I made a suggestion to her.
17      Q    (BY MR. LANE)  And it wasn't a
18  particularly friendly suggestion, was it?
19          MR. OSBORNE:  Same objection.
20      A    I believe it's how it's
21  delivered.
22      Q    (BY MR. LANE)  Which is, Maybe
23  it's time for you to leave.  No matter how you're
24  conveying that, the message you're conveying is
25  not, Welcome to King Soopers.  We're awfully glad

Page 40

1  to have your business here, and have a nice
2  night, okay?  The message you're delivering has a
3  tone to it, has an edge to it.  It's not a
4  particularly friendly message.  You would agree
5  with that, wouldn't you?  This is not a trick
6  question.
7          MR. OSBORNE:  I'm going to object
8  as to form.
9      A    In the way you characterized it,
10  yes, that's correct.
11      Q    (BY MR. LANE)  Well, that's the
12  way it went down, isn't it?
13      A    No.
14      Q    How did you say it?
15      A    I said, Maybe it's time for you
16  to leave.
17      Q    Okay.  And did you believe you
18  were being friendly?
19      A    Yes.
20      Q    Okay.  When you told her that,
21  did you believe that you were -- that that
22  statement carried no more or less significance
23  than, Have a good evening, ma'am?
24      A    Yeah.  It would carry more
25  significance.

Page 41

1      Q    You were responding to her
2  attitude, weren't you?
3      A    A little bit, yes.
4          MR. OSBORNE:  Object as to form.
5          THE DEPONENT:  Sorry.
6      Q    (BY MR. LANE)  And you were
7  responding to her attitude a little bit with your
8  attitude, weren't you?
9          MR. OSBORNE:  Object as to form.
10  Asked and answered.
11      Q    (BY MR. LANE)  In other words,
12  she escalated it a little bit by being sarcastic
13  with you, and you escalated it just a little bit
14  to match her, didn't you?  Kind of like the
15  use-of-force continuum.  It's Look, you want to
16  get snotty with me, I can get snotty with you,
17  pretty much, right?
18          MR. MORALES:  Object to the form
19  of the question.
20          MR. OSBORNE:  I'll also object to
21  foundation.
22      Q    (BY MR. LANE)  Go ahead.
23      A    No.
24      Q    What's not right about that
25  characterization?

11  (Pages 38 to 41)

Page 42

```
1        A    It has nothing to do with the
2  force continuum.
3        Q    I understand it doesn't have
4  anything to do with the force continuum.  I'm
5  simply saying, it's analogous.  You meet force
6  with force, okay?  But put that aside.
7        I'm just saying, what you did is she
8  got snotty with you, so you matched it.  You got
9  snotty with her?
10       A    I don't believe --
11            MR. OSBORNE:  Object as to form.
12  Asked and answered.
13       A    I don't believe I matched it.
14       Q    (BY MR. LANE)  Okay.  So anyway,
15  all right.  What happened then?  You're sitting
16  in your car, you've agreed to stick around and
17  wait for the manager to come out.  What happened
18  then?
19       A    Mr. Reddick came out, contacted
20  me.  I provided him a business card and gave him
21  a brief synopsis of what happened.
22       Q    What did you say?
23       A    That I had verified she had a
24  handicap placard.
25       Q    And what was he saying to you?
```

Page 43

```
1            MR. OSBORNE:  Object as to form.
2            MR. LANE:  Let me just ask this.
3  What's objectionable about that question?  I
4  mean, you've objected to just about every
5  question.
6            MR. OSBORNE:  Well, you just
7  asked him a question about what someone else
8  said.
9            MR. LANE:  Yeah.  So what's --
10           MR. OSBORNE:  And that's hearsay.
11  And so that's why I'm just objecting to form.  I
12  mean, if you want to ask the question a different
13  way, that's fine.
14           MR. LANE:  Hearsay is -- first of
15  all, it's a deposition.  Second of all --
16           MR. OSBORNE:  I understand, and
17  I'm entitled to object as to form and foundation.
18           MR. LANE:  Yes, you are.
19  However, disruptive, constant, nonstop objections
20  to every question are inappropriate under the
21  rules.
22           MR. OSBORNE:  Well, if I believe
23  that your question is phrased in an improper way,
24  I have every right to object.
25           MR. LANE:  Absolutely, you do.
```

Page 44

```
1  But I'm going to start asking you for a specific
2  ground --
3            MR. OSBORNE:  Okay.
4            MR. LANE:  -- for the objection.
5            MR. OSBORNE:  Absolutely.  I'll
6  be more than happy to provide that to you.
7            MR. LANE:  That's fine.  But it's
8  disruptive, and it's intended to be disruptive.
9            MR. OSBORNE:  It's not intended
10  to be disruptive.
11           MR. LANE:  I believe it.
12           MR. OSBORNE:  It's intended to
13  preserve the record, Mr. Lane.
14           MR. LANE:  I understand that that
15  is -- the legitimate objections are designed to
16  preserve the record.  But asking him what was
17  said to him, first of all, unless it's used to
18  prove the truth of the matter asserted, is not
19  hearsay.  And it's a disruptive objection, as
20  have many of yours been.  So I'm just saying --
21           MR. OSBORNE:  I would disagree.
22           MR. LANE:  Well --
23           MR. MORALES:  Why don't we go on
24  with the deposition instead of wasting time like
25  this.
```

Page 45

```
1            MR. LANE:  I guess we can then,
2  if it continues, take other steps.
3            MR. OSBORNE:  And I'll state the
4  reasons for the objection.  I mean, under the
5  rules, as I understand them, we're not allowed to
6  expound --
7            MR. LANE:  No.  You can object to
8  form.  I understand that.  You're not.
9            MR. OSBORNE:  -- on the basis of
10  the objection.  If you would like me to, I'll be
11  more than happy to.
12           MR. LANE:  The mechanical
13  objection is within the rules.  I'm simply
14  saying, you're objecting to every single
15  question, virtually, and it's disruptive.  And
16  it's intended to be so, which is against the
17  rules.  That's the only point I'm making.
18           MR. OSBORNE:  I'm not intending
19  be disruptive in any way, shape, or form.
20       Q    (BY MR. LANE)  Okay.  What did
21  the manager say to you?
22           MR. OSBORNE:  Same objection.
23       A    I asked him what she was saying
24  in the store.  And he told me that she had said
25  that she was called names, including the "N"
```

Page 46

1    word.  I can't recall anything beyond that.
2        Q    (BY MR. LANE)  What did you say
3    about that?
4        A    I told him it wasn't true.
5        Q    Okay.  How long did this
6    conversation take?
7        A    Less than a minute.
8        Q    Okay.  So what happened then?
9        A    He left the driver's door of the
10   car and started to walk back in the store.  And I
11   started to turn down the aisle that was on the --
12   the first aisle on the west side of the parking
13   lot, if you'd -- it would be easier if I had a
14   map, but it's --
15       Q    You know what?  If you want to
16   draw a picture, I'm happy to let you do that.
17            MR. MOHAMEDBHAI:  Get some paper.
18            MR. LANE:  That would be great.
19   And a pen, too, please.  That's great.
20            (Mr. Mohamedbhai left the deposition
21            room.)
22       A    All of the spaces down that aisle
23   are all angled for cars that are traveling north
24   to pull directly into them on both sides of the
25   aisle, so there's not two-way traffic in the

Page 47

1    aisle.  And I pulled from the curb to go down
2    that aisle and had to stop abruptly because she
3    was driving her minivan at a fairly fast clip,
4    but not dangerously, back up the aisle at the
5    store.
6        Q    (BY MR. LANE)  Was she going in
7    the way the aisle was intended to be driven or --
8        A    No.
9        Q    -- opposite?
10       A    In the exact opposite way.
11       Q    Okay.  Is that one of those
12   traffic laws that is not enforceable in a private
13   parking lot?  In other words, there's no such
14   thing as a one-way street in a private parking
15   lot, correct?
16       A    Correct, yes.
17            (Mr. Mohamedbhai reentered the
18            deposition room.)
19       Q    We have a pen and some paper for
20.  you.  If you would sort of draw us a little
21   diagram, that would be helpful.
22            MR. OSBORNE:  Just so you know,
23   use the whole page.  It will be easier for all of
24   us to understand what you're drawing.
25            (Mr. Sands left the deposition and

Page 48

1            returned.)
2        Q    (BY MR. LANE)  All ready?
3        A    Yeah.  It's not to scale.  My
4    parking -- my middle parking area looks like a
5    fish's backbone.
6            MR. LANE:  Let's get this marked
7    as an exhibit.  Start -- I suggest we just have
8    one notebook with consecutive exhibits.  This
9    will be Exhibit 9.
10           (Deposition Exhibit 9 was marked.)
11       Q    (BY MR. LANE)  Okay.  The front
12   of King Soopers, and then this is the parking
13   lot, okay?
14       A    Part of it, yes.
15       Q    Okay.  Draw a car where your
16   vehicle was parked when you saw -- when you
17   talked to the manager.
18       A    I'm sorry.  I didn't designate
19   the handicap spots.  May I go ahead and do that?
20       Q    Sure.  Go ahead.  Do it.
21       A    (Deponent complied.)  Oh, crud.
22   Okay.  And I'm sorry.  You wanted my car?
23       Q    Yeah.
24       A    Okay.
25       Q    Show me where you were -- well,

Page 49

1    actually, where were you parked when you -- you
2    don't have to draw it.  Just point on the map.
3    Where were you parked when you were talking to
4    the manager?
5        A    Over in this area.
6        Q    Okay.
7        A    It would be away from -- to the
8    west of the front door.
9        Q    That's fine.  And then when you
10   were driving and you had to avoid Loree's car,
11   where was that?
12       A    Coming down this aisle this way.
13           (Mr. Sands left the deposition room.)
14       Q    Okay.  She was going --
15       A    This way, to the south.
16       Q    Toward the store.  Where had she
17   been parked when you had your first interaction
18   with her?
19       A    You want me to mark it on the
20   map?
21       Q    Yeah.  Just draw a little box for
22   her car.
23       A    (Deponent complied.)
24       Q    Okay.  That's where her car was
25   when you first encountered her?

13  (Pages 46 to 49)

Page 50

1    A    Correct.
2    Q    Okay.
3    A    Yeah.
4    Q    Okay.  And -- that's fine.  Okay.
5  So anyway, did you see her leave the store, go
6  back to her car, get into her car, and then start
7  driving?
8    A    I saw her exit the store and walk
9  towards her car, but I couldn't see her car
10  because of the other vehicles parked.
11    Q    Okay.  And where were you at that
12  point?  You were over by where your wrist is
13  here, off the map?
14    A    Yes, sir.
15    Q    Okay.  So did you see her just
16  simply pull forward and then start down the
17  aisle?
18    A    No.  In this area, you can't pull
19  forward.  It's --
20    Q    Okay.  So to get to where she was
21  driving down this row -- and I understand we're
22  on the record, and I'm not making a good record,
23  but I'm just trying to understand this for
24  myself.
25    So she presumably backed out, went to

Page 51

1  the north, and then cut over to the east and then
2  went south; is that right?
3    A    No.
4    Q    What must she have done?
5    A    Leave the parking spot, go to the
6  north, U-turn, and come back up the same aisle.
7    Q    Oh, okay.  So she was going --
8    A    In the same aisle that --
9    Q    Okay.  Or she could have simply
10  backed out, maybe, and driven straight down that
11  way?
12    A    That's a possibility.
13    MR. OSBORNE:  And I'm going to
14  object as to form.  I mean, the basis for the
15  objection, if you want to know, is that you're
16  basically testifying at this point in time.
17    MR. MORALES:  David, can I
18  suggest, just for the future, can we maybe mark
19  these as H's so that -- because they're not
20  really differentiated for the purposes of the
21  record.  It's up to you.
22    MR. LANE:  I really don't want
23  to.  I'm trying to understand this myself.  I'm
24  going to remember this.  I'm not trying to
25  make . . . .

Page 52

1    MR. MORALES:  Okay.  All right.
2    MR. LANE:  I understand we should
3  be making a verbal record of everything that he's
4  doing here, but I'm just trying to understand it
5  myself, so . . . .
6    MR. MORALES:  Okay.
7    Q    (BY MR. LANE)  Okay.  So anyway,
8  she's driving back down the aisle, and you're
9  driving up the aisle; is that right?
10    A    I had just left this position and
11  was starting to turn down the aisle, when I
12  stopped abruptly to avoid the head-on.
13    Q    Okay.  And so did you go to her
14  left, or did -- did you swerve your vehicle to
15  the left or to the right?
16    A    No.  I stopped.
17    Q    You stopped, and then she went
18  around you?
19    A    She went to her right.  To her
20  right, my left.
21    Q    Okay.  And that's not an uncommon
22  occurrence in that parking lot, is it, for cars
23  to be going the wrong way on an aisle?
24    A    I -- no.
25    Q    Okay.  Certainly nothing that you

Page 53

1  could do anything about in your capacity as a
2  police officer enforcing any traffic laws,
3  correct?  In other words, you can't give somebody
4  a ticket for going the wrong way on a parking lot
5  aisle, right?
6    A    You can.
7    Q    Well, if it's careless, if it's
8  reckless --
9    A    Correct.
10    Q    -- if they're going a hundred
11  miles an hour.  I understand all of that.  But
12  I'm just saying, you're a general person driving
13  the wrong way on an aisle at a grocery store, you
14  can't give them a ticket for that, right?
15    MR. OSBORNE:  Once again, I'll
16  object to form.
17    Q    (BY MR. LANE)  Not a trick
18  question.
19    A    I believe the correct terminology
20  would be "wouldn't."  "Can't" is inappropriate.
21  I can, but wouldn't is more appropriate.
22    Q    If they're not driving
23  carelessly, if they're not driving recklessly,
24  what could you possibly give them a ticket for?
25    A    And that's just it.  That's

14  (Pages 50 to 53)

Page 54

1 exactly what I'm saying.
2         Q    Okay.  All right.  So anyway,
3 what happens then?
4         A    It is June and the windows are
5 down.  And as --
6         Q    Your windows are down or her
7 windows are down?
8         A    Both.
9         Q    Okay.
10        A    As her car goes by me, I hear,
11 "Fuck you, motherfucker" as she drives by.
12        Q    Coming from who?
13        A    I believe it was her.
14        Q    Okay.  Directed at whom?
15        A    Me.
16        Q    Okay.  What did you think when
17 you heard that?
18        A    Thought her conduct was
19 inappropriate.
20        Q    Okay.  So what did you do?
21        A    Mr. Reddick had just -- he was
22 still outside, and when he heard it, he turned
23 and looked.  And --
24        Q    Mr. Reddick, the manager?
25        A    Yes.

Page 55

1         Q    Okay.
2         A    And there was a father with a
3 young child on the other side of her path of
4 travel, and I saw him, and his mouth was just
5 hanging open.
6         And I also saw -- when I was looking at
7 Mr. Reddick, there were some other people up
8 around the front of the store, but I didn't see
9 what they were doing.  I just saw people there.
10        Q    Mm-hmm.
11        A    And I yelled back at her to
12 "Leave now."
13        Q    Those were your words, "Leave
14 now"?
15        A    Correct.
16        Q    Okay.  Why did you do that?
17        A    Based on what I had seen with the
18 citizen and her yelling, obtaining Mr. Reddick's
19 attention, that was a violation of disorderly
20 conduct, municipal code.
21        Q    You think it's illegal to yell,
22 "Fuck you, motherfucker," at somebody?
23        A    If it seriously inconveniences
24 somebody, yes.
25        Q    Was somebody seriously

Page 56

1 inconvenienced?
2         A    Yes.
3         Q    Who?
4         A    I believe that person was, by the
5 reaction.
6         Q    That person being who?
7         A    The father with the child and the
8 reaction on his face.
9         Q    He was inconvenienced by hearing
10 the words, "Fuck you, motherfucker"?
11        A    Yes.
12        Q    Did you talk to him?
13        A    No, sir.
14        Q    Okay.  So that's just an
15 assumption you've made?  Is that right?  That
16 would be speculation on your part, that he was
17 inconvenienced by hearing, "Fuck you,
18 motherfucker"?
19             MR. OSBORNE:  Object as to form.
20        A    In the ordinance, it also calls
21 that the officer can use his own determination
22 for the prima facie of a case.
23        Q    (BY MR. LANE)  Mm-hmm.  So you
24 speculated that he was inconvenienced by hearing
25 the words, "Fuck you, motherfucker," right?

Page 57

1         A    Yes.
2             MR. OSBORNE:  Once again, I'll
3 object as to form.
4             MR. LANE:  Well, what's wrong
5 with the form?
6             MR. OSBORNE:  Well, you're
7 basically testifying, and it wasn't his words.
8 He never said he speculated.
9             MR. LANE:  I'm asking him a
10 leading question.  Are you suggesting I shouldn't
11 be leading him?
12            MR. OSBORNE:  Well, I'm
13 suggesting that you're inserting words into his
14 mouth that he never said.
15            MR. LANE:  No.  I'm asking him.
16            MR. OSBORNE:  That's why I'm
17 objecting to the form.
18            MR. LANE:  Could you read that
19 question back, Kathy.
20            (The last question was read back.)
21            MR. LANE:  Okay.  Now that's a
22 question, isn't it?
23            MR. OSBORNE:  Mm-hmm.
24            MR. LANE:  Okay.
25            MR. OSBORNE:  But it's going to

15 (Pages 54 to 57)

Page 58

1  be a yes or no question, right?  And you're
2  inserting words into his mouth that he did not
3  testify to.  And that's why I'm objecting as to
4  form.
5            MR. LANE:  Okay.  Now, that, to
6  me, is an improper objection.  I'm asking him a
7  leading question.  He can answer it yes.  He can
8  answer it no.  He can say that's partially
9  correct, partially incorrect.  He can say
10  anything he wants, okay?  I'm asking him --
11            MR. OSBORNE:  I'm just preserving
12  the record.
13            MR. LANE:  I understand, but what
14  I'm saying is these are the kinds of objections
15  that I'm objecting to, because I think they're
16  intended to disrupt the flow.  You're going to
17  object to every question.
18            MR. OSBORNE:  I'm not objecting
19  to every question, Mr. Lane.  I'm objecting to
20  questions where I feel you are inserting words
21  into my client's mouth that he has not uttered in
22  his testimony here.
23            And like you said, this could be used
24  in the courtroom.  And so I'm just maintaining
25  the record for purposes of being able to object

Page 59

1  to those questions down the road.
2            MR. LANE:  I understand.  I have
3  no problem with legitimate objections.
4            MR. OSBORNE:  And I --
5            MR. LANE:  And I'll rephrase --
6            MR. OSBORNE:  Okay.  Thank you.
7            MR. LANE:  -- when I get a
8  legitimate objection.  That, I don't believe, is
9  a legitimate objection.  So let me ask it again.
10            THE DEPONENT:  Before you do, can
11  we take break?
12            MR. LANE:  Absolutely.
13            (A recess was taken from 10:23 to
14            10:34 a.m.)
15            Q    (BY MR. LANE) Okay.  You were
16  speculating, were you not, that this man, this
17  unknown man with the unknown child, was
18  inconvenienced by hearing Loree McCormick-Rice
19  say, "Fuck you, motherfucker"; is that correct?
20            A    I believe he was inconvenienced
21  because of the look I saw on his face.
22            Q    What was the look on his face?
23            A    Shock.
24            Q    Show me the look.
25            A    (Deponent indicated.)

Page 60

1            Q    Okay.
2            A    He could not believe what he'd
3  just heard.
4            Q    You believe that to be true,
5  without ever having spoken to him; is that
6  correct?
7            A    Yes, sir.
8            Q    All right.  And at that point,
9  did you believe a violation of the law had
10  occurred?
11            A    Yes, sir.
12            Q    And you used your discretion not
13  to stop Loree McCormick-Rice, even though she had
14  violated the law, but to tell her to "Leave now";
15  is that correct?
16            A    Yes.
17            Q    And you believe that the
18  disorderly conduct statute in Aurora is such that
19  if someone is inconvenienced by someone's
20  statements, then a crime has been committed; is
21  that correct?
22            A    Yes.
23            Q    Do you have some -- can you give
24  me -- and again, if you can't do it, tell me you
25  can't do it.  But what is your understanding of

Page 61

1  the disorderly conduct municipal ordinance in
2  Aurora?  What are the elements, as you recall
3  them?
4            A    Well, disorderly conduct is the
5  actions or words that causes a -- I can't
6  remember the exact elements, but basically causes
7  a breach of the peace.  Disturbing the peace is
8  where, in a public place, somebody uses words or
9  language that causes a serious inconvenience to
10  somebody.
11            Q    Okay.  Now, it would be
12  inconvenient if I made you take the stairs up to
13  this office, as opposed to the elevator, wouldn't
14  it?  That would be inconvenient, right?
15            A    Yes.
16            Q    Okay.  But hearing Loree
17  McCormick-Rice call you a "motherfucker," how
18  does that inconvenience a patron in a parking
19  lot?  I mean, he's not having to drive any extra
20  distance.  He's not being obstructed from getting
21  to his car, and has to go around the whole
22  parking lot.  That would be inconvenient.  I'm
23  trying to figure out how, in your mind, a
24  bystander hearing somebody call you a
25  "motherfucker" is inconvenient to the bystander.

16  (Pages 58 to 61)

Page 62

1    A    He has a small child with him.
2    Q    Right.
3    A    And he has to train that child.
4  It's his duty to raise that child.
5    Q    Okay.
6    A    And he has to explain this
7  conduct and this type of activity in the world to
8  his child and explain to them it's inappropriate,
9  even though they see it every day.
10   Q    But that's sort of a parental
11 job, isn't it?
12   A    It is.
13   Q    Okay.  So when a parent sees a
14 bad example of bad conduct, that can act as a
15 graphic example to the kid, Don't ever do that.
16 What that lady did was wrong, right?
17   A    Can --
18   Q    Dad could do that, right?
19   A    Can be that way.
20   Q    Okay.  So it could very well be
21 that, far from being an inconvenience, it served
22 as a graphic illustration to this little child of
23 how not to behave in public, right?
24   A    With the proper parenting, yes.
25   Q    Okay.  And I guess we'll never

Page 63

1  know whether it was an inconvenience or a
2  convenience, because we have no idea who this
3  person is, right?
4    A    Correct.
5    Q    All right.  In any event, Loree
6  is told, "Leave right now" by you, correct?
7    A    "Leave now."
8        MR. OSBORNE:  Asked and answered.
9    Q    (BY MR. LANE) "Leave now."  So
10 what happens then?
11   A    She drives west across the front
12 of the store to -- there's a stop sign on the
13 west side of the store.  And at the stop sign,
14 you can either go left or right or straight over
15 to the strip mall area.  And she drove to the
16 stop sign, stopped.  I was turning around, and a
17 vehicle got behind her, so there was a vehicle
18 between us.
19   Q    Where were you going at this
20 point?
21   A    I was going to follow her to make
22 sure she left.
23   Q    Okay.  Could you not just
24 visually see whether she left?
25   A    No.

Page 64

1    Q    Okay.  Why don't you take another
2  piece of paper and show me the bird's eye view of
3  the whole parking area, with King Soopers being
4  one of the points of reference.
5    A    Okay.
6    Q    Okay.  Let's call this Exhibit
7  10.
8    A    Let me mark "North," if that's
9  okay.
10   Q    Sure.  Great.
11       (Deposition Exhibit 10 was marked.)
12       MR. LANE:  Thanks.
13   Q    (BY MR. LANE)  Okay.  So Loree
14 is -- show me the stop sign where you were making
15 reference.
16   A    There's a stop sign right here.
17   Q    You made a little black dot next
18 to the King Soopers.  Okay.  So she's at that
19 stop sign.  Did you pull up behind her at that
20 point?
21   A    No.
22   Q    You were making a U-turn?
23   A    Yes.
24   Q    And another car pulled up behind
25 her?

Page 65

1    A    Yes.
2    Q    So there was a car behind her,
3  and then you were behind that car?
4    A    Yes.
5    Q    Okay.  Where was she going?
6    A    She made a left turn and started
7  down towards Chambers Circle --
8    Q    Okay.
9    A    -- along the west side of the
10 store.
11   Q    All right.  She appeared to be
12 heading for the exit; is that correct?
13   A    Yeah.
14   Q    All right.  And you were
15 following, you claim, to make sure that she was
16 leaving; is that right?
17   A    Yes.
18   Q    Did you have some reason to
19 believe she wasn't leaving?
20   A    I did.
21   Q    What was that?
22   A    Based on her conduct earlier.
23   Q    What was her conduct earlier?
24   A    She recontacted me twice after
25 the initial contact to make sarcastic statements.

17  (Pages 62 to 65)

Page 66

1   Q   Okay.  Well, she was now in her
2 car, and she was apparently going away, right?
3   A   That's what I was hoping.
4   Q   Okay.  She would not be in
5 violation of any law, if she chose to go back
6 into King Soopers and complain about you again,
7 would she?
8   A   She had been told to leave.
9   Q   Well, was that a lawful order, as
10 far as you were concerned?
11   A   Yes.
12   Q   So if she had failed to
13 leave, then she would be failing to obey a lawful
14 order; is that correct?
15   A   Correct.
16   Q   She hadn't been told by the
17 manager of King Soopers that -- who was in
18 control of the property, to leave, had she?
19       MR. OSBORNE:  I'm going to
20 object.
21       MR. HIGGINS:  Object to the form
22 of the question.
23       MR. OSBORNE:  Same objection.
24   A   I don't know.
25   Q   (BY MR. LANE)  Okay.  You

Page 67

1 deciding somebody needs to leave may or may not
2 be a lawful order; is that correct?
3       MR. OSBORNE:  Object as to the
4 form of the question.
5   A   No, that's not correct.
6   Q   (BY MR. LANE)  So you think --
7 well, I mean, if you told me right now, right
8 here, Leave, and I said, No, would I be in
9 violation of -- would I be failing to obey a
10 lawful order?
11   A   You're in the city of Denver.  I
12 don't have any authority here.
13   Q   Okay.  Let's say we were in an
14 Aurora office doing this deposition and you just
15 looked at me and said, Leave, and I say, Fuck
16 you.  No.  I'm not leaving.  Am I in violation of
17 any law?
18   A   Yes.  If I order you to leave --
19   Q   Mm-hmm.
20   A   -- then you're required to leave.
21   Q   So it's your understanding that
22 when you, as a police officer, order somebody to
23 do something and they don't do it, they are in
24 violation of failing to obey a lawful order; is
25 that correct?

Page 68

1   A   Yes.
2   Q   Do you have any training or
3 experience to know that only lawful orders carry
4 any weight, and if you give me an unlawful order,
5 I can ignore it?
6   A   Well, it's been my understanding
7 that that's for the courts to determine, whether
8 it was lawful or not.
9   Q   Well, presumably, every order you
10 give somebody, you believe to be a lawful order
11 that they have to obey; is that correct --
12   A   Yes.
13   Q   -- in Aurora?
14   A   Yes.  In my official capacity,
15 yes, that's correct.
16   Q   Okay.  All right.  Okay.  So you
17 are following her to -- toward the exit; is that
18 correct?
19   A   Not following her to that point.
20 I wanted to visually observe to make sure that
21 she left.
22   Q   So when she made her left at the
23 stop sign, did you just pull up to the stop sign
24 and visually watch where she was going?
25   A   And I was watching, yes.

Page 69

1   Q   But you weren't following?
2   A   Not at that point.
3   Q   Okay.  Did the car between the
4 two of you also turn in the same direction she
5 turned in?
6   A   No.  That car turned to the right
7 and left northbound.
8   Q   All right.  So what happened
9 then?
10   A   A car pulled up behind me at the
11 stop sign.  And I didn't want to impede them, so
12 I turned left and slowly started to drive to the
13 south --
14   Q   Okay.
15   A   -- to make sure that she left.
16   Q   All right.  And what happened
17 then?
18   A   When she got to Chambers Circle,
19 she stopped at the stop sign, started to make a
20 right turn.  And then it appeared, by the
21 maneuver -- the movement of the vehicle, that she
22 was turning in a U-turn to come back into the
23 lot.
24   Q   Okay.  So what happened then?
25   A   I was -- I don't recall exactly

18  (Pages 66 to 69)

Page 70

1  how far down the side of the store, but I
2  activated the lights on the car and drove to the
3  entrance to the parking lot and blocked the
4  entrance.
5      Q   Okay.  What happened then?
6      A   Both our windows were down.  And
7  I instructed her to leave.  And she said that she
8  was going to go back to where there were
9  witnesses.  And I told her, You're not coming
10  back on the lot.  If you want to pull to the curb
11  on the other side of the street, I'll be more
12  than happy to talk with you, but you're not
13  coming back on the lot.
14      Q   What did she claim she wanted
15  witnesses for?
16      A   I don't know.
17      Q   Well, that would be a non
18  sequitur, then?  Do you know what I mean when I
19  say that would be a non sequitur?
20      A   No, sir.
21      Q   What that means is that's just a
22  random statement out of the blue that had no
23  connection to anything, then; is that right?
24  Meaning, witnesses to what?
25      A   I assumed it was the interaction.

Page 71

1      Q   Okay.  Well, what is your
2  understanding of what Loree Rice says was
3  occurring as she was trying to leave the parking
4  lot?  What is your understanding of what her
5  claim is?
6      A   I'm sorry.  I don't know what
7  you're asking.
8      Q   Okay.  Do you understand that
9  Loree Rice says that when you were following her
10  in the parking lot, you activated your lights to
11  pull her over in the parking lot, and she tried
12  to make a U-turn to comply with your order, as a
13  police officer, to stop, and she said, I'm not
14  stopping in this darkened area of the parking
15  lot.
16      If you want to talk to me or have any
17  interactions with me, I'll go back to the front
18  entrance of King Soopers where it's well-lit and
19  there are witnesses.
20      In other words, the only reason she was
21  stopping is because you had activated your
22  lights, okay?  Did you know that was her claim?
23      A   No.
24      Q   Okay.  Is that what happened?
25      A   No.

Page 72

1      Q   So it's your testimony that she
2  was leaving -- first of all, how much time had
3  passed between the time you had this semi-
4  unpleasant interaction with her and the time that
5  you were blocking the entrance to the parking
6  lot?  Ballpark me.  I know you didn't have a
7  stopwatch on.
8      A   No, I didn't have a stopwatch,
9  but my best guess would be 10 to 15 minutes.
10      Q   Okay.  So she claims you called
11  her a "nigger," right?
12      A   I don't know if that's one of her
13  claims.  I've read that in the paper, but I don't
14  know that that's --
15      Q   Well, you know that that's what
16  she complained about, because the manager of the
17  store told you that's what she complained about?
18      A   Well, that's true.
19      Q   The security guard told you
20  that's what she complained about.  You've been in
21  this case for over a year now.  You know that's
22  one of her claims?
23      A   Yes.
24      Q   Okay.  She goes into the store,
25  carries on with the manager, raises a ruckus in

Page 73

1  the store, right?
2      MR. OSBORNE:  I'm going to
3  object.  This has all been covered.  It's asked
4  and answered.
5      Q   (BY MR. LANE)  This is your
6  understanding of what the chronology is, right?
7      A   Yes.
8      Q   Okay.  She then comes back out to
9  her car, gets into her car, starts to leave,
10  drives by you, calls you a "motherfucker," right?
11      A   Yes.
12      MR. OSBORNE:  I'm going to object
13  as to form.
14      Q   (BY MR. LANE)  You tell her to
15  leave.  She then starts to head out, and then
16  decides -- your conclusion is, is that she then
17  decides, You know what?  I want to go get
18  witnesses.  10 to 15 minutes after you supposedly
19  called her a "nigger," she's going to double back
20  and go see if she can find witnesses to that
21  incident?  Is that your understanding?
22      MR. OSBORNE:  I'm going to object
23  as to form.  Asked and answered.
24      MR. MORALES:  Same objection.
25      A   I don't know.

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 74

1   Q   (BY MR. OSBORNE) But that's what
2   you thought, right?
3   A   No. I --
4   Q   What did you think?
5   A   I thought she wanted to go back
6   to escalate the situation. She wanted to engage
7   people there to support her.
8   Q   Okay. Would there have been
9   something wrong with that?
10   A   Yes. She had already caused a
11   disturbance in the parking lot, and she'd been
12   given an order to leave.
13   Q   Okay. So when she says that you
14   activated your lights and the only reason she
15   didn't leave is because you had activated your
16   lights, and she is a law-abiding person, and when
17   a police officer is trying to stop her, she'll
18   stop, that's just a big, fat lie, then, isn't it?
19       MR. OSBORNE: I'm going to object
20   as to the form of the question.
21       MR. MORALES: Same objection.
22       MR. OSBORNE: It's argumentative.
23   A   I'm not sure how to answer that.
24   Q   (BY MR. OSBORNE) Well, is it the
25   truth?

Page 75

1   A   No.
2       MR. OSBORNE: I'm going to object
3   to the question.
4   Q   (BY MR. OSBORNE) Okay. Is she
5   just hallucinating? Is she delusional? Is she
6   lying? What is your conclusion about --
7       MR. OSBORNE: I'm going to object
8   to that line of questioning.
9   Q   (BY MR. LANE) -- about her?
10      MR. OSBORNE: There's case law
11   that establishes that those of types of
12   questions, asking someone if someone else is
13   lying, is argumentative and impermissible.
14      MR. LANE: In front of a jury.
15      MR. MORALES: Same objection.
16   A   My understanding of what was
17   going on was she was trying to come back into the
18   lot to create a further disturbance. I took
19   action to stop that.
20   Q   (BY MR. LANE) Okay. So when she
21   says the only reason she didn't leave is because
22   you activated your lights to stop her, is that
23   the truth?
24   A   No.
25   Q   Do you believe she is lying about

Page 76

1   that?
2       MR. OSBORNE: And I'm going to
3   object, once again, to that question. It's
4   argumentative.
5       MR. MORALES: Same objection.
6       MR. OSBORNE: Form of the
7   question.
8   A   I don't know. I don't know what
9   was in her mind.
10   Q   (BY MR. LANE) But you can tell
11   me unequivocally that is simply not true, that
12   the reason she stopped is because you activated
13   your lights and stopped her?
14   A   I'm sorry. Go through that
15   again.
16   Q   You didn't activate your lights
17   until what point in this whole proceeding?
18   A   When I saw her -- her car
19   starting back into the parking lot.
20   Q   Then you activated your lights
21   and blocked the entrance --
22   A   Yes.
23   Q   -- is that right?
24   A   Yes, sir.
25   Q   Okay. So her statement that the

Page 77

1   only reason she didn't leave immediately, as she
2   was trying to do, is because you did activate
3   your lights, and that is a signal to her, as a
4   citizen, to stop, that would simply not be true,
5   then, would it?
6       MR. OSBORNE: Object as to the
7   question, form of the question.
8   A   I don't know what she was trying
9   to do. It appeared to me she was trying to come
10   back into the lot. And I didn't want her to come
11   back into the lot.
12   Q   (BY MR. LANE) Okay. All right.
13   So what happened then?
14   A   I think I described the
15   conversation we had there, when I told her that
16   if she pulled to the curb on the other side, we
17   would talk, but she's not coming back on the lot.
18   Q   Okay.
19   A   And she started to pull her car
20   forward.
21   Q   Well, but you said she said
22   something about getting witnesses, right?
23   A   Right. I covered that, I
24   thought. I didn't --
25   Q   Okay. But what did she say to

20 (Pages 74 to 77)

Page 78

1   you?  Did she say to you, I'll go where there are
2   witnesses, or I'll talk to you where there are
3   witnesses?  What do you recall exactly, as best
4   you can, what she said?
5           MR. OSBORNE:  And I'm going to
6   object.  Asked and answered.
7       A    I told her, You're not coming on
8   the lot.  I don't remember the exact
9   chronological order of the conversation, but
10  basically, I told her she wasn't going to come
11  back on the lot.  She said she's not stopping
12  here, she's going to go where there was
13  witnesses.  And that might have been in response
14  to, If you pull across the street, I'll talk to
15  you there.
16      Q    (BY MR. LANE) She's claiming her
17  comment to you about witnesses is, I'm not
18  stopping with you in a dark corner of a dark
19  parking lot.  If you want to have some
20  interaction with me, we're doing it in front of
21  King Soopers where people can see it.  That's her
22  claim.  Is that what you understood her to be
23  saying, in essence?
24      A    No.
25      Q    Okay.  But you did in fact have

Page 79

1   your lights activated in a remote part of the
2   parking lot?  You would agree?  And this whole
3   interaction was occurring in a remote part of the
4   parking lot?
5           MR. OSBORNE:  I'll object as to
6   form and foundation.
7       A    It occurred at a -- off of a
8   street entrance to the parking lot.  I wouldn't
9   call it remote.
10      Q    (BY MR. LANE) Well, you've seen
11  the videotape, haven't you?  And we've got it
12  right here --
13      A    Right.
14      Q    -- and I'm going to show it to
15  you.
16      A    I --
17      Q    You would agree that there were
18  no cars parked for King Soopers or anybody else
19  in that part of the parking lot?  It was pretty
20  empty?
21      A    It was a fairly, yeah,
22  unpopulated part of the parking lot.
23      Q    Okay.  And it was at nighttime,
24  correct?
25      A    Yes.

Page 80

1       Q    And the lighting there -- there
2   were far fewer people there -- in fact, you would
3   agree that there were no pedestrians that you saw
4   in the area at that time?  Would you agree with
5   that?
6       A    At the time of the stop?
7       Q    Mm-hmm.
8       A    No.
9       Q    I'm correct in that?
10      A    Yeah.  I don't recall seeing
11  anybody.
12      Q    Okay.  As opposed to the front
13  entrance of King Soopers, where there was a lot
14  of foot traffic going on, people coming in and
15  out of the store, right?
16      A    Correct.
17      Q    Okay.  Okay.  So what happens
18  then?
19      A    Cassidy gets out of the passenger
20  seat and comes around the front of the van.  And
21  I get out of my car and meet her in front of the
22  van.
23      Q    Okay.  How tall is Cassidy, based
24  on your observations?
25      A    I would guess in the neighborhood

Page 81

1   of 5'6 to 5'8.
2       Q    Do you have a guess how much she
3   weighed?
4       A    135, 140 pounds.
5       Q    Okay.  Do you know how old she
6   was, approximately?
7       A    I guessed her to be 18.
8       Q    Okay.  I don't know what her
9   height and weight are actually, but did you come
10  to find out how old she was?
11      A    Yeah.  She was under the age of
12  18.  I don't recall exactly right now.
13      Q    Okay.  Like 12?
14      A    That could be.
15      Q    Okay.  So this 12-year-old girl
16  gets out of the car and does what?  Well, let me
17  ask you, before I ask you that, how tall are you?
18      A    5'11.
19      Q    What do you weigh?
20      A    At the time of this incident,
21  about 230.
22      Q    Okay.  And you were in full
23  Aurora police uniform with a gun belt, correct?
24      A    Yes.
25      Q    You had a gun in the holster,

21 (Pages 78 to 81)

Page 82

1  correct?
2       A    Yes.
3       Q    You had a Taser device on you?
4       A    No.
5       Q    Did you have a club on you?
6       A    No.
7       Q    What other weaponry did you have
8  on you?  You had pepper spray?
9       A    Yes.  And that would be it.
10      Q    Okay.  So what did Cassidy --
11 what did this 12-year-old girl do when she got
12 out of the car and -- did she look in your
13 direction?
14           MR. OSBORNE:  I'm going to object
15 as to form.  He testified that he thought that
16 she was 18 at the time.  He did later learn that
17 she was 12.
18           MR. LANE:  Then there's nothing
19 wrong with the form, because I'm asking, What did
20 this 12-year-old girl do?
21           MR. OSBORNE:  Once again, I'll
22 object as to form.
23      A    What I perceived to be an adult
24 got out of the car, and she came around the front
25 of the car in an aggressive manner, very quickly.

Page 83

1       Q    (BY MR. LANE)  Okay.  She came
2  around the front of the car in an aggressive,
3  quick manner.  Did she apparently look in your
4  direction?
5       A    Yes.
6       Q    Okay.  And what was she wearing
7  at the time?
8       A    She was wearing a -- I believe it
9  was a top without sleeves --
10      Q    Okay.
11      A    -- and a pair of shorts.
12      Q    All right.  Fairly tight shorts?
13      A    Yeah.
14      Q    Okay.  Sleeveless shirt?
15      A    Yes.
16      Q    Okay.  So -- and it was a summer
17 evening, right?
18      A    Right.
19      Q    Weather was nice, correct?
20      A    Mm-hmm.  I'm sorry.  Yes.
21      Q    She had no weapons that you were
22 able to see, correct?
23      A    I couldn't see both of her hands.
24      Q    What, was she hiding a hand
25 behind her back when she came around?

Page 84

1       A    Her right hand was slightly
2  behind her leg as she came around.
3       Q    Behind her leg.  Well --
4       A    'Cause she was walking in an
5  aggressive manner.
6       Q    So she was walking toward you in
7  an aggressive manner?
8       A    Yes.
9       Q    Well, if she's walking toward
10 you, then presumably, her right hand is to her
11 right, her left hand is to her left.  Are you
12 saying she was hiding her hand behind her back or
13 her leg?
14      A    No.  What I'm saying is she was
15 walking in an aggressive manner with her chest
16 out and her hands back.
17      Q    Show me.  Can you stand up?
18      A    (Deponent indicated.)
19      Q    Okay.  Well, I can see both your
20 hands right now.  I'm right in front of you,
21 okay?  Are you saying you couldn't see her hands?
22      A    Couldn't see her hands because of
23 the angle of the car.
24      Q    Okay.  So what happened then?
25      A    So I confronted her outside of my

Page 85

1  car in front of the van.
2       Q    And how close was she to you?
3       A    About as close as we are right
4  here, which would be 4 feet.
5       Q    4, 5 feet, maybe?  Okay.  Well,
6  at that point, you could see whether she had any
7  weapons on her, couldn't you?
8       A    Her hand was still back in a
9  threatening manner.
10      Q    Her hand was hiding behind her
11 right leg?  Is that what you're saying?
12      A    Slightly back behind her body as
13 her chest was pushed out.
14      Q    Okay.  You came to learn, did you
15 not, that she had no weapons of any kind?
16      A    Correct.
17      Q    Okay.  You came to learn that
18 this 12-year-old girl had no weapons and didn't
19 threaten you with any weapons; is that correct?
20      A    No, she did not.
21      Q    Okay.  So what happened then?
22      A    I ordered her back in the van.
23      Q    How did you do that?
24      A    Told her to get back in the van.
25      Q    And what did she say?

22 (Pages 82 to 85)

Page 86

1        A    She says, Nobody comes up on my
2   mama like that.
3        Q    So how close was she when she
4   said that to you?
5        A    She was about the distance we are
6   here.
7        Q    Okay.
8        A    And after she said it, she took a
9   step closer.
10       Q    So she was apparently -- based on
11  your reasonable belief and your training and
12  experience, this 12-year-old girl with no weapons
13  was getting ready to possibly physically assault
14  you, wasn't she?
15            MR. OSBORNE:  I'm going to object
16  as to form.  He testified that he did not know
17  whether or not she had weapons at the time of the
18  incident.
19            MR. LANE:  I understand.
20       Q    (BY MR. LANE)  And she had no
21  weapons, did she?
22       A    Subsequently, I learned that,
23  yes.
24       Q    Okay.  So you're telling me right
25  now that you believed that this 12-year-old girl,

Page 87

1   who you subsequently learned had no weapons, was
2   getting ready to possibly physically attack you;
3   isn't that correct?
4        A    I believed it was a possibility.
5        Q    Okay.  So you did what in
6   response to that?
7        A    I ordered her back in the van
8   again.
9        Q    And you did it in a command
10  voice, didn't you?
11       A    Yes.
12       Q    Which is part of the use-of-force
13  continuum, isn't it?
14       A    Yes.
15       Q    Okay.  Had you drawn your gun at
16  that point?
17       A    No.
18       Q    Okay.  Now, you couldn't see her
19  hand, could you?
20       A    No.
21       Q    All right.  The possibility
22  existed she had some deadly weapon in her hand,
23  then, didn't it?
24       A    It was a possibility, yes.
25       Q    And you were possibly in fear for

Page 88

1   your life, weren't you?
2        A    Not at that point, no.
3        Q    Why weren't you in fear for your
4   life?
5        A    I didn't know if she had anything
6   in her hand.  I was more -- I was more operating
7   under the assumption that it was going to be a
8   hand assault, as opposed to any type of weapon.
9        Q    So this 12-year-old girl was
10  going to come up and punch you or scratch you or
11  kick you or bite you or do something like that?
12  Is that what you were worrying about?
13            MR. OSBORNE:  Object as to form.
14       A    I was concerned about being
15  assaulted.
16       Q    (BY MR. LANE)  How?
17       A    By hands, maybe feet.
18       Q    All the -- all of the above that
19  I just listed were of concern to you?  She was
20  going to punch you, hit you, slap you, kick you,
21  scratch you, bite you, all of the above?
22       A    It was a possibility.
23       Q    Okay.  All right.  So what did
24  you do?  What do you do -- what did you believe
25  you needed to do to control this 12-year-old

Page 89

1   girl?
2        A    To get her back in the van --
3        Q    Mm-hmm.
4        A    -- and get her and her mom to
5   leave.
6        Q    Okay.  So you used your command
7   voice twice, told her to get back in the van.
8   And what happened then?
9        A    She refused again.
10       Q    What did she say?
11       A    It was another -- it was some
12  other comment about her mama and her.  I don't
13  recall exactly.
14       Q    But she wasn't listening to you,
15  was she?
16       A    No.  She was defiant.
17       Q    Okay.  Now, if I were to tell you
18  that Cassidy's teachers, for example, say she is
19  the most shy, retiring, compliant girl in the
20  whole school, would that shock you?
21            MR. OSBORNE:  I'm going to object
22  as to form.
23            MR. MORALES:  Same objection.
24       A    Based on my interaction with her,
25  yes, it would.

23 (Pages 86 to 89)

Page 90

1    Q    (BY MR. OSBORNE) Mm-hmm.  Okay.
2  Did she seem to be high on drugs at the time?
3         MR. OSBORNE:  Object as to form
4  and foundation.
5    Q    (BY MR. LANE)  Or drunk?
6    A    No.
7    Q    Okay.  So anyway, she doesn't
8  listen to you twice.  She says something else
9  about, Nobody treats my mama like this, or words
10  to that effect, right?
11    A    Correct.
12    Q    What happens then?
13    A    I order her a third time to get
14  back in the van and advise her that if she
15  doesn't, she'll be arrested.
16    Q    What happens then?
17    A    She refuses to move.
18    Q    What did she say?
19    A    She didn't say anything.
20    Q    She just stood there?
21    A    Yes.
22    Q    So what did you do?
23    A    I advised her she was under
24  arrest and ordered her to turn around and put her
25  hands behind her back.

Page 91

1    Q    Okay.  And what did she do?
2    A    She didn't move.
3    Q    Okay.  So what did you do?
4    A    I took her by the right hand and
5  attempted to place her right hand behind her
6  back.
7    Q    Okay.  And what happened then?
8    A    Her mom got out of the van.
9    Q    And what happened then?
10    A    And then her mom grabs her around
11  the neck, and a struggle ensues, me trying to
12  pull Cassidy from her mother and her mother
13  trying to pull Cassidy from me.
14    Q    Okay.  And do you believe Cassidy
15  suffered some injury as a result of all of this?
16    A    No.
17    Q    Okay.  Why do you believe she
18  suffered no injury?
19    A    'Cause she complained of no
20  injury at any time.
21    Q    Have you seen medical records as
22  a result of this interaction?
23    A    No.
24    Q    Has anybody told you that she
25  suffered any injury?

Page 92

1    A    I read the --
2         MR. OSBORNE:  Object as to form.
3    A    I read in newspaper accounts that
4  she was claiming that, and on flyers that they
5  distributed.
6    Q    (BY MR. LANE)  Okay.  So a tug of
7  war is going on with you and Loree, with Cassidy
8  being the rope.  What happens then?
9         MR. OSBORNE:  I'm going to object
10  as to form.  It mischaracterizes the testimony.
11    Q    (BY MR. OSBORNE)  Does that
12  mischaracterize your testimony?
13    A    Yes.
14    Q    How does that mischaracterize
15  your testimony?
16    A    I was attempting to effect an
17  arrest, and Loree was interfering with that.
18    Q    Right.  So there was a tug of war
19  going on with you and Loree, right?
20         MR. OSBORNE:  And once again,
21  I'll object to the phrase "tug of war."  He never
22  testified to that effect.
23    A    There was not a tug of war.
24    Q    (BY MR. LANE)  Was Loree pulling
25  on Cassidy?

Page 93

1    A    She was, by her neck.
2    Q    She was pulling one way?
3    A    By her neck, yes.
4    Q    And you were pulling on Cassidy
5  another way?
6    A    That is correct.
7    Q    What is a tug of war?
8    A    A tug of war is where you put a
9  rope between two teams and pull the rope.
10    Q    Right.  This is called an
11  analogy, see.  I know you weren't having an
12  actual tug of war with a rope in the parking lot,
13  okay?  Cassidy was the rope.  Is that a good
14  analogy?
15    A    I don't believe so.
16    Q    Okay.  So you were pulling on
17  Cassidy one way, and Loree was pulling the other
18  way; is that right?
19    A    Yes.
20    Q    Let's just call that a tug of
21  war, okay?  What happened then?
22    A    I was concerned that Cassidy was
23  going to be injured and possibly that I would get
24  overpowered by the two of them.  So I released
25  pressure that I was pulling and allowed them to

24 (Pages 90 to 93)

Page 94

1    fall between the two cars.
2          Q    Okay.  What happened then?
3          A    I went down on top of Cassidy.  I
4    pushed her down, trying to get Loree to break her
5    grip around her daughter's neck.  I had --
6          Q    When you say you went down on
7    Cassidy, what do you mean by that?
8          A    When they went down to the
9    ground, I went down with them.
10         Q    Well, you weren't all just, like,
11   dropping to your knees and crawling around.  Did
12   you jump on her?  Did you fall on her?  Did you
13   put your weight on her?
14         A    No.
15         Q    What happened?
16         A    I went down into a crouch
17   position next to her.  And I had ahold of her arm
18   with both of my hands, and I shoved down onto --
19   onto Cassidy, hoping that the force would force
20   Loree to let go of her.
21         Q    Okay.  What happened then?
22         A    It didn't.  She didn't let go.
23   So I pulled Cassidy's arm across my lap and held
24   it in a straight arm bar hold.  And I got on my
25   radio and asked for another car.

Page 95

1          Q    What happened then?
2          A    Several things.  A lot of things
3    happened.  I remember, as -- I'm trying to work
4    Loree's fingers off of Cassidy's neck, and --
5    while I'm holding onto Cassidy.  Loree's on her
6    back.  Cassidy's on her side laying on top of her
7    mother.
8          And I remember the armed security
9    guards coming up and --
10         Q    Which ones?  Who?
11         A    Mr. Kuebler and Mr. Sands.
12         Q    Okay.
13         A    And Mr. Sands came up, and he put
14   his hand on my left shoulder, and he said, Do you
15   need help, Sarge?  If you need help, tell me you
16   need help, and I can help.
17         And it was about at that time when I
18   was able to break Loree's grip off of Cassidy and
19   pull her away from her mother.  And I asked
20   Mr. Sands to just keep her away from me, meaning
21   Loree.
22         Q    Okay.  So what did Mr. Sands do
23   at that point?  And is Mr. Sands -- for the
24   record, is he present today?
25         A    Yes, he is.

Page 96

1          Q    Can you identify him?
2          A    He's seated to my right,
3    wearing -- wearing a leather jacket.
4          Q    Okay.  And so what did he do?
5          A    I honestly -- at that point, I
6    didn't know.  Because when I pulled Cassidy away,
7    my back was to them.
8          Q    Did you see him make physical
9    contact with Loree?
10         A    I never did.
11         Q    Okay.  So what happened then?
12         A    When I got Cassidy away from her
13   mother, she was -- she was in a seated position.
14   And when I was trying to get her onto a -- into a
15   prone position, using verbal commands, On your
16   belly, On your belly, and trying to pull her over
17   onto her belly, she kept spinning on her butt and
18   keeping her legs between me and her, which is a
19   potential weapon.
20         Q    Her legs were a potential weapon?
21         A    Yes.
22         Q    So what did do you about this
23   potential weapon?
24         A    I escalated my use of physical
25   force.

Page 97

1          Q    To do what?
2          A    Pulled her into a prone position
3    and handcuffed her.
4          Q    Okay.  Had other officers
5    responded at this point?
6          A    No.
7          Q    Okay.  What happened then?
8          A    I ordered Cassidy to stay in a
9    prone position by the car so that I knew exactly
10   where she was.  And I started to get up.
11         And as soon as I got up, she started to
12   get up.  So I pushed her back down and again
13   ordered to her to stay in a prone position and
14   not to move.  And when I got up the second time,
15   it appeared that she was going to stay in that
16   position.
17         And then I went to the van, and Loree
18   was now seated in the van.
19         Q    Okay.  And what was she doing in
20   the van?
21         A    She had the cell phone -- her
22   cell phone to her ear.
23         Q    Who was controlling Cassidy at
24   this point?
25         A    Nobody.

25  (Pages 94 to 97)

Page 98

```
1        Q    So Cassidy was just sitting in
2   the parking lot in cuffs?
3        A    She was laying down when I left
4   her in cuffs.
5        Q    Okay.  All right.  Weren't you
6   afraid she was going to get up and run away?
7        A    It was a concern.  But I was more
8   concerned about her moving around and that her
9   mom's van was still running.  And with her mom
10  being in the driver's seat, I didn't want her to
11  get run over.
12       Q    Okay.  So what happened then?
13       A    When I saw that the -- that Loree
14  was in the van -- she was on -- she had the cell
15  phone to her ear.  I don't know if she was
16  talking to anybody.  And I ordered her out of the
17  van, advising her she was under arrest.
18       Q    What was she under arrest for?
19       A    Interference, obstruction.
20       Q    How did she -- oh, with the tug
21  of war with Cassidy?  That was the obstruction
22  interference?
23            MR. OSBORNE:  Once again, I'll
24  object.  Form of the question.
25       A    When she tried to interfere with
```

Page 99

```
1   my arrest of Cassidy.
2        Q    (BY MR. LANE)  By doing what?
3        A    By grabbing her around the neck
4   and pulling.
5        Q    Okay.  Any marks that would have
6   been on Cassidy's neck, you're claiming, were put
7   there by Loree; is that right?
8        A    They weren't done by me or any
9   other officer that I know of.
10       Q    Okay.  And in fact, you would
11  argue that any injuries suffered by Cassidy were
12  the result of Loree pulling on Cassidy?
13            MR. OSBORNE:  Object as to form.
14       Q    (BY MR. LANE)  Is that correct?
15            MR. MORALES:  Same objection.
16       A    I did not do anything that I
17  believe would cause any type of injury to
18  Cassidy.
19       Q    (BY MR. LANE)  Okay.  Okay.  So
20  what happened then?
21       A    The van was still running.  Loree
22  wasn't going to get out.  She refused to move.
23  She didn't give any verbal indication.  She just
24  didn't make any physical movement in attempt to
25  get out.
```

Page 100

```
1             So I reached into the van to shut the
2   van off.  And Loree laid down across the front
3   seats of the van.  And I knew that other officers
4   were responding, so I decided that I would just
5   remain outside the van and wait for another
6   officer to get there to assist me in arresting
7   Loree.
8        Q    How did you know Loree didn't
9   have a gun in the van, was going to blow your
10  brains out?
11       A    I didn't.
12       Q    Well --
13       A    But I remained --
14       Q    -- had you been concerned about
15  that possibility, you would have taken steps to
16  make sure that she was out of the van then; isn't
17  that correct?
18       A    I felt reasonably comfortable,
19  because as I stood by the door of the van, she
20  had the cell phone to her ear, even as she laid
21  across the front seat.  And I had her -- her left
22  hand was in plain view, so if she reached for
23  anything, I was in a position where I could back
24  towards the back of the car, if she produced a
25  handgun.
```

Page 101

```
1        Q    I see.  Okay.  So what happened
2   then?
3        A    I just remained there.  I ordered
4   her a total of at least two times, maybe three
5   times, to get out of the van.  She refused to
6   comply with any of those orders.  So I just
7   waited for other officers to arrive.
8             Officer Michelle Hanley arrived, and
9   she asked me what I needed.  And I had told her
10  to secure Cassidy in a car.  And she did that.
11  And then she came back to the van.
12       Q    And then what happened?
13       A    Then I ordered Loree out two more
14  times, advising her that she was under arrest
15  each time.  And I actually thought she was going
16  to start complying, 'cause she sat up in the
17  seat.
18            And I said, Come on.  It's time -- we
19  can't -- it's over.  It's done.  Let's get out.
20  And she started to lay back down in the seat
21  again.  And I reached in and grabbed her by her
22  left arm and pulled her from the van.
23       Q    Okay.  What did she do?
24       A    She stood up and then collapsed.
25       Q    Okay.  What happened then?
```

26 (Pages 98 to 101)

## Page 102

1    A    She went down to her knees and
2 then down into a prone position.  And she was
3 handcuffed.
4    Q    Do you know why she did that?
5    A    No.
6    Q    What is your opinion on why she
7 did that?
8         MR. OSBORNE:  Once again, I'm
9 going to object.  Calls for speculation.
10    A    I don't know.
11    Q    (BY MR. LANE)  Okay.
12    A    It surprised me when it happened.
13    Q    All right.
14    A    I expected a very physical
15 confrontation.
16    Q    Okay.  So what happened then?
17    A    Once she was handcuffed, she
18 was -- there was a third officer there at that
19 time, and Officer Hanley and a third officer got
20 her to her feet and escorted her --
21    Q    Who was that officer?
22    A    I don't know.
23    Q    Okay.
24    A    But they escorted her to his car.
25    Q    All right.  What happened then?

## Page 103

1    A    I went back to the front of the
2 car and picked up --
3    Q    Whose car?
4    A    My car.  It was in front -- the
5 front of my car --
6    Q    Right.
7    A    -- which was near the door of her
8 van.  And I picked -- I remember picking up some
9 stuff off the pavement that had fallen out.  I
10 retrieved her purse out of the car and got her
11 ID, put her purse back in the car, and --
12    Q    Now, let me just stop you right
13 there.
14    A    Okay.
15    Q    Do you know that Loree is
16 claiming that she had the phone number and the
17 name of a witness who heard you call her a
18 "nigger" in her purse, and when this whole
19 incident was over, that piece of paper was
20 missing?
21    A    First of all, I never called her
22 a "nigger."  Second of all, the only thing I
23 removed from her purse was her driver's license.
24    Q    Okay.  So what happened then?
25    A    Two road sergeants showed up on

## Page 104

1 scene, and I had a conversation with them, 'cause
2 they wanted to know what happened.  So I
3 explained what had happened.  And they wanted to
4 jail Loree and Cassidy.  And I elected not to do
5 that.
6    Q    Why?
7    A    While I was talking to them,
8 Officer Hanley came over and advised me that
9 Loree was complaining of some difficulty
10 breathing and asked for her oxygen.  And she
11 wanted to know if she could give it to her.  I
12 said, Absolutely give it to her.
13         So she took her oxygen back to her.
14 That was the only thing I heard about until
15 later, about comments about her asking -- or her
16 having Officer Hanley unhook her bra and her
17 inhaler.  I never heard anything about that that
18 night.
19         But I knew that if we were to try to
20 incarcerate Loree, she would have to get a
21 medical clearance through the hospital, and the
22 City would be responsible for that bill.  And I
23 didn't feel that was necessary, because I felt if
24 we could provide -- obtain a good address for
25 her, then it was okay to release her on a

## Page 105

1 summons.
2    Q    Had Loree made any physical
3 contact with you at any time?
4    A    Not directly with me, not that I
5 recall.  Only through Cassidy.
6    Q    Did Cassidy at any time ever
7 punch you, kick you, scratch you, bite you, push
8 you?
9    A    No, sir.
10    Q    So neither Cassidy, nor Loree
11 ever struck you in any way?
12    A    No.
13    Q    What I'd like to do is have you
14 take a look -- you've seen this videotape
15 probably several times, haven't you?
16    A    Yes.
17    Q    In fact, do you remember being in
18 court one day when I was queuing it up --
19    A    Yes.
20    Q    -- for the Judge?
21    A    Yes.
22    Q    Remember that?
23    A    Mm-hmm.
24    Q    And do you remember you were
25 standing in court?

27 (Pages 102 to 105)

Page 106

```
 1        A    Yes.
 2        Q    And do you remember Loree and
 3  Cassidy were both in court watching me queue up
 4  the videotape?
 5        A    Yes.
 6        Q    Do you remember they were
 7  reacting to watching that videotape?
 8        A    Yes.
 9        Q    And do you remember that they
10  were crying?
11        A    I don't remember that, no.
12        Q    Do you remember that you laughed?
13        A    That's not true.
14        Q    Okay.  Well, do you remember me
15  standing there looking at you?
16        A    I remember you mischaracterizing
17  what I said or what I did, to the Judge.
18        Q    All right.  So you would say I'm
19  a liar also, then?
20        A    Yes, sir, I would.
21        MR. OSBORNE:  Object.  That's
22  argumentative.  You know the line of cases,
23  Mr. Lane.
24        MR. MORALES:  Object.
25  Argumentative.
```

Page 107

```
 1        MR. LANE:  I can ask questions in
 2  a deposition that are not proper in front of a
 3  jury.
 4        MR. OSBORNE:  Well, no.
 5        MR. LANE:  I can ask him to
 6  speculate.  I can ask for an opinion.  I can ask
 7  for all kinds of things.
 8        MR. OSBORNE:  And we have every
 9  right to object to those questions.
10        MR. MORALES:  I know you'd love
11  to do our job for us, but why don't you just do
12  yours and get this over with, because, you know,
13  your question could be used in front of a jury.
14  I mean, we don't know what you're going to do
15  with it.  You just gave a big speech about that
16  at the start, so we have to be careful.  That's
17  all we're doing.  We're not trying to disrupt
18  your line of questioning.
19        MR. LANE:  I understand.
20        All right.  Let's gear up the
21  videotape.  Do you have it all set?
22        MR. MOHAMEDBHAI:  I think so.
23        Q    (BY MR. LANE)  Give us a
24  narrative of -- why don't you stand up in a way
25  so that you can see it clearly.
```

Page 108

```
 1        MR. MORALES:  Want me to turn the
 2  light off?
 3        MR. LANE:  Sure.
 4        Q    (BY MR. LANE)  Can you see it
 5  clearly?
 6        A    Yes.
 7        Q    Okay.  Is it starts at -- the
 8  timer says 21:50:32.  And hang on.  That would
 9  be -- what time would that be, 9:50?
10        MR. SANDS:  9:50.  Military time,
11  21:50.
12        Q    (BY MR. LANE)  Right.  I
13  understand that, but for -- it's 9:50 in the
14  evening; is that right?
15        MR. MORALES:  Chuck, I think he's
16  asking you.
17        A    Oh, yes.
18        Q    (BY MR. LANE)  Okay.  Do you know
19  who took this videotape?
20        A    It was King Soopers security.
21        Q    Do you know who?
22        A    I don't know the guy's name, no.
23        Q    Okay.  Have you talked to the
24  person who took this videotape since you learned
25  of its existence?
```

Page 109

```
 1        A    Once, yes.
 2        Q    And what was that conversation?
 3        A    It wasn't actually about this
 4  videotape.  It was about a subsequent videotape.
 5        Q    Okay.  And what was the
 6  subsequent videotape about?  Anything --
 7        A    That tape --
 8        Q    Anything to do with this case?
 9        A    Yes.
10        Q    What was it?
11        A    That was the videotape where it
12  shows Cassidy and Loree coming back onto the lot
13  40 minutes after she was released from jail.
14        MR. LANE:  Okay.  I don't believe
15  we -- I don't think we have that videotape.
16        MR. MORALES:  I believe you do.
17        MR. OSBORNE:  We --
18        MR. LANE:  Do we?  Have you given
19  us that?
20        MR. MORALES:  We've given you
21  everything.
22        MR. LANE:  All right.  I'll
23  check.
24        MR. MORALES:  It's in that IAU,
25  that massive IAU that I gave you.
```

28 (Pages 106 to 109)

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 110

1    MR. LANE:  Okay.
2    Q    (BY MR. LANE)  All right.  So
3  anyway, why don't you start this.  And narrate
4  for me what we're seeing in this videotape.
5    THE DEPONENT:  Can you stop for
6  just a second, Qusair?  Did I say that right?
7    MR. MOHAMEDBHAI:  Qusair.
8    THE DEPONENT:  Qusair.  I
9  apologize, sir.
10    A    To set it up, this -- Cassidy
11  getting out of the car, the three orders for her
12  to get back in the car, the announcement that
13  she's under arrest, and me taking her right arm
14  to place it behind her back has already taken
15  place.
16    Loree's gotten out of the car, has
17  grabbed Cassidy around the neck.  And the
18  struggle at this point is where Loree is
19  continuing to resist and interfere with my
20  attempt to arrest Cassidy, and we're now between
21  the two cars on the ground.
22    THE DEPONENT:  Thank you.
23    Q    (BY MR. LANE)  So who is that
24  person running?
25    A    I believe that's Mr. Kuebler.

Page 111

1    Q    Okay.  All right.  Who are all
2  these -- you apparently have two security cops,
3  or officers, and then some civilians lagging
4  behind.  Is that what we're looking at here at
5  21:50:40?
6    A    I believe it's the two security
7  officers, Mr. Kuebler and Mr. Sands.  And I don't
8  know who the other people are.
9    Q    Okay.  You presume they're just
10  basically civilian bystanders?
11    A    I assume.  I don't -- have no
12  idea.
13    Q    Okay.
14    A    That's --
15    Q    What are you doing to Cassidy?
16    A    That's where I'm trying to push
17  down on Cassidy to get her mom to release her
18  grip around her neck.
19    Q    Now, are you saying Loree is
20  between your car and the minivan, and we can't
21  really see her very well?  Is that the deal here?
22    A    Yes.
23    Q    Okay.
24    A    That's where --
25    THE DEPONENT:  Can you stop it

Page 112

1  there sir?
2    A    Just before he stopped it --
3  sorry.  The Diet Pepsi's coming back.
4    MR. MORALES:  Can you reference
5  the time, too, so we have some reference on the
6  tape.
7    A    Here at 21:50:43.
8    Q    (BY MR. LANE)  That's 49.
9    MR. MORALES:  I think that --
10    A    49.  Are my eyes that bad?
11    MR. MORALES:  Yeah.  I think they
12  are.  I think that is a 49.
13    A    Okay.  At this point, this is
14  where I remember Mr. Sands putting his hand on my
15  shoulder and asking me if I needed help.  That's
16  a conversation we had.  I believe I had already
17  called for assistance on the radio at that point.
18    Q    (BY MR. LANE)  Let me ask you
19  this.  We're at 21:50:51.  Are you saying you
20  were trying to get Loree's hands off of Cassidy's
21  neck by pushing down on Cassidy?
22    A    I was trying to get her to
23  release her grip on Cassidy, yes.
24    Q    By pushing down on Cassidy?
25    A    Yes.

Page 113

1    Q    Why didn't you let go of Cassidy
2  and just grab Loree by the hands and throw her
3  arms off of Cassidy?
4    A    Loree was underneath Cassidy, and
5  she had a grip on Cassidy that I couldn't break.
6    Q    So by pushing down on Cassidy,
7  you're putting Cassidy closer to Loree, aren't
8  you?
9    A    Yes.
10    Q    So how is pushing Cassidy closer
11  to Loree designed to break Loree's grip on
12  Cassidy?
13    A    My push on Cassidy -- and it's
14  not putting her any closer, because they were
15  already body-to-body contact.  My push was
16  designed to force her to be uncomfortable in that
17  position on the ground and want to get out of
18  that position.
19    Q    I'm still not following, okay?
20  Loree is on the bottom of this pileup.  Do you
21  really -- you would agree you can't really see
22  Loree in this picture?
23    A    Correct.
24    Q    Okay.  But we do see you pushing
25  down on the back -- appears to be the back of

29 (Pages 110 to 113)

**Page 114**

1 Cassidy's neck or upper back area. Do you agree
2 with me there?
3     A    No.
4     Q    What are you pushing down on?
5     A    On her side. On her hip and on
6 her shoulder.
7         MR. LANE: Okay. Q, can you
8 rewind that just a bit?
9         MR. MOHAMEDBHAI: Sure.
10        MR. LANE: Keep going. Keep
11 backing it up, ten seconds. Okay. Stop there.
12    Q    (BY MR. LANE) Okay. Now, let's
13 just stop it at 21:50:39. Where is Cassidy? Is
14 she seated right there?
15    A    I can't tell.
16    A    'Cause frankly, I don't see Loree
17 anywhere in that picture.
18    A    I don't see me anywhere in that
19 picture.
20    Q    I think you're standing right
21 behind Cassidy.
22    A    I don't see Cassidy in that
23 picture.
24    Q    You're standing right next to
25 Loree's van.

**Page 115**

1     A    I'm sorry. I'm not seeing that.
2 Oh, okay. There. I see.
3     Q    Okay. Now you're behind Cassidy.
4 At 21:50:42.
5         MR. LANE: Play it, Q.
6     Q    (BY MR. LANE) Now, you're
7 pushing down on Cassidy, from what I'm seeing
8 here?
9     A    That's right.
10    Q    Is that incorrect?
11    A    No. That's correct. And I have
12 her --
13    Q    Where is Loree?
14    A    She's underneath her.
15    Q    Well, Cassidy is in a seated
16 position; is that correct?
17    A    She is -- no, she is not. She's
18 laying on her side, her left side down, on top of
19 her mother. I have her right wrist in my right
20 hand, and my left hand is on her shoulder.
21    Q    Okay. And you're pushing down --
22    A    Let me rephrase that. Not her
23 shoulder, as in the scapula area, but on the
24 upper humerus area of the upper arm.
25    Q    And by pushing down on Cassidy

**Page 116**

1 like that, you're trying to get Loree to release
2 Cassidy?
3     A    Yes.
4     Q    Why didn't you just pick up
5 Cassidy and drag her away from her mother at that
6 point?
7     A    I had already tried that.
8     Q    Why didn't you grab Loree's arms
9 and try to break free from Cassidy?
10    A    That's what I did next.
11    Q    Okay. So what are you doing now?
12    A    This is where I'm prying the
13 hands off -- Loree's hands off of Cassidy's neck.
14    Q    Okay. So what happened then?
15    A    That's where I am able to pull
16 her away from her mother. And I asked them to
17 keep her away from me.
18    Q    Okay. Who's the person in the
19 black that seems to be between the two cars?
20    A    That's Loree.
21    Q    Okay. So she was up and
22 seemingly trying to get away?
23    A    No.
24        MR. LANE: Just play it, Q.
25        MR. MOHAMEDBHAI: Okay.

**Page 117**

1     Q    (BY MR. LANE) Do you know who
2 pulled up in that car right there?
3     A    No.
4     Q    Okay. Now, what did you just do
5 there, 21:51:30?
6     A    Pushed her back down and told her
7 to stay down.
8     Q    That's Cassidy you pushed down?
9     A    Yes.
10    Q    She was cuffed at this point; is
11 that correct?
12    A    Yes.
13    Q    Okay.
14    A    Still defiant, still failing to
15 obey orders.
16    Q    Okay. Continue. Was she crying?
17    A    No.
18    Q    Cursing at you?
19    A    No.
20    Q    Yelling at you?
21    A    No.
22    Q    Is there some sort of a loading
23 dock back there?
24    A    Yes.
25    Q    Okay. Now that the King Soopers

30 (Pages 114 to 117)

Page 118

1    truck is out of the way, what's going on now?
2        A    I'm standing by the door.  This
3    is where I'm telling her that she's under arrest,
4    to get out of the car --
5        Q    All right.
6        A    -- two, maybe three times.
7        Q    This is at approximately 21:53 of
8    the videotape.  The King Soopers truck gets out
9    of the way.  Now, this is Michelle --
10       A    This is Officer Hanley, yes.
11       Q    -- Michelle Hanley showing up?
12       A    She asked -- at this point, she
13   said, What do you need?  And I said, Secure her
14   in a car, meaning Cassidy.  She understood what I
15   meant, 'cause she secured Cassidy in the car.
16       Q    Okay.  So who -- at 21:54 and I
17   guess about 14 or 13, Loree gets pulled out of
18   the car, right?
19       A    Yes.
20       Q    And she immediately collapses; is
21   that correct?
22       A    Yes.
23       Q    All right.  Who assisted you in
24   pulling her out of the car?
25       A    No one.

Page 119

1        Q    That was just you?
2        A    Yes.
3        Q    Okay.  Continue.  Who is this?
4        A    That's -- I don't know.
5        Q    Okay.  Loree's getting picked up
6    at 21:54:53, right?  Keep going.  Is that right?
7        A    That appeared so, yes.
8        Q    Okay.  She's now being taken to
9    somebody else's police car; is that right?
10       A    Yes.
11       Q    You'd agree that's basically the
12   end of the tape of any relevance?
13       A    She accused me of stealing stuff
14   out of her purse.  There I'm going into her purse
15   to --
16       Q    Okay.  So you're going through
17   her purse right now.  That's you?
18       A    Yeah, to obtain her ID.
19       Q    That's at 21:55 --
20       A    21.
21       Q    -- approximately 20?
22       A    Yeah.
23       Q    Okay.  Now, did Loree Rice resist
24   arrest?
25       A    Yes.

Page 120

1        Q    By doing what?
2        A    Part of the resisting arrest
3    municipal code is interfering with a police
4    officer attempting to effect another arrest.  So
5    she was resisting arrest there.
6        And also, you can't see it on the small
7    screen, but when you put that video on a large
8    screen, you can see that when I'm ordering her
9    out of car, she makes a -- or lays back down.
10       Q    Okay.  Now, did you fill out the
11   summons and complaint on Cassidy Rice?
12       A    I believe I did.
13       Q    Okay.  Let's take a look at --
14   take a look at what has been marked --
15       MR. LANE:  You know what?  We're
16   going to have to re-mark the drawings, because
17   these have been previously marked.
18       (The diagrams drawn by the Deponent
19       were re-marked as Exhibits 9 and 10
20       and are referred to as such throughout
21       this deposition transcript.)
22       Q    (BY MR. LANE)  Look at what has
23   been marked as Exhibit 1.  Look at page 3 of
24   Exhibit 1.  Is that the ticket you filled out for
25   Cassidy?

Page 121

1        A    I issued it, but it appears that
2    Officer Hanley started it by entering her name,
3    address, phone number --
4        Q    Okay.
5        A    -- location of occurrence.  But I
6    signed it.
7        Q    So Cassidy's date of birth is
8    6/20/93, is that correct, according to this?
9        A    According to this, yes.
10       Q    You have no reason to doubt that
11   as being true, do you?
12       A    No.
13       Q    Okay.  And her weight is listed
14   as 118 pounds; is that correct?
15       A    Yes.
16       Q    And her height is listed as 5'2;
17   is that correct?
18       A    Yes.
19       Q    So you were confronting a
20   12-year-old, 118-pound, 5'2 inch girl who was
21   wearing shorts and a sleeveless shirt; is that
22   correct?
23       A    In hindsight, yes.  That's not
24   what I perceived her to be at that time.
25       Q    Understood.  So if this is

**Page 122**

1  accurate, your perceptions were incorrect; is
2  that true?
3      A    Yes.
4      Q    Okay.  All right.  Let's look at
5  the next page, which is -- there's a number down
6  in the lower right-hand corner saying Rice 91.
7  Is this your narrative of the events that
8  occurred?
9      A    Yes.
10      Q    If you look at page -- the next
11  page, which is 92, why is most of that piece of
12  paper blank?  And it picks up again on 93.
13      A    I don't know.
14      Q    Okay.  And Rice 96, which is
15  still part of Exhibit 1, that's Michelle Hanley's
16  narrative; is that correct?
17      A    Yes.
18      Q    Have you reviewed both your
19  narrative and her narrative prior to coming here
20  today?
21      A    No.
22      Q    At any time in the pendency of
23  this case, have you reviewed those narratives?
24      A    Not hers, no.
25      Q    Never even as -- at any time,

**Page 123**

1  have you ever reviewed Michelle Hanley's
2  narrative?
3      A    Not that I recall, no.
4      Q    Okay.  You've reviewed yours
5  prior to testifying today.  And do you wish to
6  make any changes, additions, corrections,
7  deletions to it, in terms of accuracy?
8      A    No.
9      Q    Do you stand by this?
10      A    Yes.
11      Q    It's an officially filed document
12  with the Aurora Police Department, isn't it?
13      A    Yes.
14      Q    And you would understand that if
15  you made false statements in here, that would be
16  a crime, wouldn't it?
17      MR. OSBORNE:  I'm going to
18  object.  Asks for a legal conclusion.
19      Q    (BY MR. LANE)  You're a law
20  enforcement officer, aren't you?
21      A    Yes.
22      Q    To enforce the law, presumably,
23  you have to have some knowledge of the law, don't
24  you?
25      A    Yes.

**Page 124**

1      Q    All right.  Do you have the
2  knowledge of the law that if you file an official
3  police report with false statements that you know
4  to be false in there, that's a crime?
5      A    Yes.
6      Q    Okay.  Looking at Bates stamp
7  Number 99.  Is this Mr. Sands' statement, as far
8  as you're aware?
9      MR. OSBORNE:  I'm going to object
10  as to lack of foundation.
11      A    I don't know.
12      Q    (BY MR. LANE)  Have you ever seen
13  this before?
14      A    I believe I booked this in when I
15  collected them that night, but I don't recall
16  reading it or --
17      Q    Well --
18      A    And I can't -- it's been such a
19  long time, I can't clearly read the signature on
20  it.
21      Q    It says, Witness, Officer S.
22  Fazio on page 100.  Do you see that?
23      A    Yes, sir.
24      Q    Do you know an Officer S. Fazio?
25      A    Yes.

**Page 125**

1      Q    Okay.  And it seems that the
2  signature says Ernest D. Sands, doesn't it?
3      A    It very well could.
4      Q    Well, you can read.  What does it
5  say?
6      A    I'm not sure.  I see it --
7  clearly it says Security Guard underneath it.  On
8  Rice 101, I can see Officer Kuebler's name.  So I
9  would presume that that's Mr. Sands' statement.
10      Q    Okay.  And page 102 is Michelle
11  Hanley again taking basic contact information
12  about Cassidy, correct?
13      A    Yes.
14      Q    Do you know where Cassidy ended
15  up going?
16      A    She went to the juvenile side of
17  the detention facility.
18      Q    Where is that located?
19      A    At 15001 East Alameda Parkway.
20      Q    Okay.  Do you know if she
21  received medical attention there?
22      A    No, she did not.
23      Q    Okay.  And did she have to bond
24  out?
25      A    No.

32 (Pages 122 to 125)

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 126

1    Q    She was released?
2    A    On a summons, yes.
3    Q    Okay.  Why was she taken into
4  custody?
5    A    That was a discretion on my part
6  that I -- based on what I saw her, she has a
7  violent attitude.  She was the one who
8  precipitated the physical confrontation.  And
9  it's a judgment call.  I believe she crossed the
10 line and that she needs to understand this is
11 serious business.  And I made the election to
12 have her processed through the jail.
13    Q    Okay.  Bates stamp (sic) Number 2
14 is basically all the same stuff relating to Loree
15 Rice?
16         MR. OSBORNE:  What's that?
17         THE DEPONENT:  Does he mean that?
18         MR. OSBORNE:  Exhibit 2, yeah.
19    Q    (BY MR. LANE)  Exhibit 2, do you
20 agree that that's what this appears -- same
21 documents, basically?
22         MR. OSBORNE:  Take a look at
23 them.
24    Q    (BY MR. LANE)  But the ticket
25 relates to -- well, hang on a second.  I think

Page 127

1  we've got this backwards.  I'm not sure why these
2  are put together the way they are.  They seem to
3  be the same documents, Exhibit 2, as we had in
4  Exhibit 1.  So let's move on to Exhibit 3.
5  Actually, never mind about that either.
6         THE DEPONENT:  Mr. Lane, do you
7  mind if we take another break?
8         MR. LANE:  Not a bit.
9         THE DEPONENT:  I apologize.
10        MR. LANE:  No problem.
11        (A recess was taken at 11:40 a.m.)
12        (Mr. Sands left the deposition room.)
13        (The deposition resumed at 11:45 a.m.)
14        MR. LANE:  Okay.  We're almost
15 done.
16    Q    (BY MR. LANE)  You know there was
17 an entire internal affairs investigation into
18 this incident; is that correct?
19    A    Yes.
20    Q    And did they exonerate you of any
21 wrongdoing?
22    A    Not entirely, no.
23    Q    They said your use of a company
24 car was inappropriate, basically; is that right?
25    A    Yes.

Page 128

1    Q    But in terms of your use of force
2  on Loree or Cassidy or any other aspect of this
3  case, what did they conclude?
4    A    That I was within policy.
5    Q    Okay.  Did they say anything
6  about use of the word "nigger"?
7    A    I don't recall specifically, but
8  the allegation -- 'cause the allegation falls
9  under -- in fact, they investigated several
10 different aspects of policy violations.  And in
11 all but the secondary employment policy
12 violation, I was found either exonerated or not
13 sustained or -- honestly, I don't remember the
14 exact findings.
15    Q    Okay.  What is -- have you been
16 interviewed by the FBI?
17    A    No.
18    Q    Have you been subpoenaed to a
19 federal grand jury?
20    A    No.
21    Q    Do you know whether a grand jury
22 has been meeting or is scheduled to meet on this
23 matter?
24    A    I've heard, but I don't know for
25 a fact.

Page 129

1    Q    What have you heard?
2    A    I've heard that one was convened,
3  but I don't know that for a fact.
4    Q    And you don't know whatever
5  happened to it?
6    A    No, sir.
7    Q    Okay.  Do you know what target
8  letters are from the Feds?
9    A    No, sir.
10    Q    Okay.  You haven't received any
11 letters from the U.S. Attorney saying, You were
12 the target of a grand jury investigation, and
13 nothing has come of it, and nothing will come of
14 it?  You haven't heard from the Feds on that,
15 have you?
16    A    If I have, I don't know that.
17    Q    Okay.
18    A    I've been forwarded a lot of
19 correspondence from Mr. Osborn's office.  If that
20 was in there -- he's been keeping me abreast of
21 everything.  But I don't recall it.
22    Q    Okay.  Have you ever been
23 disciplined?  I have three disciplinary
24 write-ups.  One is from using the car in this
25 case.  One is from a chase that you did in July

33 (Pages 126 to 129)

Page 130

1  of this year, right?
2      A    Yep.
3      Q    You didn't follow policy in
4  chasing somebody; is that right?
5      A    No.
6      Q    I'm sorry?
7      A    No.
8      Q    That's not right?
9      A    No.  Yes, that is right.
10      Q    You got disciplined?
11      A    Yes.
12      Q    For not following policy and
13  chasing someone?
14      A    Yeah.  We're not allowed to
15  chase, and I now have the written reprimand to
16  prove it.
17      Q    Okay.  And then you made some
18  sort of sexual comment that your bosses thought
19  was inappropriate in 2004; is that right?
20      A    Yeah.
21      Q    Did you do it?
22      A    Yeah, I made the comment.
23      Q    Okay.  And then your discipline
24  here is that you used a City vehicle without
25  getting permission; is that right?

Page 131

1      A    Yes, sir.
2      Q    I recall seeing something from
3  some other jurisdiction where you were alleged to
4  have beat up somebody who spit on you.
5          MR. OSBORNE:  I'm going to object
6  as to the form of the question.
7      A    That's not correct.
8      Q    (BY MR. LANE)  What was the
9  allegation there?
10      A    Allegation was I had struck a
11  handcuffed prisoner.
12      Q    Okay.  And what happened?  Was
13  that sustained or not sustained?
14      A    It was -- I believe they
15  sustained it, and then I had received remedial
16  training.  I didn't receive any days off or
17  written reprimand or anything.
18      Q    Okay.  How did you strike him?
19      A    He was a prisoner -- we didn't
20  have cages in Commerce City, the block between
21  the front and back seats, and so we were required
22  to transport prisoners in the front seat.  And we
23  had arrested him for shoplifting.  And also,
24  another officer was transporting his uncle, who
25  appeared to be handicapped, but he was still

Page 132

1  complicit in the shoplift.
2          And the individual that I was
3  transporting was upset about that.  He spit on
4  the windshield.  And he drew in to -- mucus into
5  his mouth and turned to spit on me, and when he
6  did, I put my hand up, and I caught his nose with
7  the blade of my hand.
8      Q    What happened to his nose?
9      A    I bloodied it.
10      Q    Did you break it?
11      A    No.  To my knowledge, no.
12      Q    Is that what he said happened?
13      A    I don't know what he said
14  happened.
15      Q    Okay.  Do you know the name of
16  that individual?
17      A    I don't.  That was 15 years ago.
18  I don't recall.
19      Q    Okay.
20          MR. LANE:  All right.  Give me
21  two minutes. Q . . . .
22          (A recess was taken from 11:51 to
23          11:58 a.m.)
24      Q    (BY MR. LANE)  All right.  During
25  the pendency of the investigation by internal

Page 133

1  affairs on this case, you were actually promoted,
2  were you not?
3      A    Yes.
4      Q    What is your rank right now?
5      A    Lieutenant.
6      Q    Okay.  And how many lieutenants
7  are there in the Aurora Police Department?
8      A    Somewhere in the neighborhood of
9  36.
10      Q    All right.  Are you still working
11  at King Soopers?
12      A    No.
13      Q    Okay.  Why did that secondary
14  employment cease?
15      A    The chief disallowed it.
16      Q    Why?
17      A    Immediately following the
18  publication of this case and the backlash that
19  the department was taking in the media, he
20  suspended -- completely suspended my secondary
21  employment privileges till the IRB was done.
22  When the IRB was done --
23      Q    "IRB," meaning what?
24      A    The incident review board.
25      Q    Internal affairs?

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 134

1    A    No.
2    Q    What is the incident review
3  board?
4    A    It's a eight-person panel made up
5  of half citizens and half officers who listen to
6  the case and make recommendations to the chief as
7  to changes in policy or the -- I can't remember
8  what their other function is, but it's to make
9  changes.  And one of the big reasons is to make
10  the department transparent to the public.
11    Q    So did they meet on this case?
12    A    Yes.
13    Q    What did they conclude?
14    A    They voted 8-0 in my favor.
15    Q    Okay.  So the chief suspended
16  your work at King Soopers pending the IRB review?
17    A    No.  He -- when he called me up
18  and told me that he suspended my off-duty -- or
19  secondary employment, it was indefinitely.
20    Q    Was that across the board for
21  anything, or was it --
22    A    Everything.
23    Q    Okay.  Did you think that was
24  fair?
25    A    No, but I understood why he did

Page 135

1  it.
2    Q    Why did he do it?
3    A    Because most of the places I
4  worked, I was in contact with the public, and he
5  just -- in the best -- as he explained it to me,
6  for the best interests of the department, it was
7  best that I didn't -- I limited my contact with
8  the public.
9    Q    Well, don't you have very
10  substantial contact with the public in your
11  day-to-day job?
12    A    Yes.  He pointed out that where I
13  was a Sergeant in Par, that I was doing a very
14  good job.  And he didn't remove me from that
15  position because of the job I was doing, but he
16  felt that it was important that we limited the
17  exposure of me.
18    Q    Who's the chief who was doing
19  this?
20    A    Dan Oates.
21    Q    Okay.  Are there any other
22  officers that you know of in Aurora who don't
23  have the right to do secondary employment?
24        MR. OSBORNE:  I'm going to object
25  as to foundation.

Page 136

1    A    I don't know.
2    Q    (BY MR. LANE)  Okay.
3    A    I don't know of any.
4        MR. LANE:  Okay.  I have no
5  further questions.
6        MR. MORALES:  I have some.
7        E X A M I N A T I O N
8  BY MR. MORALES:
9    Q    Chuck, this is Peter Morales,
10  representing the City.  This notion about you
11  being promoted, when did the promotion occur?
12    A    April 14th of 2007.
13    Q    And you were promoted pursuant to
14  the Civil Service rules?
15    A    Yes, sir.
16    Q    And what was involved in
17  obtaining that promotion?
18    A    You had to meet the minimum
19  requirements to be eligible to test.  You had to
20  take a written test, scoring 70 or better.  You
21  had to attend an assessment center and pass the
22  assessment center.  And you also had to put a --
23  what Civil Service terms is a promotional book
24  together.
25        And in the book, it's copies of

Page 137

1  evaluations, training, experience, and a cover --
2  cover sheet identifying who the candidate is.
3    Q    And when you do this -- when was
4  the test, if you recall, for this promotion to
5  lieutenant?  When did it occur?
6    A    March -- I believe it was March
7  of 2006.
8    Q    And so that -- since this -- you
9  would agree that the incident we're all here
10  about occurred on June 17th of '06?
11    A    Yes, sir.
12    Q    So the test that you're talking
13  about for which you received a promotion occurred
14  three or four months before the incident we're
15  here about?
16    A    Yes.
17    Q    You recall testimony you gave to
18  Mr. Lane about a lawful order?
19    A    Yes.
20    Q    And specifically, an example he
21  made was he's sitting in an office or a
22  conference room in Aurora, and you give an order
23  to leave.  And he asked you about the lawfulness
24  of that.  Do you recall that?
25    A    Yes.

Page 138

1    Q    Now, in that scenario that he
2  proffered, do you have the right to order him out
3  of the room simply based on the facts that he
4  gave you?
5    A    No.
6    Q    Okay.  What would you need in
7  order to make it a lawful order, to ask him to
8  leave, if we were in the jurisdiction of Aurora?
9    A    Some underlying offense or some
10  rationale in an attempt to keep the peace.  There
11  has to be something else there for me to issue a
12  lawful order.
13    Q    So let me give you an example.
14  Let's assume that some kind of a fracas broke out
15  in a conference room, okay, some kind of
16  violation of municipal law, and Mr. Lane started
17  to interfere.  Under those circumstances, could
18  you give him a lawful order to leave the room?
19    A    Yes.
20    Q    Okay.  Going to the situation
21  we're here about now, the incident that occurred
22  on June 17th of '06, when you gave this order to
23  leave upon hearing the term "motherfucker"
24  directed toward you, what was the underlying
25  basis, if any, for ordering her to leave the

Page 139

1  premises?
2    A    Her disturbance of the peace,
3  based on the reaction of the father I saw with
4  the child.
5    Q    And lastly, looking to -- do you
6  have that in front of you?  Can you turn to that
7  pile of exhibits and look specifically at Bates
8  stamp Rice 91 and 92 and 93.
9    A    Yes, sir.
10    Q    Do you recall being asked by
11  Mr. Lane about the apparent -- Well, it looks
12  like some interruption or miscopying on Bates
13  stamp 92 -- Rice 92, specifically, does it not?
14    A    Yes.
15    Q    Okay.  Let me ask you about, when
16  you are putting together your report, are you
17  typing on a typewriter, or are you typing into a
18  computer?  What's happening?
19    A    I'm typing into a computer on a
20  predesignated form.
21    Q    Okay.  Do you have any control
22  over what -- however the computer or the police
23  department may format your report?
24    A    No.
25    Q    Okay.  With respect to 91, 92,

Page 140

1  and 93, I'd like to you look at, just to get the
2  context, the second to last sentence, and
3  actually read it into the record on Bates stamp
4  91.  I want you to read from "He asked for a
5  business card."  Do you see that?
6    A    Yes, sir.
7    Q    I want you to read on to page
8  Bates stamp 92 and then into the first full
9  sentence of Bates stamp 93.  Would you do that.
10    A    Okay.  "He asked for a business
11  card in the event she called his bosses, he could
12  refer them to me.  I provided him a card.  As I
13  was speaking to Mr. Reddick, I observed the
14  female exit the store and get into her van.  She
15  backed out of the parking spot and drove
16  northbound in the lot.  This particular area of
17  the slot was striped, angling the parking spaces
18  for a northern departure from the area.  After
19  providing the business card, I started to pull
20  from the fire lane to go down the same lane the
21  minivan had traveled."
22    Q    Okay.  Despite the fact that
23  there's apparently a large blank on Bates stamp
24  Rice 00092, does it appear as though the -- that
25  your narrative has been interrupted in any way?

Page 141

1    A    No.
2    MR. MORALES:  I have no further
3  questions.
4    MR. HIGGINS:  I do.
5    MR. OSBORNE:  I have some
6  questions.  My name is Dave Osborne, and I
7  represent Charles DeShazer in his individual
8  capacity.
9    E X A M I N A T I O N
10  BY MR. OSBORNE:
11    Q    There was a sequence of questions
12  that were asked about your initial contact with
13  Ms. Loree McCormick-Rice.  And I believe that
14  your testimony was that you had three specific
15  contacts.  Can you talk about those for us, just
16  in the order that they went.
17    A    Yes.  The three initial contacts,
18  the first one was when I was checking the
19  handicap placards.  And as I approached her car,
20  hers was angled, so I couldn't see it.  And I
21  looked at her front plate, did not see a handicap
22  plate.
23    So I saw her loading groceries into the
24  car.  And I asked her, Do you have a handicap
25  placard?  And she says, It's right there on the

36 (Pages 138 to 141)

## Page 142

1   mirror. When I look from a different angle, I
2   see the handicap placard hanging from the mirror,
3   and I say, Oh, okay, and I moved on.
4      Q   Okay. What was your second
5   contact with her?
6      A   When I had found the Mazda 626 in
7   that parking spot closest to the King Soopers
8   entrance, I was in the process of writing the
9   parking ticket out when she approached me and
10   said sarcastically, What, you can see her
11   handicap placard, but you can't see mine?
12      Q   Now, I'm a little confused with
13   that statement, because as I understand your
14   testimony, you indicated that you were in fact
15   writing a ticket. So you couldn't see a placard,
16   correct?
17      A   Not on that car, no.
18      Q   Okay. So what was your
19   understanding of what she was referring to?
20      A   My understanding was the -- there
21   was another lady who was parked in -- and I
22   believe it was a Cadillac -- to the north of
23   Loree's car. And that lady had pulled in so far
24   under the handicap signs. 'Cause King Soopers --
25   or Denton, I'm not sure who put it up, but in

## Page 143

1   front of the handicap spots, there's a long blue
2   sign posted up above that says Handicap Parking
3   with the wheelchair emblems on it.
4      And the lady that was driving that what
5   I believe was a Cadillac had pulled in so far
6   that when I walked around the front of her car I
7   actually had to bend over the hood of the car.
8   And she was at her door, just getting into her
9   car, and she looked up and smiled at me, 'cause
10   she realized what she had done. I assumed that's
11   what she did. And we made eye contact. And she
12   had a handicap placard hanging from her mirror.
13      And I made the -- when Loree made that
14   second comment, I assumed it was based on me
15   being able to see the first lady's placard.
16      Q   Okay. Then what was your third
17   initial contact with Ms. Loree McCormick-Rice?
18      A   After I had issued the driver of
19   the 626 the ticket in person, I turned and
20   started to walk to the Taurus that I had taken
21   there. And Loree approached me again and
22   sarcastically stated, Maybe next time I should
23   put my oxygen in the front seat.
24      Q   And what was your response to
25   that?

## Page 144

1      A   Maybe it's time for you to leave.
2      Q   Okay. Now, at that point in
3   time, were you ordering her to leave?
4      A   No.
5      Q   Okay. I want to direct your
6   attention to some exhibits that we looked at,
7   specifically, Exhibit 1, Rice Bates stamp 102.
8   Do you remember testifying about this particular
9   document?
10      A   Yes.
11      Q   And what is this document?
12      A   This is a Aurora Police
13   Department Arrest/Booking sheet.
14      Q   Okay. And in general, how are
15   these filled out?
16      A   When somebody's taken into
17   physical custody and transported to the jail,
18   this is a way to transfer the information from
19   the street officer to the detention officer.
20      Q   Okay. And there's a series of
21   boxes. How were those fields filled out?
22      A   By the officer filling the boxes
23   in by hand.
24      Q   Okay. And are questions asked of
25   the in-custody to provide the information to this

## Page 145

1   report?
2      A   Yes.
3      Q   Okay. Now, at the bottom, before
4   the narrative, there's a series of boxes that
5   describe Injuries, Prescribed Medications,
6   Medical Conditions, Vehicle Towed. Do you see
7   those?
8      A   Yes.
9      Q   Okay. What were some of the
10   responses given to those questions?
11      A   In the box marked Injuries, it's
12   marked "No." Prescribed Medications was
13   initially marked "No" and then crossed out and
14   marked "Yes." And Medical Conditions is marked
15   "No." And Vehicle Towed is marked "No."
16      Q   Okay. And this particular intake
17   is for Cassidy Rice?
18      A   Yes.
19      Q   Okay. And so she informed the
20   officer that filled this document out that she
21   had no medical conditions?
22      A   And no injuries, yes.
23      MR. OSBORNE: Okay. I have no
24   further questions.
25      (Mr. Mohamedbhai left the deposition

37 (Pages 142 to 145)

Page 146

```
 1        room.)
 2        E X A M I N A T I O N
 3   BY MR. HIGGINS:
 4        Q    Officer, my name's Steve Higgins,
 5   and I represent Dillon Companies, Inc., doing
 6   business as King Soopers, and Ernie Sands, who is
 7   the security guard that was involved in this
 8   incident.  I just have a few questions for you.
 9   This occurred on June 17th, 2007; is that
10   correct?  This incident?
11        A    2006.
12        Q    '6.  '6.  I'm sorry.  And it was
13   at a King Soopers store or shopping center
14   located at 15250 East Mississippi?
15        A    Yes, sir.
16        Q    And how many times do you think
17   you'd been to that parking lot?
18        A    For the purpose of working --
19        Q    Yes.
20        A    -- the secondary job?
21        Q    Correct.
22        A    I believe I started the job in
23   March, and I had worked almost every Saturday
24   night since March.
25        (Mr. Mohamedbhai reentered the
```

Page 147

```
 1        deposition room.)
 2        Q    Is this a high-crime-rate area?
 3        A    It is.
 4        Q    Was there another officer that
 5   also worked that particular parking lot or that
 6   particular shopping center?
 7        A    On the same night?
 8        Q    Any night.
 9        A    My understanding was they also
10   employed an officer for Friday nights, four hours
11   a night.
12        Q    When you say "they," who is they?
13        A    The property management company.
14        Q    How did you get the job there?
15        A    It was referred to me by another
16   officer.
17        Q    And did you sign a contract with
18   Dunton Realty for your services?
19        A    No.  If I remember correctly, I
20   had to do a 1099 for them.  But I didn't see
21   anybody from the company themselves.  It was all
22   done via fax.
23        Q    Do you know the person's name
24   that you dealt with?
25        A    I didn't deal with anybody at
```

Page 148

```
 1   Dunton.  I was instructed by the officer who gave
 2   me the job -- he provided me a log sheet, an
 3   invoice, and then I obtained a 1099 on my own.
 4        And I was instructed by the officer who
 5   referred me the job to complete the log sheet on
 6   a weekly basis and then to fax the log sheet and
 7   a invoice to Dunton Realty on a weekly basis.  I
 8   subsequently learned later they preferred I
 9   didn't do it on a weekly basis.  They preferred I
10   did it -- I save up two or three weeks, maybe a
11   month, and then fax it all together.
12        Q    Did you ever fax anything to
13   Dillon Companies, Inc., or King Soopers?
14        A    No.
15        Q    Did you know that you were
16   getting paid by Dunton Realty?
17        A    Yes.
18        Q    Did you know you were working for
19   Dunton Realty?
20        A    Yes.
21        Q    You were not working for Dillon
22   Companies, Inc., were you?
23        A    No, sir.
24        Q    Did you take any directions from
25   anybody at King Soopers or Dillon Companies,
```

Page 149

```
 1   Inc., with reference to your job --
 2        A    No, sir.
 3        Q    -- in the parking area?
 4        A    No, sir.
 5        Q    What kind of uniform were you
 6   wearing the night in question?
 7        A    The issued Aurora Police blue
 8   uniform.
 9        Q    Dark blue?
10        A    Dark blue with a black leather --
11   or faux leather gun belt.
12        Q    Does it say -- do you have arm
13   patches that say Aurora Police Department?
14        A    We do now, but I don't remember
15   if at the time we did.
16        Q    Did you identify yourself to
17   Loree Rice at any time that you were a police
18   officer?
19        A    Not that I recall.
20        Q    In your mind, was it obvious that
21   you were a police officer?
22        A    In my mind, yes.
23        Q    If someone was to give you
24   direction as to what to do at this parking lot,
25   who would that person have been?
```

38 (Pages 146 to 149)

Page 150

1   A   I assume that there would have
2   been a manager at Dunton.
3   Q   Would this other officer also be
4   a person who would give you directions in what to
5   do?
6   A   No, 'cause he had turned the job
7   over to me.
8   Q   Okay.  And you were just there to
9   enforce the laws in the parking area?
10   A   Yes, sir.
11   Q   Did you actually go into the King
12   Soopers store --
13   A   To enforce laws?
14   Q   -- at any time?  Yes.
15   A   No.  I did go in and purchase,
16   you know, food on occasion when I was out there.
17   Q   It's my understanding that
18   Mr. Sands and Mr. Kuebler didn't know you before
19   this incident; is that correct?
20   A   On a personal level, no, other
21   than in passing to say hi as I would go in and
22   get a bottle of water or something.
23   Q   They never gave you any
24   directions as to what to do out in the parking
25   lot?

Page 151

1   A   No.  There -- Mr. Kuebler did ask
2   if I would check handicap parking, because he had
3   received complaints -- as he explained it to me,
4   he had received complaints from patrons for
5   people violating the handicap parking.
6   Q   Other than that, did you ever
7   have any meetings with Mr. Kuebler or Mr. Sands
8   or King Soopers with reference to what you were
9   doing out on this lot?
10   A   No.
11   Q   Before Mr. Kuebler mentioned to
12   you that there was a conversation with Loree
13   Rice, had you told any of the security officers
14   what confrontation you had had with her?
15   A   No.
16   Q   So it would be safe to assume
17   they didn't know what had transpired out there
18   between you and Loree Rice?
19   A   Yes, that would be correct.
20   Q   Did Mr. Reddick appear to be
21   concerned about the possibility that maybe the
22   "N" word was said out in the parking lot?
23   A   Yeah.  Yes, he did.
24   Q   The tickets that you write for
25   handicap parking, are they actually written on

Page 152

1   Aurora -- official Aurora documents?
2   A   Yes.
3   Q   The decision to make -- or to
4   charge Loree Rice and her daughter with crimes,
5   whose was that?
6   A   Mine.
7   Q   The decision to arrest her, whose
8   decision was that?
9   A   My decision.
10   Q   Did you ever see the King Soopers
11   security guards ever touch either of -- either
12   Cassidy Rice or Loree Rice?
13   A   No.
14   Q   And when you requested help from
15   the security officers, did you believe that was
16   something that might be necessary?
17   A   Yes.
18   Q   Would you expect them to help you
19   if you needed help?
20   A   The way Mr. Sands termed it to me
21   when he put his hand on my shoulder, I -- I
22   believed in my mind that I had to request help
23   from him before he could intervene.  Whether that
24   was a company policy or whatever, just the way he
25   phrased the terminology, it appeared to me that I

Page 153

1   had to request help before he would become
2   involved.
3   Q   So at no time were you -- were
4   you ever conspiring with anybody with Dillon
5   Companies or King Soopers to somehow racially
6   charge someone with a crime in the parking lot?
7   A   No, sir.
8   Q   Did you ever have any meetings
9   with any King Soopers representatives at any time
10   with reference to your duties out in the parking
11   lot?
12   A   I'm sorry?  Any meetings?
13   Q   Yeah.  Any meetings with any --
14   A   No, sir.
15   MR. HIGGINS:  That's all I have.
16   Thank you.
17   E X A M I N A T I O N
18   BY MR. LANE:
19   Q   Let me do a couple of quick
20   followups here.  Who -- based on your
21   observations, who employed Mr. Sands?
22   A   King Soopers.
23   Q   Okay.  And Mr. Sands and
24   Mr. Kuebler -- Kuebler?  I don't know what his
25   name is.  They both came out of King Soopers; is

39 (Pages 150 to 153)

Page 154

1   that right?
2       A   Yes.
3       Q   And Mr. Sands asked you if you
4   needed help; is that correct?
5       A   Yes.
6       Q   And he was acting in his capacity
7   as a King Soopers employee at that point in a
8   security uniform, based on your observations?
9       A   I believe so.
10      Q   Okay.  Did he touch Loree Rice,
11  to your knowledge?
12      A   No.
13      Q   Did you say you needed help?
14      A   Yes.
15      Q   Okay.  What did he do to help?
16      A   When I was able to get Cassidy
17  away from Loree, I asked him to make sure she
18  stays away from me.
19      Q   That who stays away from you?
20      A   Loree.
21      Q   Okay.  So did he?
22      A   He stepped in between us.
23      Q   Okay.
24      A   And --
25      Q   Did --

Page 155

1       A   I don't know.  My back was to
2   them at the time.  I can only -- based on what I
3   see in the video.
4       Q   So if Loree Rice says yes, he did
5   go hands-on with her, you wouldn't know one way
6   or the other, would you?
7       A   No.  Not when my back was turned,
8   no.
9       Q   Okay.  And if you were using
10  excessive force, which I understand your position
11  is you were not, but if you were and he assisted
12  you in using excessive force -- you understand,
13  as a police officer, a theory of complicity; is
14  that correct?
15      MR. OSBORNE:  I'm going to
16  object.  That calls for a legal conclusion.
17      MR. MORALES:  Same objection.
18      Q   (BY MR. LANE)  Well, let me
19  backtrack.  If my associate here and I go into a
20  liquor store, pull out guns, and rob the liquor
21  store, you understand that the getaway car driver
22  who's part of the plan is as guilty of robbing
23  the liquor store as he and I, right?
24      A   Yes.
25      Q   Okay.  You learn that in the

Page 156

1   police academy, don't you?
2       A   Yes.
3       Q   When someone is engaged in an
4   unlawful activity and somebody is assisting them
5   in that unlawful activity, they're both equally
6   culpable in the eyes of the law.  You understand
7   that, don't you?
8       This is not a trick question.  This is
9   not a law school exam.  This is your common
10  sense.  It's what you do every day on the
11  streets.  You know that to be true, don't you?
12      A   I --
13      Q   Their sentence may be less.  They
14  may have all kinds of mitigation.  But if we're
15  pulling an armed robbery, I don't care whether
16  you're sitting five blocks away in a getaway car
17  or you're standing in the cash register with a
18  gun in the guy's face, you're equally guilty in
19  the eyes of the law, right?
20      A   In the eyes -- yes, in the eyes
21  of the law.
22      Q   Okay.  So you understand, then,
23  that if Sands -- if you were acting unlawfully --
24  and I understand you say you were not.  But if
25  Sands was helping you act unlawfully, you

Page 157

1   understand, in a complicity theory, then Sands
2   would be equally culpable with you, right?
3       MR. OSBORNE:  Same objection.
4       MR. MORALES:  Same objection.
5   Mischaracterizes, because one, you're asking
6   about criminal law, and now you're asking about
7   civil, at least my understanding of what you're
8   doing.
9       A   One, there was no excessive force
10  used.  And two, Mr. Sands, to my knowledge, never
11  touched her.
12      Q   (BY MR. LANE)  Well, you've
13  already said maybe he did, maybe he didn't.  You
14  don't know.
15      A   I didn't say that.
16      Q   You said you didn't see him touch
17  Loree Rice.  You said your back was to him.
18  Isn't that correct?
19      A   My back was to him.
20      Q   So whether he did or did not, you
21  don't know?
22      A   I do based on the video.
23      Q   Based on the video?
24      A   Yes.
25      Q   Well, you've seen that video how

40 (Pages 154 to 157)

Page 158

1  many times?
2      A    Numerous times.
3      Q    Okay.  And it's your testimony
4  that just based on watching the video, he didn't
5  touch anybody?
6      A    Yes, sir.
7      Q    He didn't touch either Loree or
8  Cassidy?
9      A    I never saw him touch either one
10  of them.
11      Q    Okay.  Was his presence there
12  designed to keep Loree away from you?
13      A    Yes.  He did assist in that
14  regard.
15      Q    All right.
16          MR. LANE:  No further questions.
17          MR. MORALES:  Thanks.
18          MR. LANE:  Okay.  Thank you all.
19      (The deposition concluded at
20          12:23 p.m.)
21
22
23
24
25

Page 159

1          A F F I D A V I T
2
3  STATE OF COLORADO    )
                        ) ss.
4  COUNTY OF DENVER     )
5          I have read my deposition, and the same
6  is true and accurate, save and except for changes
7  and/or corrections, if any, as indicated by me on
8  the amendment sheet(s) attached hereto as
9  indicated.
10
11  Amendment sheet(s) attached [ ]
12  No changes; no amendment sheet attached [ ]
13
14
15          _____.
          CHUCK DeSHAZER
16
17      SUBSCRIBED AND SWORN TO before me on this
18  _____ day of _____, 2007.
19      My commission expires:  _____.
20
21
22          _____
              NOTARY PUBLIC
23  in and for the State of _____.
24  kd
25

Page 160

1
2                C E R T I F I C A T E
3
4  STATE OF COLORADO   )
                        ) ss.
5  COUNTY OF DENVER     )
6
7      I, Kathy L. Davis, Certified Realtime
   Reporter and Notary Public in and for the State
8  of Colorado, duly appointed to take the
   deposition of CHUCK DeSHAZER, certify that prior
9  to the examination the deponent was duly sworn to
   testify to the truth in the matters in
10  controversy between the parties herein; that the
   deposition was taken in shorthand by me at the
11  time and place aforesaid and was thereafter
   reduced to typewritten form by me and processed
12  under my supervision, the same consisting of 159
   pages; and that the same is a full, true, and
13  complete transcription of my machine shorthand
   notes.  I further certify that I am not related
14  to, employed by, nor counsel to any of the
   parties herein, nor otherwise interested in the
15  events of the within cause.
16      A transcript review of this deposition
   was requested and is available to the deponent as
17  notified me.
18      IN WITNESS WHEREOF, I have affixed my
   notarial seal this 2nd day of December, 2007.  My
19  commission expires April 29, 2009.
20
21
22      _____
23          Kathy L. Davis
        Certified Realtime Reporter
24
25

41 (Pages 158 to 160)