# EXHIBIT 2

```
                                   Loree McCormick-Rice.
0001
   1           IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
   2
       Civil Action No. 07-cv-00355-RPM-MEH
   3
   4
       _____
   5
       LOREE MC CORMICK-RICE; CASSIDY RICE, through her next
   6   friend Loree McCormick-Rice,
   7   Plaintiffs;
   8
       v.
   9
  10   CHARLES DESHAZER, in his official and individual
       capacity; DILLON COMPANIES, INC., d/b/a KING SOOPERS,
  11   INC., a Kansas corporation, and ERNEST SANDS,
  12   Defendants.
       _____
  13
  14
  15
  16
  17           DEPOSITION OF LOREE MC CORMICK-RICE
  18                  Thursday, March 6, 2008
  19
  20
  21
  22
  23
       Pursuant to Notice taken on behalf of the Defendants
  24   at 15151 East Alameda Parkway, Suite 5300, Aurora,
       Colorado, at 9:18 AM before Martha Loomis, Certified
  25   Shorthand Reporter and Notary Public within Colorado.
0002
   1   APPEARANCES:
   2
       DAVID A. LANE and QUSAIR MOHAMEDBHAI, Attorneys at
   3   Law, from the Law Firm of Killmer Lane & Newman, LLP,
       1543 Champa Street, Suite 400, Denver, Colorado
   4   80202, appearing on behalf of the Plaintiffs.
   5
       PETER RUBEN MORALES, Attorney at Law, Office of the
   6   City Attorney, City of Aurora, 15151 East Alameda
       Parkway, 5th Floor, Aurora, Colorado  80012,
   7   appearing on behalf of Defendant City of Aurora.
   8
       DAVID R. OSBORNE, Attorney at Law, from the Law Firm
   9   of Hamilton & Faatz, 1600 Broadway, Suite 500,
       Denver, Colorado  80202, appearing on behalf of
  10   Defendant Lieutenant DeShazer.
  11
       STEPHEN HIGGINS and JIM M. MESECK, Attorneys at Law,
  12   from the Law Firm of White & Steele, PC, 950 17th
       Street, Suite 2100, Denver, Colorado  80202 appearing
  13   on behalf of Defendants King Soopers, Inc., and
       Ernest Sands.
  14
  15
                 Also Present:  Lt. Charles DeShazer;
  16              Cassidy Rice; George Koumantakis
  17
                                 Page 1
```

Loree McCormick-Rice.
```
24    understand my question simply ask me to rephrase it.
25               One of the general rules of depositions
0007
 1    is that while you are free to consult your counsel at
 2    any time, the one occasion upon which you cannot
 3    consult with him is when there's a question already
 4    on the table.
 5               In other words, let's say I asked you if
 6    your suit is red and for some reason that was a
 7    question you wanted to consult him about.  You would
 8    have to answer the question first, then you can go
 9    consult with him.  Otherwise we can take as many
10    breaks as you want to consult with your counsel as
11    long as you want, all right?
12         A.   Yes.
13         Q.   Okay.  On the way here through this
14    little maze we call the City Attorney's office I
15    showed you where the rest rooms were.  Generally it's
16    a right, a left, then a right down the little hallway
17    just so you know.
18               There is some water over there and
19    coffee.  Again at any time you need a break for any
20    reason let me know and we'll take the break.
21               Let's go ahead and get started.  Is
22    there any reason today medically or otherwise that
23    you cannot fully respond to my questions,
24    Mr. Osborne's questions, Mr. Meseck's questions or
25    Mr. Higgins' questions?
0008
 1         A.   Not at this point.
 2         Q.   You say "not at this point," which seems
 3    to qualify it.  Is there some condition that you
 4    believe may arise during the deposition?
 5         A.   I do have some medical problems but not
 6    at this point.  I feel capable to go on.
 7         Q.   Okay.
 8         A.   If I do --
 9         Q.   I think I saw that you carried in an --
10    and I apologize.  I don't know the terminology --  an
11    oxygen kit unit or something to that effect.
12         A.   Yes, sir.
13         Q.   You're not wearing it now; is that
14    right?
15         A.   Yes.
16         Q.   Is that what you were referring to, at
17    some point you might need a break to at some time put
18    your oxygen on?  Something to that effect?
19         A.   I can put that on.  I also have a
20    medical kit in the car for asthma.  I have my inhaler
21    over there if need be.  I also have injections if I
22    need to take them.
23         Q.   All right.  Those go to a respiratory
24    issue; is that right?  Those medical devices that you
25    just talked about, these are all respiratory?  The
0009
 1    asthma?
 2         A.   Yes.
 3         Q.   Has nothing to do with your mental
 4    capability today to answer my question today; is that
 5    right?
 6         A.   No.  But I also take pain pills.
 7         Q.   Okay.  What kind of pain pills do you
 8    take, ma'am?
```

```
                              Loree McCormick-Rice.
12         A.    Yes.
13         Q.    Okay.  Let me show you Exhibit B and
14   Exhibit C.
15               (Exhibits B and C.)
16         Q.    Now, I'll give you a chance to study
17   them before I ask any questions.
18               MR. LANE:  Why don't you go ahead and
19   ask a question?  These are fairly meaningless without
20   a question.
21               MR. MORALES:  I'm planning on it.  I was
22   giving you the courtesy --
23               MR. LANE:  Sorry.  She doesn't need to
24   review it.  It's fairly meaningless without a
25   question for context.
0022
 1         Q.    (BY MR. MORALES)  Turning to B this says
 2   at the top of it, does it not, A criminal history,
 3   does it not?
 4         A.    Yes
 5         Q.    And it relates to a party known as Loree
 6   M. Rice, correct?
 7         A.    Yes.
 8         Q.    And you see it has a creation date of
 9   6-21, 2006?
10         A.    Yes.
11         Q.    And then just before I get into the
12   particulars, Exhibit C is a single page that is a
13   disposition screen report for a party named Loree M.
14   Rice, date of birth 1-9, 1955, correct?
15         A.    Yes.
16         Q.    Is your birthdate 1-9, 1955, ma'am?
17         A.    Yes.
18         Q.    Looking to Exhibit C there apparently
19   was a conviction, a guilty plea to the first charge
20   of false statement.  Then there was a dismissal of a
21   misdemeanor crime called false report with a $50 fine
22   being imposed.
23               Do you recall this disposition?
24         A.    No, I don't recall it.  It's been so
25   long ago.
0023
 1         Q.    Okay.
 2         A.    I don't recall it.
 3         Q.    All right.  And the reason you might not
 4   recall it -- I took the liberty.  Look at Exhibit B.
 5   You'll see the handwritten notes.  This is from an
 6   incident back on November 29, 1994.
 7               Do you see that?
 8         A.    Yes.
 9         Q.    Involving some kind of incident that
10   occurred at I-225 and I-70.  I'd like you to review
11   those notes and see if that sparks your memory and
12   refreshes your recollection about it.
13         A.    As best as I can remember I remember
14   speeding and I pleaded guilty to a speeding.
15               I recall telling the officer that my
16   cousin and I were sick after we had ate something.
17   And that's to the best of my recollection of what it
18   may be speaking of.
19         Q.    All right.  Now, you see there the notes
20   include what a false statement is at the bottom?
21               MR. LANE:  Can I interrupt?  Those are
22   your handwritten notes?
                              Page 10
```

```
                                        Loree McCormick-Rice.
14       Q.    Okay.  Now, it says here, and we've read
15  it together once, you assumed Sergeant DeShazer was
16  only contacting you because you were a black female
17  and he pretended not to see the placard so he could
18  harass you.  Is that correct?
19       A.    I didn't say that; that's what
20  Sergeant -- I mean, Lieutenant Jeans wrote.
21       Q.    So you're disavowing what it says in
22  Exhibit F?
23       A.    Yes.  That's not what I said to him.
24       Q.    What did you tell Lieutenant Jeans?
25       A.    When I flicked my lights and asked
0051
 1  him --  he asked me was that my vehicle once my
 2  lights went on.  And I said, Yes.
 3       Q.    Would you agree with me that what I said
 4  to you is contained in Exhibit F?  Is that correct?
 5  Exhibit F is this one, ma'am.
 6             MR. LANE:  Exhibit F.
 7       A.    Okay.
 8       Q.    (BY MR. MORALES)  It does say, does it
 9  not, that you assumed DeShazer was only contacting
10  you because you were black, and he pretended not to
11  see the placard so he could harass you.  Isn't that
12  right?  That's what it says?
13       A.    That's what it says.
14       Q.    Okay.  Let's stick with that for a
15  while.
16             That statement indicates, does it not,
17  that the party making it, assuming it to be you just
18  for the sake of this question, assumes that Sergeant
19  DeShazer could actually see the placard as well as
20  you could.  Isn't that true?
21             MR. LANE:  I'm going to object to the
22  form.
23             Go ahead and answer.
24       Q.    (BY MR. MORALES)  That's fine.
25             (Mr. Koumantakis left the deposition.)
0052
 1       A.    Yes.
 2       Q.    In other words, today you believe, isn't
 3  it true today you believe that Sergeant DeShazer
 4  could see the placard as easily as you could on that
 5  night?  Isn't that true?
 6       A.    Yes.
 7       Q.    And yet it's also true that you have no
 8  idea, do you, what Sergeant DeShazer could or could
 9  not see on that night.  Isn't that also true?
10       A.    That I have no idea what he could or
11  could not see?
12       Q.    Exactly.
13       A.    The placard was clearly hanging and it
14  was visible.
15       Q.    That's not my question.  You assumed
16  that Sergeant DeShazer could see what you could see.
17  Isn't that true?
18       A.    Yes.
19       Q.    Okay.  And you assumed because you could
20  see the placard and you knew where it was he could
21  also see the placard and knew where it was.  Isn't
22  that true?
23       A.    Yes.
24       Q.    It's true is it not that prior to the
                             Page 22
```

```
                                          Loree McCormick-Rice.
25   start of this incident you had never ever met
0053
 1   Sergeant DeShazer?  Isn't that correct?
 2         A.    Correct.
 3         Q.    You knew nothing about him at that time,
 4   at the point of initial contact.  Isn't that correct?
 5         A.    Correct.
 6         Q.    So it would be a pretty big assumption
 7   to assume, would it not, that the only reason he's
 8   contacting you is because he could see you were a
 9   woman of color, and he wanted to harass you?  That
10   would be a pretty big assumption.  Isn't that true?
11               MR. LANE:  I'm going to object.
12   Compound question.
13               MR. MORALES:  I'll break it up.
14         Q.    (BY MR. MORALES)  Sergeant DeShazer on
15   that night could see that you were a woman of color.
16   We would agree with that; is that right?
17         A.    Yes.
18         Q.    You don't know whether he could see your
19   placard or not.  Isn't that also true?  But you
20   believe he could?
21         A.    Yes.
22         Q.    I know you say you didn't say that.  But
23   I'm just asking for the sake of the question, the
24   statement that there was an immediate assumption that
25   Sergeant DeShazer was only contacting her because she
0054
 1   was a black female and pretending not to see the
 2   placard so he could harass her, that's a pretty big
 3   assumption.  Isn't that true?
 4               MR. LANE:  Object to form.
 5               Go ahead and answer.
 6         A.    Yes.
 7         Q.    (BY MR. MORALES)  The reason that's a
 8   pretty big assumption is because you knew nothing
 9   about DeShazer until later in the event.  Isn't that
10   right?
11         A.    Yes.
12         Q.    Let me ask this.  Do you believe that
13   all white police officers are racist, ma'am?
14         A.    No.
15         Q.    You believe, however, today that
16   Sergeant, former Sergeant DeShazer now Lieutenant
17   DeShazer, is in fact a racist?
18         A.    Do I believe that?
19         Q.    Yes.
20         A.    Yes.
21         Q.    And that is based upon what happened in
22   the incident?
23         A.    Based on the name-calling, the way he
24   treated us, yes.
25         Q.    Now, let's take a look at what you said
0055
 1   in the Body of Christ News, which is Exhibit G, about
 2   the initial contact.
 3               Do you see there in the article that you
 4   partially authored, looking at the very first
 5   paragraph going into the second one, those relate to
 6   the initial contact that we just went over to some
 7   degree in Exhibit F.
 8               This reads, does it not, It all began
 9   when I had my vehicle parked in the handicapped
                              Page 23
```

Loree McCormick-Rice.

1 me that the second paragraph contains the information
2 about the white female indicating that she did not
3 have a handicapped placard? Is that true?
4     A.   She did not have one.
5     Q.   Okay. I'm asking is it true the second
6 paragraph of Exhibit F is the paragraph that contains
7 that information.
8     A.   Yes.
9     Q.   And it's the third paragraph where
10 apparently, according to Lieutenant Jeans, that's
11 where you tell him that he called you a nigger. Is
12 that right?
13    A.   Yes.
14    Q.   In the Body of Christ News which you
15 authored with Randy it's true, is it not, in
16 Exhibit G that, let's see, five paragraphs down that
17 is the paragraph that contains the information about
18 the white woman saying, I'm parked right next to you
19 in the handicapped parking. He walked right past me
20 without even questioning.
21         It's the next paragraph that the racial
22 epithet, Fucking niggers, appears. Is that correct?
23    A.   Correct.
24    Q.   Okay. Let's take a look at Exhibit A.
25 This is your responses, ma'am. Interrogatory No. 5
0083
1 on page 4.
2         Have you got page 4, ma'am?
3     A.   Yes.
4     Q.   Now, I'm interested in the remainder of
5 that response. Going on from that sentence we were
6 talking about earlier.
7    Until he saw me, the response goes on, does it
8    not: After that he stopped me and asked if the
9    vehicle was mine. When I replied, Yes, DeShazer
10   continued to ask me, Where is the handicapped
11   placard? I don't see it.
12        After opening my car door and examining
13   the placard he then began looking in the back seat
14   of the van seeing my oxygen nebulizer. As
15   DeShazer walked away he referred to us as, quote,
16   fucking niggers, unquote.
17        Another woman said, Did you hear that?
18   That's just pure racism. When will it ever end?
19   I'm parked right here next to you in a handicapped
20   spot without a handicapped placard and he walks
21   right past me and didn't question me about not
22   having a placard; yet he harasses you when your
23   placard is hanging right there in plain sight.
24        That's what that reads; is that right?
25    A.   Yes.
0084
1     Q.   You prepared this response?
2     A.   Yes.
3     Q.   When we look at all the exhibits would
4 you agree with me that in Exhibit A, second
5 paragraph, the first and second paragraphs to your
6 response to Interrogatory No. 5 actually reverses the
7 order of what you testified to in court, what you put
8 in Exhibit G, and what's contained in Exhibit F as to
9 when the racial epithet occurred?
10        MR. LANE: Objection to form. I'm going
11 to say that that is a compound question.

Page 35

Loree McCormick-Rice.

```
 8        Q.    So is there anything else besides the
 9  incident where DeShazer interacted with you over the
10  handicapped placard and the alleged interaction at
11  the vehicles that are the basis for your claim of
12  willful, wanton conduct?
13        A.    To my knowledge.
14        Q.    What does that mean, to your knowledge?
15        A.    As far as I can understand that would be
16  the conclusion.
17        Q.    And you understand that it's important
18  for us to know what this is all about, because
19  eventually we're going to have to go to trial over
20  this.  That's is what the discovery process is all
21  about, to figure out what the claims are before we
22  get to court, correct?
23        A.    Yes.
24        Q.    So I'm a little bit cautious with your
25  response when you say, For now.  I'm not going to get
0216
 1  another opportunity to talk to you; this is it.
 2              It's important when you answer these
 3  questions if this is it this is it.
 4        A.    Yes.
 5        Q.    Okay.  So those two incidents that we're
 6  talking about: the initial interaction over the
 7  placard and then your allegations that he used
 8  excessive force --
 9        A.    The ongoing --
10        Q.    -- vehicles?
11        A.    The ongoing harassment.
12        Q.    What do you mean by that, "ongoing
13  harassment"?
14        A.    How he kept saying he didn't see it, he
15  didn't see it.  Four times he said that.
16              He gets in the car and he touches it.
17  He looks around in the car.  That should be enough
18  right there.  He doesn't leave it like that.
19        Q.    So besides that initial feel of the
20  placard and then the interaction that happened
21  thereafter?
22        A.    I felt that DeShazer waited for us to
23  come out of the store.  He went somewhere out in the
24  parking lot, got his car and parked it up on the
25  sidewalk.  It wasn't on the sidewalk when we walked
0217
 1  in the store.
 2              I saw that navy blue Taurus several
 3  times while I was inside the King Soopers; I just
 4  didn't know who was driving the navy blue Taurus.
 5              When I went outside, and after having --
 6  after him being parked on the sidewalk and we passed
 7  by him -- although we didn't know that was him -- and
 8  he yells out, Fucking idiots, still didn't know that
 9  was him until he puts his overhead light on and
10  confronts Cassidy and I.  That's when I realized it
11  was him.
12              So at that point in time he was angry
13  because we went and reported it that he called us a
14  fucking nigger and he was going to get us back for
15  doing it.  Because he also said, You still want to
16  fuck with me?  Mighty funny you wasn't acting like
17  that.  You didn't have on your oxygen tank in the
18  store.  You didn't have it with you.
```

Page 90

```
                              Loree McCormick-Rice.
19              Then he kept on asking me the same
20   questions once I was placed in the police car over
21   and over again, my name, my address, my telephone
22   number, my Social Security number.
23              And once I gave that information to him
24   he kept saying -- when I asked for my oxygen he
25   wasn't willing to give it to me until the officer in
0218
 1   the other car said, She says she's having problems
 2   breathing.  Another policeman told him that I was
 3   wheezing.
 4              He told -- he tells them to make me wait
 5   about another 10 minutes.  My daughter is screaming
 6   out, You're going to kill my mom.  You're going to
 7   kill my mom.  My mom has a lot of medical
 8   problems.
 9              DeShazer comes back to the car asking me
10   the same questions which he had posed to me before.
11   Cassidy is still yelling.  I lay down in the seat
12   trying to pray and get myself together, but yet
13   concerned about her.
14              And then when I told -- when I asked the
15   officer to undo my bra so I could breathe he said he
16   couldn't do it so he asked the female policeman
17   there.  She waited a few minutes.  Later she came
18   back over there, shoved the canula up my nose.
19              I asked for the inhaler.  She didn't
20   shake it.  She didn't give it to me properly, but I
21   made it through that ordeal.
22              And then DeShazer came back to the car
23   saying, You still want to fuck with me?  And I said
24   it was true that he said what he said.  And at the
25   same time one of the officers told him that he needed
0219
 1   to let me go, and what was he going to charge me
 2   with?  He said, I don't know.  I'll think of
 3   something.  Those are his words.  I will swear those
 4   were his words.
 5              He called the other policemen into the
 6   middle of the street and told them -- right before
 7   that he told them to get their stories right.  And he
 8   asked Kuebler -- I think his name was Kuebler now
 9   that I know.  The tall security guard -- You heard
10   what she said.  You heard her say, Fuck you.  Kuebler
11   said, You said something to her first.
12              And then he told Kuebler, as far as I
13   can remember, to go back, okay?  Then he goes over to
14   the car where Cassidy was.  First he tells -- right
15   before he does that he comes back over there where I
16   was and he tells me to get out of the car.  He asked
17   me another question.  I don't too much remember what
18   that question was because I took my time getting out
19   of the car.  He said, Oh, if you don't answer you'll
20   just spend the weekend in jail with your daughter.
21              I told him, Just leave my baby alone.
22   Whatever he needs to know that I will tell him.  And
23   he goes, I thought you couldn't talk, quote, unquote.
24              That's what happened.  Those are the
25   facts regardless what order that they are placed in.
0220
 1   Those are the facts.  That's what happened.
 2              And I don't care if he sits here today
 3   and you sit here today and say, I allege this.  Those
                              Page 91
```

Loree McCormick-Rice.
```
10   e-mail address do you have about that?
11        A.    About me?  Lmac003 at comcast dot net.
12        Q.    What is it?
13        A.    About me?
14        Q.    Or where you can find out about this
15   particular case.
16        A.    You can find out about some of the
17   things that happened.  And you can also find out by
18   using copwatch.
19              MR. LANE:  Are you talking about a
20   website or an e-mail address?
21        Q.    (BY MR. HIGGINS)  A website.  I think
22   you gave me the website, right?
23        A.    You asked me for my e-mail address.
24        Q.    I don't want your e-mail address.  I
25   want a website.
0245
 1              If I wanted to find out, make a
 2   complaint about this case or find out about this
 3   case, what's the website?
 4        A.    I really don't know the website.
 5        Q.    You accused Mr. Sands of beating you,
 6   assaulting you when you were in court before the case
 7   was dismissed.
 8        A.    I accused him of being part in it, yes.
 9        Q.    And you accused Mr. Reddick of
10   assaulting you, right?
11        A.    I was wrong about Mr. Reddick.  I didn't
12   know the names clearly at that time.  I didn't know
13   Russ' last name.  And that's the reason why I
14   referred to him as Russ instead of Reddick because I
15   really didn't know the names.
16        Q.    You filed a complaint in federal court
17   alleging that Mr. Sands brutally beat you and your
18   daughter, and was part of the conspiracy to beat your
19   daughter.  Is that correct?
20        A.    Brutally beat me and my daughter?
21        Q.    Yes.
22        A.    He put his hands on Cassidy.
23        Q.    Put his hands on Cassidy?
24        A.    I don't recall him touching me.  And I
25   never said he touched me.
0246
 1        Q.    You said you've talked to hundreds of
 2   people about this incident.  And hundreds of people
 3   you've told that Ernie Sands ought to be fired,
 4   shouldn't he?
 5        A.    Yes.
 6        Q.    You still believe that, don't you?
 7        A.    I don't know.
 8        Q.    Have you been passing out brochures at
 9   the boycott?
10        A.    Yes.
11        Q.    Do you authorize those brochures?
12        A.    Do I authorize them?
13        Q.    Yes.
14        A.    Yes.
15        Q.    In front of you I believe I have handed
16   you Exhibit Q.
17        A.    Yes.
18        Q.    Would you take a look through these
19   quickly?
20              MR. LANE:  What's the question?
```
Page 102

Loree McCormick-Rice.

```
24        Q.    You were talking to the lady and you
25   overheard him talking to the security guard?
0259
 1        A.    Yes. As he approached the security
 2   guard he said, Can you believe these fucking niggers?
 3   Quote, unquote. And the other guy laughed.
 4              Those are the facts. I don't care.
 5        Q.    I want to know how far away from you
 6   they were.
 7        A.    Just no further than from here to that
 8   door.
 9        Q.    Ten feet?
10        A.    Maybe closer.
11        Q.    And where did Officer DeShazer go after
12   he did that? Did you follow him or see him again
13   anywhere?
14        A.    After he said that a couple of people
15   and myself talked a couple of seconds, Did you hear
16   that? Blah blah. I approached him and I said,
17   Excuse me. Did you call me and my daughter out of
18   our name? Did you call us the N? And he laughed and
19   said, Yeah. He admitted that he said it.
20              But he wasn't a -- coward enough to
21   admit it that night. If he was man enough to admit
22   it that night he should be a man enough to admit it
23   now.
24        Q.    You had a confrontation with him after
25   he said it?
0260
 1        A.    No. It wasn't a confrontation. I
 2   asked him and he replied as though it was funny. I
 3   walked back to the car.
 4        Q.    Then you went to the store?
 5        A.    Yeah. I went in and reported it.
 6        Q.    Did you feel threatened?
 7        A.    Did I feel threatened?
 8        Q.    Yes.
 9        A.    I don't know if I felt threatened or
10   not. I wanted to know why would he say that. And I
11   wanted to know why did he look in my car and touch
12   it, look around in my car, touched the handicapped
13   placard even after the door was physically open and
14   he saw that the placard was there.
15              He didn't just walk away. He did not
16   walk away once he even -- it was clear to him that
17   the placard was there. He didn't walk away.
18        Q.    Let me ask you. When you drove that car
19   out of the parking lot had you not said anything to
20   this police officer we probably wouldn't be here,
21   would we?
22        A.    No. We would be here.
23        Q.    Why?
24        A.    Because when I went in to report him
25   initially he walked up and he turned around and went
0261
 1   back in the opposite direction, went back this way.
 2   I thought he was gone.
 3              He came up to the door. Then he turned
 4   around and went back into the parking lot. I
 5   continued to talk, to tell the other people what was
 6   going on. And I saw that car, that navy blue car
 7   come back up this road right here and stop right here
 8   in this row. And I initially thought that a person
```

Page 108

Loree McCormick-Rice.

9 was looking for a handicapped parking spot.  I didn't
10 pay much attention to it.
11         My car is registered out of state to my
12 family.  He could not follow me to my house because
13 he didn't know where I lived because it was an
14 out-of-state license plate tag.  So in my mind after
15 everything was done and over it was my belief that he
16 sat right here and waited till I came out of the
17 parking lot and confronted me again, came out of the
18 store to confront me.
19         He positioned himself this way, lights
20 on, engine running.  And when I came up this way I
21 turned right here.
22   Q.   Why did you go up that way?  You went
23 the wrong way.
24   A.   Well, I think cars come -- well, if I
25 went the wrong way so was this car going the wrong
0262
1 way.  So -- 'cause it works every other way.  But
2 cars come up and go out all the ways.
3   Q.   Were you upset at the time you were
4 leaving the store?
5   A.   Was I a bit upset?  Yes, I was upset
6 because he had called me that.  It was clear he had
7 seen the handicapped placard when I passed him.
8         Mind you I did not know it was he in the
9 unmarked police car.  I didn't even know it was a
10 police car.  And he said, You fucking idiot.  And I
11 said back to him, Fuck you.  I'm thinking it's just
12 another racist person being the way that he is.
13         I've already experienced it from him.
14 The last thing I want to do is experience it from
15 somebody else.  I said, Fuck you.
16         I'm woman enough to admit what I said.
17 He should be man enough to admit what he said and
18 done.
19   Q.   Based on my experience, and maybe you
20 can tell me.  If I drive by a car and I yell, Fuck
21 you at the people in the car, I can probably expect
22 something is going to happen.  Would you agree with
23 that?
24   A.   If you yell -- say that again, please.
25   Q.   I say, Hey -- if I'm driving a car and I
0263
1 yell out my window at that person and yell as loud as
2 I can, Fuck you, I could probably expect somebody is
3 going to do something about it, right?
4         Would you expect somebody to do
5 something or just drive off?
6   A.   Would you yell, Fuck you to somebody for
7 no reason?  You don't know who they are?  I don't
8 know who you are?
9   Q.   I'm asking you.  You don't even know
10 this person and you yell at him, Fuck you.  And
11 you're telling us, Hey, it shouldn't be a problem?
12   A.   Works both ways, don't you think?
13   Q.   Yeah, I think it does.  Maybe it's
14 something you shouldn't have said.
15   A.   He shouldn't have said it to me.  How
16 did I know he was a cop?  He was in an unmarked
17 vehicle.
18   Q.   Did you see him coming after you?
19   A.   No, not until -- I didn't see him coming

Page 109

Loree McCormick-Rice.
```
19   of Cassidy and I with DeShazer.
20        Q.   I'm going to ask my question again.  How
21   are you going to reconstruct his reputation when you
22   said that gentleman also kicked her after Mr. Lane
23   pointed out to you who it was, and also said the name
24   on that date?  Isn't that right?  He said, Mr. Russ
25   Reddick.  There was a question --
0281
 1        A.   He said Mr. Reddick.
 2        Q.   Okay.  How are you going to reconstruct
 3   that reputation?
 4        A.   I don't have a problem of apologizing
 5   when I'm wrong, just like I did with him.
 6        Q.   My understanding is you are going to
 7   make an apology to Mr. Reddick.  Is it going to be
 8   public?
 9        A.   I don't know if it's going to be public
10   or not.
11        Q.   Well, ma'am, the fact of the matter is
12   all these other people who heard you make the
13   accusation that Mr. Reddick engaged in basically a
14   racist attack, you're not prepared to correct that
15   situation.
16             MR. LANE:  I'm going to object.  This is
17   argumentative.
18             MR. MORALES:  I got the right to ask the
19   question.  It goes to motive.
20             MR. LANE:  I'm simply objecting.
21             MR. MORALES:  Fine.  You've got your
22   objection.
23        A.   I don't know.
24        Q.   (BY MR. MORALES)  You don't know.  I
25   thought you just said, ma'am, under oath that if
0282
 1   you --
 2        A.   You said "public."
 3        Q.   Okay.  What are you going to do to fix
 4   that reputation of Mr. Reddick?  What are you going
 5   to do?
 6        A.   I don't know.
 7        Q.   You're not going to do anything, are
 8   you?  Because it's more convenient to play this
 9   race card and just make accusations --
10        A.   I'm not playing a race card.
11        Q.   Let me finish my question.
12             MR. LANE:  I'm going to object to the
13   question.  It's argumentative and confrontational.
14             MR. MORALES:  It goes right to bias and
15   motive and you know it.
16             MR. LANE:  You're asking a leading
17   question that assumes facts not in evidence.  You're
18   asking her more convenient --
19             MR. MORALES:  I'll change the question.
20             MR. LANE:  Okay.
21        Q.   (BY MR. MORALES)  When you made the
22   accusation against Russ Reddick in court you were
23   playing the race card, weren't you?
24        A.   No, I wasn't.
25        Q.   You admit now it was a mistake, correct?
0283
 1        A.   I didn't know his last name.
 2        Q.   Ma'am, was it a mistake?
 3        A.   Yes.
```
Page 117