# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-cv-00355-RPM-MEH

---

DEPOSITION OF:  ERNEST D. SANDS
EXAMINATION DATE:  FEBRUARY 11, 2008

---

LOREE McCORMICK-RICE, CASSIDY RICE, through her
next friend Loree McCormick-Rice,


Plaintiff,

v.

CHARLES DESHAZER, in his official and individual
capacity, DILLON COMPANIES, INC. d/b/a KING
SOOPERS, INC., a Kansas corporation, and EARNEST
SANDS,


Defendants.

---

        PURSUANT TO NOTICE, the deposition of
ERNEST D. SANDS was taken at 9:18 a.m. on
February 11, 2008, at 1543 Champa Street, Suite
400, Denver, Colorado, before Kathy L. Davis,
Certified Realtime Reporter and Notary Public in
and for the State of Colorado, said deposition
being taken pursuant to the Federal Rules of
Civil Procedure.



                Kathy L. Davis
            Certified Realtime Reporter

## Page 2

```
 1              A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3        DAVID A. LANE, ESQ.
          QUSAIR MOHAMEDBHAI, ESQ.
 4        Killmer, Lane & Newman, LLP
          1543 Champa Street, Suite 400
 5        Denver, CO 80202
          (303) 571-1000
 6
 7    FOR THE DEFENDANTS KING SOOPERS and SANDS:
 8        STEPHEN HIGGINS, ESQ.
          JIM M. MESECK, ESQ.
 9        White & Steele, P.C.
          950 17th Street, Suite 2100
10        Denver, CO 80202-2804
          (303) 296-2828
11
12    FOR DEFENDANT DESHAZER:
13        DAVID R. OSBORNE, ESQ.
          Hamilton and Faatz, P.C.
14        1600 Broadway, Suite 500
          Denver, CO 80202-4905
15        (303) 830-0500
16        PETER RUBEN MORALES,
              ASSISTANT COUNTY ATTORNEY
17    City Attorney's Office, Civil Division
      City of Aurora, Colorado
18    15151 East Alameda Parkway, 5th Floor
      Aurora, CO 80012
19    (303) 739-7030
20
21    Also Present:  None
22
23
24
25
```

## Page 3

```
 1                 I N D E X
 2    EXAMINATION BY:              PAGE
 3    Mr. Lane ............................  4
      Mr. Higgins ........................ 130
 4
          I N D E X   O F   E X H I B I T S
 5
      DEPOSITION              PAGE FIRST
 6    EXHIBIT NO.  DESCRIPTION    APPEARS
 7     1   King Soopers/City Market .........  71
           Confidential Investigative
 8         Report Not for Public Release
           written by Sands
 9
       2   Handwritten statement by Sands ...  83
10         dated 6-17-06
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              P R O C E E D I N G S
 2    (Mr. Morales and Mr. Meseck were not
 3    present at this point in the
 4    proceedings.)
 5              ERNEST D. SANDS
 6        The deponent herein, being first duly
 7    sworn to testify to the truth in the above cause,
 8    was examined and testified on his oath as
 9    follows:
10              E X A M I N A T I O N
11    BY MR. LANE:
12        Q    Good morning, Mr. Sands.  Could
13    you state your name and spell your name for the
14    record, please.
15        A    Ernest D. Sands, S-a-n-d-s.  Last
16    name Sands.
17        Q    Okay.  And how are you employed?
18        A    King Soopers security guard.
19        Q    Okay.  And how long have you been
20    so employed?
21        A    Roughly three years and -- about
22    three and a half years.
23        Q    Okay.  Let me just get a little
24    bit of history on you.  But before we do that,
25    you were here for DeShazer's deposition, weren't
```

## Page 5

```
 1    you?
 2        A    Yes, sir.
 3        Q    Okay.  So you kind of have some
 4    idea of how this works.  You know, every word you
 5    say is under oath, and it's going to be used in
 6    court.  You understand that, don't you?
 7        A    Yes, sir.
 8        Q    And this case very likely will
 9    end up going to trial, and a jury at some
10    point -- you're going to be on the witness stand,
11    and you know, everything you're saying here is
12    potentially going to be trotted out in front of
13    that jury in federal court whenever we go to
14    trial on this case.  You understand that?
15        A    Yes, sir.
16        Q    Okay.  So you understand that
17    it's very important for you to give complete and
18    thorough and truthful answers to every question I
19    ask you, don't you?
20        A    Yes, sir.
21        Q    And you have a right, as the
22    deponent here, to have me rephrase anything you
23    don't understand, clarify anything you don't
24    understand, ask me to repeat it, explain it.  We
25    can do all those things without any difficulty at
```

2  (Pages 2 to 5)

Page 6

1    all.
2         A    (Deponent nodded.)
3         Q    Because the main goal here is to
4    make sure you understand the questions and you're
5    giving truthful and complete answers to all of
6    them.  Okay?
7         A    Yes, sir.
8         Q    If you need to take a break at
9    any time, you just tell me.  We'll take a break.
10   You can consult with your lawyer anytime you
11   want, with one exception, and that is, in order
12   to follow the local rules, anytime you want to
13   consult with your lawyer, you have to answer any
14   question that I've asked you first.  I can't ask
15   you a question, then you say, I need to talk to
16   my lawyer before I answer that.  You've got to
17   answer the question.  Then you can talk to your
18   lawyer.  You can come back, amend your answer,
19   change your answer, complete your answer,
20   whatever you need to do.  That's fine, okay?
21        A    Yes, sir.
22        Q    All of your answers have to be
23   oral, because the court reporter can't easily
24   concentrate on shakes of the head, okay?
25        A    Yes, sir.

Page 7

1         Q    All right.  So given all that,
2    let's start asking some questions.  You know the
3    nature of this case, right?
4         A    Yes, sir.
5         Q    Okay.  What is your understanding
6    of what Loree and Cassidy McCormick-Rice are
7    talking about here in this complaint?
8         A    I don't quite understand your
9    question on that.
10        (Mr. Morales entered the deposition
11        room.)
12        Q    What's this case all about, as
13   far as you're concerned?
14        A    Well, they're --
15        Q    What are they claiming?  What are
16   you claiming?  What's King Soopers saying?
17   What's DeShazer saying?
18        A    Well, to my understanding,
19   they're claiming or allegedly claiming that
20   there's some type of brutality here.
21        Q    Okay.  And what is DeShazer
22   saying about that, as far as you know?
23        A    I have no knowledge what
24   DeShazer's saying.
25        Q    Well, you kind of sat here

Page 8

1    through his deposition, so you have some
2    knowledge.  You heard what he said, right?
3         A    I don't recall his exact words or
4    what he said.
5         Q    No.  I'm not asking for exact
6    words.  Just give me a paraphrase.  Give me your
7    understanding of what this case is all about.
8         A    Well, DeShazer's obviously
9    defending himself.
10        Q    Okay.  And what's your -- what do
11   you perceive Loree and Cassidy are saying your
12   role in all of this was?
13        A    I'm not quite clear exactly what
14   your question is there.
15        Q    Well, what -- you know about this
16   case, right?  I mean, you've been following it.
17        A    Yes, I do.
18        Q    What do you think they're
19   accusing you of doing?
20        A    Well, they're accusing me of
21   brutality.
22        (Mr. Meseck entered the deposition
23        room.)
24        Q    Okay.  And what's your response
25   to that?

Page 9

1         A    That is not true.
2         Q    Okay.  And what else -- you've
3    got a counterclaim going against Loree Rice,
4    okay?
5         A    That is true.
6         Q    Okay.  What are you claiming she
7    did?
8         A    They've caused me grave
9    embarrassment.  They've caused me discomfort.
10   They forced me to go to the doctor.  I received
11   death threats.  It's caused me to get out of my
12   regular context of life here.
13        And the customers at Store 10,
14   Mississippi and Chambers, I know several of the
15   customers.  And it's a quite and complete
16   embarrassment of the accusations she's making in
17   the parking lot for the last year, passing out
18   pamphlets with my name on it, which is not true;
19   any of it's not true.  Yes, that's -- it's caused
20   me to have some real concerns about this.
21        Q    Okay.  All right.  So now let's
22   talk about all those incidents.  But first let me
23   go back to your history, your employment history,
24   okay?  You've been at King Soopers for about
25   three years.  How old are you?

Page 10

1      A   I am 62, be 63 in March.
2      Q   Okay.  So you've got about --
3  well, you've got a long history to go back
4  through.  Can you give me just some background on
5  yourself, your employment history, your prior
6  employments.
7      A   Okay.  Where do you want to
8  start?
9      Q   Let's just go back in time.
10  Where were you before King Soopers?
11     A   I retired DOD, United States
12  Army, civilian, in 2004, October 2004.
13     Q   And how long had you been with
14  DOD?
15     A   24 years, 9 months, I believe.
16     Q   And what was your job there?
17     A   My last job was in the
18  environmental analytical lab.
19     Q   Okay.  And that's at the Rocky
20  Mountain Arsenal?
21     A   Rocky Mountain Arsenal, yes, sir.
22     Q   Okay.  What were you doing with
23  the lab there?
24     A   I was classified as a quality
25  technician control and with the RTAP units.

Page 11

1      Q   Okay.  Did you have any history
2  of discipline with DOD?
3      A   No, sir.
4      Q   Okay.  So 24 years at DOD.  What
5  did you do before that?
6      A   Kind of got me there.  I've got
7  to stop and think.
8      Q   Let me ask you this.  Do you have
9  any law enforcement training?
10     A   Yes, sir.
11     Q   With who?
12     A   Well, it was Schuyler --
13  actually, back up.  Papillion Police Department,
14  Schuyler.
15     Q   The who?
16     A   Papillion Police Department.
17     Q   Say the name of that town again.
18     A   Papillion.
19     Q   Papillion.  Where is that?
20     A   Nebraska, suburbs of Omaha.
21     Q   Okay.  You were a police officer
22  with them?
23     A   Yes.
24     Q   For how long?
25     A   I started in, I believe, December

Page 12

1  of '75.
2      Q   Till when?
3      A   Until February of 1979.
4      Q   Okay.  Any discipline with them?
5      A   No.  Not that I recall, no.
6      Q   Okay.  All right.  Can you give
7  me some educational background on yourself?
8      A   Graduated from Cherry Creek High
9  School, June of '63.  Attended the University of
10  Nebraska at Omaha.  And any more?
11     Q   Okay.  Did you graduate from
12  Nebraska?
13     A   No.  No.
14     Q   Okay.  How long did you attend?
15     A   I believe my records will
16  indicate 59 hours.  I believe I started in --
17  hmm.  It had to have been January of '74,
18  approximately, into '76, if I've not mistaken.
19     Q   Have you ever been convicted of
20  any crimes?
21     A   Did you say crimes?
22     Q   Crimes.  Misdemeanors?
23     A   Misdemeanors, yes.  But not
24  convicted.  Correction, no.  Not convicted, no.
25     Q   Okay.  Charged, but not

Page 13

1  convicted?
2      A   Yes.
3      Q   Okay.  And I saw one of those was
4  the obstruction charge that got dismissed -- in
5  where, Jefferson County?
6      A   Yes, sir.
7      Q   Okay.  Okay.
8          MR. LANE:  That's 1 and 2.  She
9  stapled them both together.  Didn't know how many
10  people were going to be at this party.
11     Q   (BY MR. LANE)  We're not going to
12  look at that yet.  I just wanted to give that to
13  you.  But let's talk about this incident, all
14  right?  Do you recall the day of this incident?
15     A   Which incident are you referring
16  to?
17     Q   The incident that -- why we're
18  all here.
19     A   Well, we just left Jefferson
20  County.  Okay.  You --
21     Q   No.  No.  I'm not talking about
22  your charges.
23     A   Okay.
24     Q   I'm talking about the incident
25  that forms the basis for why we're here today.

4  (Pages 10 to 13)

Page 14

1   A   Very well.
2   Q   Okay.  Do you remember that?
3   A   Yes, sir.
4   Q   Okay.  Will you describe for me
5   what you recall having happened on that evening.
6   A   I was standing out in front of
7   store 10, and a van drove by westbound --
8   correction, eastbound.  And a female was yelling
9   out to a courtesy clerk, who was in front of the
10  store just adjacent to me, Go get the store
11  manager.
12  Q   Now, this female was in a moving
13  van when she yelled at you -- or yelled at a
14  courtesy clerk to go get the store manager?
15  A   Courtesy clerk, yes, sir.
16  Q   She was moving in her car at that
17  point?
18  A   She was barely rolling.  And at
19  one point in time, she did stop.  She yelled at
20  the courtesy clerk a second time to go get the
21  store manager.
22  Q   Let me stop you for a quick
23  second, okay?  If I told you that Loree
24  McCormick-Rice testified that she was loading
25  stuff into her van, didn't actually get into her

Page 15

1   van, when she had some interaction with DeShazer,
2   and she was then upset, she didn't get into her
3   van and start driving, she simply walked from
4   this parking spot into the store, what would you
5   say about that?
6   A   Well, I would say that's true,
7   but it came later.
8   Q   Oh, okay.  All right.  Didn't
9   mean to interrupt, then.  Go ahead.
10  A   Mm-hmm.
11  Q   Keep going.
12  A   All right.  And then --
13  Q   Who was the -- what did you call
14  it? A courtesy clerk or . . . .
15  A   Yeah, the courtesy clerk.
16  Q   Do you know who that was?
17  A   That was just a little female gal
18  there that I don't recall.  She was a high school
19  student.
20  Q   You don't remember her name?
21  A   I don't recall her name.
22  Q   And Loree was yelling at her to
23  go get the manager?
24  A   Right.
25  Q   And how -- what tone of voice was

Page 16

1   she using?
2   A   She was very demanding, I would
3   say very sarcastic.
4   Q   What do you mean, "sarcastic"?
5   A   Just her tone of voice was
6   demanding, yelling, screaming at the courtesy
7   clerk.
8   Q   Okay.  And where was Cassidy at
9   this point?  Did you see her?
10  A   I don't recall where Cassidy was.
11  Q   And when I talk about Loree and
12  Cassidy, you know who I'm talking about, right?
13  Loree is the plaintiff, and Cassidy is also a
14  plaintiff, but it's her daughter, right?
15  A   Cassidy is the daughter, yeah.
16  Q   Okay.  All right.  So Loree's in
17  this van.  And was she yelling out of her window,
18  or was she yelling out the passenger window?
19  A   Well, she was behind the wheel
20  yelling in the direction of the courtesy clerk
21  who was standing there, so she would have been
22  yelling out of --
23  Q   Out of her window?
24  A   No, out of the --
25  Q   Out of the passenger window?

Page 17

1   A   Out of the passenger window.
2   Q   All right.  And so where were you
3   when you were listening to all of this?
4   A   I was probably maybe 15, 20 feet
5   to the left of them.
6   Q   Okay.  And so did you have any
7   idea what the commotion was all about?
8   A   I had no idea.
9   Q   Okay.  Well, did it occur to
10  you -- did it strike that you Loree was being
11  rude or she was being -- doing anything wrong by
12  telling this young lady to go get the manager?
13  A   Just by the tone of her voice and
14  screaming at the courtesy clerk and, yeah, just
15  her mannerisms coming from her voice.
16  Q   What did you think?  Did you
17  think she was inappropriate?  Did you think she
18  was rude?  Did you think she was angry?  What did
19  you think?
20  A   Really had no opinion at that
21  point in time.
22  Q   Okay.  You knew she was upset?
23  A   Well, it appeared that she was,
24  yes.
25  Q   Okay.  So what happens then?

5 (Pages 14 to 17)

Page 18

```
 1        A    The courtesy clerk continues her
 2   job, to the best of my knowledge.  She moves on.
 3   And she walked up to me.  And she just looked at
 4   me and kind of smiled.  And we're going back two
 5   years.  I don't exactly --
 6        Q    No, I understand.
 7        A    I don't exactly recall where she
 8   went.  The van disappeared into the dark
 9   eastbound into the parking lot.  I never thought
10   any more of it at that point in time.
11        Then, back to your question there,
12   apparently she went back in and parked in the
13   handicap area.
14        Q    Did you see that happen?
15        A    No, I did not.
16        Q    So how do you know that happened?
17        A    I'm just speculating.  Because
18   she went west- -- eastbound in front of the store
19   and disappeared.  Like I said, we -- I lost
20   contact there from that point in time.
21        Q    Okay.  But apparently she came
22   back and parked in a handicap spot.  Now, did
23   somebody tell you she parked in a handicap spot,
24   or did you actually see her van at some later
25   time parked in the handicap spot?
```

Page 19

```
 1        A    I heard that she was parked in
 2   the handicap.
 3        Q    Do you remember who you heard
 4   that from?
 5        A    No, I don't.
 6        Q    Okay.  So, now, it's kind of
 7   important that we distinguish what you saw with
 8   your own two eyes from what somebody else told
 9   you.  So if you get to a point in a narrative
10   where you're telling me what somebody else told
11   you, it's important you tell me that I didn't see
12   this, but somebody told me this, okay?
13        A    Okay.
14        Q    All right.  So in any event, you
15   have heard that she parked in a handicap spot.
16   What, then, did you either see or did somebody
17   tell you happened at that point?
18        A    Well, at that point in time, I
19   was still out in front of the store.  It was a
20   warm night.  I was out in front in the
21   entranceway.
22        And my first initial contact with Miss
23   Rice was she came out of the parking lot yelling,
24   I don't -- find this word very, very offensive,
25   but I will use either the -- whatever you prefer,
```

Page 20

```
 1   the "N" word or . . . .
 2        Q    I understand.  I want you to use
 3   any words that you actually heard her use.
 4        A    You want the exact --
 5        Q    We understand that words are
 6   offensive, but you're just quoting, so you're
 7   not -- you're not going to get blamed for using a
 8   word like that.
 9        A    As long as you're comfortable
10   with that.
11        Q    Yeah.  Let's do that.
12        A    I find it offensive.
13        Q    Mm-hmm.
14        A    My first contact with Ms. Rice
15   was she was coming into the store, "Please help
16   me.  They're calling me a nigger.  Please help
17   me.  They're calling me a nigger."
18        Q    Did you know what she was talking
19   about at that point?
20        A    I did not know, no.
21        Q    Okay.  So what did you do?
22        A    At that point in time, she went
23   into the store.
24        Q    Who was she saying this to, by
25   the way?
```

Page 21

```
 1        A    She was confronting primarily
 2   black individuals in the store.
 3        Q    Just random people?
 4        A    No, not random.  Primarily black
 5   individuals.
 6        Q    Well, employees or customers?
 7        A    Primarily customers.
 8        Q    Was she just kind of generally
 9   announcing to the world, "Please help me.
10   They're calling me a nigger"?  Or was she
11   targeting you?  Was she targeting a King Soopers
12   employee?  Could you tell?
13        A    No, she was just in general.  If
14   you were black and she came in contact with you,
15   she was making her point to say it to the black
16   customers.
17        Q    Okay.
18        A    Mm-hmm.
19        Q    So you were close enough to hear
20   this.  And what was her -- what was her demeanor?
21   Was she upset?  Was she -- did she appear upset?
22   Did she appear angry?  Did she appear frightened?
23   Did she appear confused?  What do you think
24   she -- if you had to label how she appeared, what
25   would it be?
```

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 22

1      A     I would say angered.
2      Q     Okay.  And at that point,
3  apparently, you didn't blame her, if that
4  happened, for her to be angry, right?  That was
5  appropriate, if somebody's calling her a nigger?
6      A     Well, at this point in time, I
7  didn't know exactly what was going on.  I didn't
8  know who was calling her a nigger.
9      Q     Okay.
10     A     I had no idea.  I didn't know,
11 you know.
12     Q     Okay.  But as a security person
13 at King Soopers, you were -- you understood that
14 this could lead to some problems, so you wanted
15 to find out what was happening, right?
16     A     I was concerned, yes.
17     Q     Okay.  So what happened then?
18     A     She goes into the store, and
19 she -- if I remember correctly, she wanted to see
20 management.
21     Q     Who did she ask to see
22 management?
23     A     To the best of my knowledge, it
24 was a head clerk by the name of Russ -- Russ
25 Reddick, I believe, she had contact with.

Page 23

1      Q     Let me ask you this.  When you
2  first heard her drive by and yelled to the
3  security -- or to the courtesy clerk to go get
4  management, Go get the manager, to your
5  knowledge, did the courtesy clerk go to get the
6  manager, or did she --
7      A     That, I don't know.  That, I
8  don't know, if she did or not.
9      Q     Okay.  How much time had passed
10 from the time -- you heard her yell, Go get
11 the manager to the courtesy clerk, from the time
12 that happened to the time she actually walked
13 into the store?  And I know you didn't have a
14 stopwatch on it.  But just give me your best
15 eyeball estimate.
16     A     I really don't know.
17     Q     Just a couple minutes?
18     A     You know, it was probably longer
19 than that.  Maybe three, four minutes.
20     Q     Long enough to park the car and
21 come in, right?
22     A     Yeah.  Wherever she went and
23 parked the car.  I really don't know.
24     Q     Okay.  So anyway, she's in there
25 and she's upset and she's talking about, Get me

Page 24

1  the manager, and she was talking to Russ, did you
2  say?
3      A     Russ Reddick, yes.
4      Q     Okay.
5      A     He was the head clerk.
6      Q     Okay.  And so what was the -- to
7  the best of your recollection, what did you hear
8  the exchange with Russ consisting of?
9      A     I didn't hear anything.  Russ
10 asked me to leave the store.
11     Q     Why did Russ do that; do you
12 know?
13     A     Because she was -- when I came
14 over to see what -- when I came into the store,
15 to see what was going on, I heard her in the
16 store.  I went over to the service counter, where
17 she was with Russ.
18         And she became -- she looked at me, and
19 no words were spoken.  She just started becoming
20 angered with me and said she didn't want me
21 around or anything else.  She didn't want to talk
22 to me or whatever.  And I don't recall her exact
23 words.  But she was angered.  And Russ said,
24 Would you leave.  And I said, Yes.  And I walked
25 away.

Page 25

1      Q     Okay.  Now, were you puzzled by,
2  why is she mad at me?  What did I do?
3      A     At that point in time, I did
4  nothing.  I -- you know, it didn't --
5      Q     Right.
6      A     -- really bother me.  That was
7  Russ's responsibility to handle the customer
8  relations.
9      Q     Right.  But here's this woman,
10 who's obviously upset and angry about something
11 having to do with being called a nigger, and now
12 she seems to be directing this at you.  Did you
13 kind of scratch your head and say, I wonder why
14 she's mad at me?
15         MR. HIGGINS:  I'm going to object
16 to the form of the question.  I think he just
17 answered it.  The reason I'm --
18         MR. LANE:  You can object.
19 That's fine.
20         MR. HIGGINS:  I'm objecting to
21 the form.  I'll explain.
22         MR. LANE:  Well, your explaining
23 is coaching, so I'm not going to --
24         MR. HIGGINS:  I'm not explaining.
25         MR. LANE:  Okay.

7  (Pages 22 to 25)

Page 26

1    MR. HIGGINS:  But I'd prefer
2  to -- if this witness says I don't know, I don't
3  want you to put words in his mouth, if he doesn't
4  know.
5    MR. LANE:  Mm-hmm.
6    Q    (BY MR. LANE)  So while you
7  were -- she's mad at you for some reason,
8  apparently, right?  She appeared to be?
9    A    I don't understand your question.
10  What are you saying to me?
11    Q    Well, did she look like she was
12  hostile toward you?
13    A    I would have the impression, as I
14  said before, she appeared to be angered.
15  I . . . .
16    Q    But she's telling -- you know,
17  she doesn't want to talk to you, apparently,
18  right?  That's what she said?
19    A    That's -- obviously, she said she
20  was angered.  And Russ asked me to leave.
21    Q    Well, my question is, you know,
22  your testimony seems to be that she was directing
23  some of her anger toward you; is that right?
24    A    It was directed somewhat.
25  Basically, again, I don't know why, but to answer

Page 27

1  your question, yes.
2    Q    Okay.  So when -- he's asking you
3  to leave and you hadn't done anything to her,
4  right?
5    A    That's correct.  I haven't done
6  anything, mm-hmm.
7    Q    Okay.  So weren't you curious at
8  that point, like, Gee, I wonder why she's mad at
9  me?
10    A    Not really, because that's a
11  public relations thing between management and
12  customers.  I --
13    Q    Okay.
14    A    I did not have a clue as to what
15  she was upset about.
16    Q    Well, you had a clue that she was
17  upset that somebody had called her a nigger.
18  That was obviously causing her to be upset,
19  right?
20    A    That's true.
21    Q    You just didn't know who or under
22  what circumstances or any of the surrounding
23  events that caused this whole thing, right?
24    A    I didn't have a clue, no.
25    Q    Okay.  So you weren't

Page 28

1  particularly surprised or upset when Russ said --
2  what do they call you, Ernie?
3    A    Yes.
4    Q    -- Ernie, why don't you just go
5  on outside?
6    A    No, that did not surprise me.  It
7  didn't bother me at all.  Because that's usually
8  standard procedure.  We don't get involved in
9  customer relations and so forth.
10    Q    Okay.  And you viewed this as a
11  customer relations kind of an issue?
12    A    I would say that, yes.  Mm-hmm.
13    Q    You didn't have any concerns that
14  there was a security problem involved in any of
15  this?
16    A    No.  I had no idea.
17    Q    Okay.  So when you stepped away,
18  could you still hear what was going on?
19    A    Yeah.  I went back outside.  And
20  I couldn't hear the conversation between Russ and
21  Miss Rice.  If that answers your question, no, I
22  did not hear what was said.
23    Q    Okay.  Did you know DeShazer at
24  that point?
25    A    No, didn't know him.

Page 29

1    Q    Had you ever talked to DeShazer
2  before that night?
3    A    No.
4    Q    Had you ever seen him on duty
5  before?
6    A    You know, I don't recall ever
7  seeing him.  I don't recall ever seeing DeShazer
8  on duty.
9    Q    Okay.  So in any event, you go
10  outside.  Do you see -- are you keeping an eye on
11  Loree and Russ?
12    A    No.  No, I'm not, really.  This
13  was a manager -- as I said before, a manager/
14  customer problem.
15    Q    Okay.  So what happens then?
16  First of all, how long did Loree and Russ
17  interact with each other that you saw?
18    A    Actually, I never saw them.  I
19  went back outside.  I really couldn't give you a
20  base time on it.
21    Q    At some point did you see Cassidy
22  come walking in?
23    A    To the best of my knowledge, she
24  was standing by the -- Cassidy is the daughter.
25    Q    Mm-hmm.

8  (Pages 26 to 29)

Page 30

```
 1        A    She was standing by the doorway,
 2  I believe.  She had a pencil in her hand and a
 3  piece of paper.
 4        Q    Okay.  Did you hear her say
 5  anything?
 6        A    No.  No.
 7        Q    Okay.  You have no idea what that
 8  pencil and piece of paper was for?
 9        A    No.  No.
10        Q    Okay.  Did she seem upset, or did
11  she just -- she was just standing there?
12        A    She was just standing there.
13        Q    Okay.
14        A    She was . . . .
15        Q    Did you observe Loree moving her
16  hands, while she was talking to Russ, and
17  pointing or doing anything like that?
18        A    Not while talking to Russ, I
19  don't believe.  She went back in the lobby area,
20  and that's what got my attention.  That's when --
21        Q    What happened there?
22        A    She was --
23        Q    This is after she was done with
24  Russ?
25        A    I believe, yes, to the best of my
```

Page 31

```
 1  knowledge, it was -- yeah.
 2        Q    And what, would this be a few
 3  minutes later?
 4        A    Yeah, I would say within seconds
 5  or so --
 6        Q    Okay.  So --
 7        A    -- when I heard her.
 8        Q    So she goes back to the lobby
 9  area, and what does she do?
10        A    She's running around in the lobby
11  area hollering, "Please help me.  They're calling
12  me a nigger.  Please help me.  They're calling me
13  a nigger."
14        Q    So she was yelling that as she
15  was going into the store before she talked to
16  Russ.  She then talks to Russ, and she's
17  basically yelling the same thing as she's leaving
18  the store, after she talks to Russ?
19        A    Yes, to my knowledge, mm-hmm.
20        Q    Okay.  And who was she saying
21  this to?
22        A    She was primarily pointing out
23  black customers.
24        Q    And was there any response from
25  any of the customers, either as she was going in
```

Page 32

```
 1  or as she was coming out, to her yelling about,
 2  "Please help me.  They're calling me a nigger"?
 3        A    I don't understand your
 4  "response."
 5        Q    Did any customers -- did you see
 6  any customers stop and say, What are you talking
 7  about?  What happened?  Tell me what's going on
 8  here?
 9        A    No, not to my knowledge.  They --
10  she approached them, and they and a couple that I
11  saw just kind of blew her off and went on.
12        Q    Okay.
13        A    And -- but --
14        Q    So as she's leaving, how long --
15  how much time did she spend telling random
16  customers, "Please help me.  They're calling me a
17  nigger"?
18        A    You know, I don't recall.  She
19  was -- she was making it a point to get the black
20  customers' attention.  Timewise, I couldn't
21  really tell you.
22        Q    Did you think there was anything
23  wrong with her doing that?
24        A    That's really not my concern
25  until management calls me in.
```

Page 33

```
 1        Q    Mm-hmm.
 2        A    And she left before management
 3  ever called me or asked for my assistance.
 4        Q    At any time did you ever talk to
 5  Russ about what he and Loree were talking about?
 6  Even to this day.  I mean, maybe a year after the
 7  fact, you might have sat down with Russ and had a
 8  conversation with him where you said, Russ, what
 9  was she saying to you, or Russ told you what she
10  was saying, what the back and forth between Russ
11  and Loree was.
12        A    If we did, I don't recall.  I'm
13  sure we did, for the record.
14        Q    Okay.
15        A    But I don't recall exactly what
16  Russ had said.  I mean, he did tell me that --
17  basically what her concerns were, her complaints,
18  but I don't recall sitting down there having a
19  basic conversation, only at the motions hearing.
20        Q    Okay.  So we're now back to the
21  lobby as she's leaving.  She spends a few minutes
22  yelling about getting called a nigger and talking
23  to black customers.  What happens then that you
24  saw?
25        A    To the best of my knowledge, she
```

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

## Page 34

1 goes out of the store. I'm -- I'm outside the
2 store myself, if I recall correctly. She goes
3 into the parking lot. She was walking
4 northbound.
5     Q    "Northbound," meaning straight
6 out the front door?
7     A    Straight out the front door.
8     Q    Okay.
9     A    And lost track of her.
10    Q    Okay.
11    A    And maybe a couple -- one, two,
12 or three minutes, somewhere in that category,
13 this van -- I believe it was a van. It was like
14 an SUV. It was -- I'm not quite clear on the
15 model, but . . . .
16    Q    Was this the same van that you
17 saw her driving in when she yelled to the
18 courtesy clerk to go get the manager?
19    A    It appeared to be, yes.
20    Q    Okay. All right. So then what
21 do you see happening?
22    A    She -- obviously, I don't recall
23 her going the opposite way of traffic, so she had
24 to go back out and pull out and go north. That
25 is my guess on that. There's only one way out.

## Page 35

1     But it was minutes later. But the van
2 drives, apparently, through the parking lot.
3 Anyway, it winds up in front of the store going
4 westbound. And they drive by at a fairly low
5 rate of speed. And they yell out, "Fuck" --
6     Q    They yell out, or one person
7 yells out?
8     A    I would have to say it sounded
9 like an older voice, probably Miss Rice. It come
10 from the driver's side.
11    Q    Okay.
12    A    In my opinion, it came from the
13 driver's side.
14    Q    Right. And yells out what?
15    A    "Fuck you."
16    Q    To who?
17    A    It appeared to be directed at the
18 Aurora police officer.
19    Q    Okay. And where was the Aurora
20 police officer? Was he in his car? Was he
21 standing? What's the layout?
22    A    To the best of my knowledge, he
23 was seated in his car.
24    Q    That's an unmarked car?
25    A    Un -- yes, I believe it is an

## Page 36

1 unmarked car.
2     Q    And was that unmarked car sitting
3 right next to the entrance of King Soopers?
4     A    No.
5     Q    How far away from the front
6 entrance of King Soopers was that unmarked car?
7     A    Oh, it would have to be at least
8 50 feet. He was parked by the propane tank, so
9 he was minimum of 50 feet.
10    Q    Okay. And where were you when
11 you heard this voice yell, "Fuck you"?
12    A    I was standing in front of the
13 store.
14    Q    So from 50 feet away, you could
15 hear somebody yell, "Fuck you"?
16    A    Oh, definitely. Definitely. You
17 could hear. That's how loud it was, yeah.
18    Q    Okay. Do you know what that was
19 in response to, if anything?
20    A    That, I have no idea what that
21 was in response to, no.
22    Q    Okay.
23    A    Hm-mm.
24    Q    Did you recognize the car -- and
25 was the car facing -- was DeShazer's car facing

## Page 37

1 northbound by the propane tanks?
2     A    No.
3     Q    Was it facing west?
4     A    It was facing westbound.
5     Q    So Loree Rice is driving west,
6 drives past --
7     A    Correction. Correction. Okay.
8 If I may?
9     Q    Sure.
10    A    DeShazer was facing eastbound.
11    Q    Okay.
12    A    Loree Rice was going westbound --
13    Q    Westbound. Okay.
14    A    -- for the record, okay.
15    Q    Okay. So how close did Loree
16 Rice's car come to DeShazer's car when she
17 yelled, "Fuck you"? Was it just like 10 feet
18 away?
19    A    Whatever the, you know, divider
20 is in the road. My -- if you want just an
21 estimation, I would say, yeah, 10 feet, maybe.
22    Q    Okay. And DeShazer was parked at
23 that location --
24    A    Yeah, he was parked.
25    Q    -- or was he moving?

10 (Pages 34 to 37)

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 38

1    A    Yeah.
2    Q    Okay.  Did you know that to be
3  DeShazer's car?
4    A    Not at the time.  Just common
5  sense would tell you it was a police car.
6    Q    Okay.  Based on -- well, it was
7  an unmarked car?
8    A    Mm-hmm.
9    Q    But it did have police lights; is
10  that right?
11    A    Yeah.  Eventually, I found out
12  later, yeah, mm-hmm.
13    Q    Right.  Common sense would tell
14  you it's a police car if you know that it's an
15  undercover kind of a police car.  Is that it?
16    A    Yes, I would say that's a safe
17  description, yeah.
18    Q    Okay.  So -- and DeShazer was in
19  full uniform, as far as you were able to see,
20  right?
21    A    Yes, sir.  Mm-hmm.
22    Q    Okay.  And he was wearing an
23  Aurora Police Department uniform; is that
24  correct?
25    A    Yes, sir.

Page 39

1    Q    And as far as anybody -- I mean,
2  you knew DeShazer was working at that point in a
3  moonlighting job, right, with --
4    A    No, I did not.
5    Q    Did you think he was acting in
6  his official capacity as an Aurora police
7  officer?
8    A    I didn't know what DeShazer's
9  capacity was at that time.
10    Q    Okay.  But as far as you could
11  tell, he was in an official Aurora Police
12  Department uniform; is that right?
13    A    Yes, mm-hmm.
14    Q    And you didn't know that he was
15  acting as an employee of King Soopers at that
16  point, or somebody else?
17    A    No.  No.  I did not know that,
18  no.
19    Q    Okay.
20    A    No.
21    Q    All you knew is Loree Rice tells
22  a guy who's dressed in an Aurora Police
23  Department uniform, "Fuck you," and continues to
24  drive; is that right?
25    A    Yes.  She drove off, yes.

Page 40

1    Q    Okay.  At any time up to the time
2  she yelled, "Fuck you," at DeShazer, did you ever
3  see Loree Rice -- Loree McCormick-Rice commit any
4  offense -- any -- violate any law that you were
5  aware of?
6          MR. OSBORNE:  I'm going to object
7  as to foundation.
8    Q    (BY MR. LANE)  Go ahead and
9  answer.
10    A    State the question again.
11    Q    Yeah.  Did you see her break any
12  laws?
13    A    Not to my knowledge.  I did not
14  see or have any knowledge of Loree Rice, as I
15  stated before.  I'm --
16    Q    Well, you had some knowledge.  I
17  mean, you saw her come into the store.  You saw
18  her leave the store.  You saw her yell "Fuck you"
19  to DeShazer.  During that whole time period, did
20  you see anything that you, as a layperson or as a
21  former police officer, would believe was a
22  violation of any law?  This is not a trick
23  question.  You're not a lawyer.  I understand.
24          MR. HIGGINS:  Which question do
25  you want him to answer?

Page 41

1          MR. LANE:  The question I asked.
2          MR. HIGGINS:  He's not a lawyer.
3    Q    (BY MR. LANE)  Go ahead.
4          MR. HIGGINS:  Ask the question
5  again.
6          MR. LANE:  We don't need to go
7  there.  The question --
8          MR. HIGGINS:  We do need to go
9  there.  You said, You're not a lawyer, are you?
10          MR. LANE:  No.  I said, I know
11  you're not a lawyer.
12          MR. HIGGINS:  Oh, okay.
13          MR. LANE:  I didn't ask him if
14  he's a lawyer.  I know he's not a lawyer, okay?
15  So we don't need to go there.
16          MR. HIGGINS:  Why don't we just
17  ask him, Did you see her violate the law.
18          MR. LANE:  I just asked him --
19    Q    (BY MR. LANE)  Did you see her at
20  any time break any laws?
21    A    Not to my knowledge, no.  No.
22    Q    Okay.
23    A    No.
24    Q    All right.  So she yells, "Fuck
25  you" to DeShazer, and she then continues to drive

11 (Pages 38 to 41)

Page 42

1 westbound; is that right?
2     A    Westbound, yes.
3     Q    She seemed to be leaving; is that
4 right?
5     A    Yes.
6     Q    What did you see happen then?
7     A    She, as I said, moved off
8 westbound at a fairly high rate of speed, would
9 be my estimation. She --
10     Q    When you say "a high rate of
11 speed," what's the speed limit in the parking
12 lot?
13     A    Well, she gunned it, in other
14 words.
15     Q    Okay. She yells "Fuck you," and
16 then she accelerates?
17     A    She accelerates her vehicle
18 westbound.
19     Q    She didn't, like, squeal her
20 tires or anything?
21     A    Not to my knowledge, no.
22     Q    Okay.
23     A    But it was too fast for the
24 parking lot, too fast for conditions, I thought
25 anyway. But that's beside the point.

Page 43

1     Q    Hang on. Let me stop you there.
2 It was a pretty empty parking lot, would you
3 agree, where she was headed?
4     A    That parking lot is never empty.
5     Q    Pretty empty, I said. I mean,
6 we've seen -- you've seen the videotapes, right?
7     A    Yes.
8     Q    Okay. Where she was going, there
9 were no cars parked in the vicinity generally.
10 Do you agree with that? It's not like she was
11 endangering other cars or there were a lot of
12 people walking around. So she wasn't driving too
13 fast for conditions or anything, was she?
14     A    I don't quite understand your
15 question, but there's a --
16          MR. HIGGINS: I'm going to object
17 to the form. There's about eight questions in
18 there.
19     Q    (BY MR. LANE) Go ahead.
20          MR. HIGGINS: No. Well, which
21 question do you want him to answer?
22          MR. LANE: Just the one I asked.
23          MR. HIGGINS: Which one? Too
24 much traffic?
25          MR. LANE: Well, let him answer,

Page 44

1 okay? You know, I'm not deposing you.
2          MR. HIGGINS: But you're
3 asking --
4          MR. LANE: I'm deposing him. If
5 he wants clarification --
6          MR. HIGGINS: I'm objecting to
7 the form.
8          MR. LANE: That's fine. You've
9 made your objection to form.
10     Q    (BY MR. LANE) Now, if you want
11 clarifications, you can ask me for
12 clarifications.
13          MR. LANE: But I'm not deposing
14 you, okay?
15     Q    (BY MR. LANE) So go ahead.
16          MR. HIGGINS: What question do
17 you want him to answer? Go ahead. Why don't you
18 ask him the question again.
19     Q    (BY MR. LANE) Do you want me to
20 rephrase?
21     A    Yes, please do.
22     Q    Okay. You would agree that that
23 parking lot -- you've seen the videotape, right?
24     A    Yes, mm-hmm.
25     Q    Okay. There aren't any cars

Page 45

1 parked in the area where the stop was made,
2 right? Maybe one, at tops? I mean, it was an
3 empty part of the lot, right?
4     A    On the -- you're referring to
5 southeast Chambers Circle.
6     Q    Where she got stopped. That's
7 where she was heading, right?
8     A    Yeah. There was minimal traffic
9 down there, yes, uh-huh.
10     Q    Okay. You're not suggesting that
11 she was somehow doing something wrong in her
12 driving as she -- after she said "Fuck you" to
13 DeShazer, are you?
14     A    I'm not challenging her driving
15 now. What I'm saying is she appeared to be
16 moving a little too fast for the conditions in
17 the parking lot. That's all I'm saying. She
18 came to the stop sign, and she turned left and
19 went in the direction of Chambers Circle.
20     Q    Okay. What did you see DeShazer
21 do?
22     A    At that point in time, he made a
23 U-turn.
24     Q    Did he activate his lights first?
25     A    To the best of my knowledge, the

12 (Pages 42 to 45)

Page 46

1  first time I saw his lights come on was when he
2  made the U-turn, I saw the lights in the
3  rearview -- or in the rear glass, in the back
4  glass.
5      Q    And did you see any -- you said
6  you hadn't seen any violations of any laws.  Did
7  you have any idea why DeShazer had activated his
8  lights and appeared to be going after her?
9      MR. OSBORNE:  Object as to form.
10     A   I had no --
11     Q   (BY MR. LANE)  Go ahead.
12     A   Okay.
13     MR. HIGGINS:  You can answer.
14     Q   (BY MR. LANE)  When they object,
15  you can go ahead and answer.
16     A   Okay.  Would you state your
17  question again.
18     Q   Yeah.  Did you see any violations
19  of any laws that you concluded would have caused
20  DeShazer to activate his lights and go after her?
21     MR. HIGGINS:  Object.
22     MR. OSBORNE:  Object as to form.
23     A   At that point in time, I really
24  did not know what was going on.
25     Q   (BY MR. LANE)  Okay.  But you

Page 47

1  didn't see her do anything like -- okay.  Had she
2  thrown something at DeShazer, that might be a law
3  violation, right?  You would understand that, as
4  a layperson and as a former police officer, you
5  throw somebody -- throw something at somebody,
6  you know, you might --
7      A   Yes.
8      Q   Okay.  You didn't see any of that
9  happen, did you?
10     A   No.  I never saw her throw
11  anything at him, if that's what you're asking.
12     Q   Okay.  So by what -- I'm just
13  asking you.
14     A   Yeah.
15     Q   I mean, she says, "Fuck you" to
16  DeShazer, DeShazer activates his lights and goes
17  after her.  Did you see any reason that you could
18  tell that amounted to some law violation that
19  would have caused DeShazer to do that?
20     A   No.  I don't know what DeShazer
21  was thinking.  I don't have a clue of that.
22     Q   Okay.  All right.  So what did
23  you see happen then?
24     A   At that point in time, I mean, he
25  made -- he come out, turned -- made a U-turn to

Page 48

1  westbound.  And when I looked up, I saw him
2  following the van.
3      Q   How close to the van was he?
4      A   Oh, he was a reasonable distance.
5      Q   Give me a best eyeball estimate.
6      A   Well, when he made his U-turn and
7  I saw his lights in the back come on, the van had
8  already turned.  He came up to the stop sign and
9  made his stop, and then he went after the van.  I
10  lost him after that.
11     Q   Did he seem to be hurrying to
12  catch up to the van?
13     A   Not really.  I mean, he wasn't
14  using excessive speed to catch up to the van.  I
15  mean, he was using reasonable and just, you know,
16  a little prudence there, you know, in the parking
17  lot with the pedestrians and everything.
18     Q   Mm-hmm.
19     A   But no, he wasn't . . . .
20     Q   Okay.  But his lights were on; is
21  that right?
22     A   Yes, sir.
23     Q   Okay.  And when a police officer
24  turns on their emergency lights and is following
25  you, what are you supposed to do, based on your

Page 49

1  training and experience?
2      A   Well, when the reds come on,
3  you're supposed to pull over and stop.
4      Q   Okay.  So did you take the fact
5  that DeShazer turned on his lights as a statement
6  to Loree Rice, Pull over, basically?  That's what
7  that means, isn't it?
8      A   Yeah.  Well, yes.  You know, when
9  a police car turns his lights on, yeah, it's
10  standard procedure.
11     Q   Okay.  All right.
12     A   Mm-hmm.
13     Q   And he turned on his lights.  How
14  much time passed from the time you heard Loree
15  Rice say, "Fuck you" to the time you saw those
16  lights go on?  Was it a matter of two or three
17  seconds?
18     A   You're asking me to go back two
19  years here now.
20     Q   I understand.  I know, it's
21  tough.  I'm not trying to give you a rough time
22  here.  I'm just trying to figure out what
23  happened.
24     A   Well, once they yelled, "Fuck
25  you" --

13  (Pages 46 to 49)

## Page 50

1    Q    Mm-hmm.
2    A    -- seems to me there was -- the
3  lights came on fairly quickly.
4    Q    Within seconds?
5    A    Yeah, I would say seconds.  Yes,
6  uh-huh.
7    Q    Before he makes his U-turn or
8  while he's making his U-turn or after he makes
9  his U-turn?
10    A    No, he turned them on, paused a
11  second, and then he made his U-turn.
12    Q    All right.  Did you take that to
13  mean that -- well, he makes his U-turn.  How far
14  away was -- and again, you didn't have a tape
15  measure.  I understand.  Loree Rice -- how far
16  away was Loree Rice from DeShazer when those
17  lights went on?
18    A    Are you referring when they were
19  going westbound, how far they were before?
20    Q    Well, he turns on his lights.
21  Let me get this straight, okay?  She's going
22  westbound.
23    A    Okay.
24    Q    All right?  DeShazer's facing
25  eastbound.

## Page 51

1    A    Okay.
2    Q    She says, "Fuck you."
3    A    Uh-huh.
4    Q    Continues to drive to a stop
5  sign, correct?
6    A    Uh-huh.
7    Q    DeShazer activates his lights,
8  makes a U-turn.  While he's making his U-turn, is
9  Loree making a left turn at the stop sign?
10    A    To my knowledge, yes, she was
11  making a --
12    Q    Okay.
13    A    She was --
14    Q    So then she's going -- at that
15  point, she's going which direction?
16    A    She turns --
17    Q    She's going northbound?
18    A    -- and is going south.  She's
19  going south towards Chambers Circle.
20    Q    All right.  She's going
21  southbound while DeShazer is approaching the stop
22  sign, right?  And his lights are still on --
23    A    Yes.
24    Q    -- as he's approaching the stop
25  sign?  He then makes a right turn at the stop

## Page 52

1  sign also?
2    A    Left turn.
3    Q    Left turn at the stop sign?  And
4  at that point you couldn't see how far ahead of
5  him Loree McCormick-Rice's car was; is that
6  right?
7    A    Yeah, I -- I don't recall that,
8  no.
9    Q    Okay.  What happens then?  What's
10  the next thing you remember happening?
11    A    It all ended right then and there
12  with that.  We still continued to stand outside
13  the store.
14    Q    And you were watching?
15    A    Watching . . . .
16    Q    Watching what was going on?
17    A    No.  It was -- it was gone.  I
18  mean, they had turned the corner.
19    Q    Okay.
20    A    They were out of sight by then.
21    Q    All right.  And who were you
22  standing there with?
23    A    Again, you got me going here two
24  years.
25    Q    Sure.

## Page 53

1    A    I believe it was the other
2  security guard, Kuebler, I believe it was.
3    Q    Okay.  So what happened then?
4    A    We're standing out front.  Like I
5  said, it was a warm night, and we were just
6  standing there.  And customers were all wanting
7  to know what was going on.  We didn't have a clue
8  what was going on.
9        And next thing, there were some
10  customers in the parking lot.  Customers -- I'm
11  not sure if they were our customers or who they
12  were.  But they were up on the west end of the
13  parking lot where -- by the stop sign up there.
14  And they were hollering, An officer needs help.
15  They were yelling at us, maybe two or three
16  people who were walking in the parking lot.
17    Q    Okay.  So what did you do?
18    A    First went up and made sure that
19  we heard them right, An officer needs help.  You
20  know, that's pretty vague.  So we said, What do
21  you mean?  And they were pointing towards
22  Chambers Circle down there.  So, of course, we
23  took off to assist the officer.  We weren't -- we
24  didn't have a clue what was going on, other
25  than -- I don't know whether they call them

14  (Pages 50 to 53)

**Page 54**

1  customers or patrons or just pedestrians or what.
2    Q    Right.  Mm-hmm.
3    A    So we acted on what they were
4  saying to us.  We went down there, and we arrived
5  at Chambers Circle.
6    Q    Mm-hmm.  And what happened then?
7    A    Officer DeShazer or Sergeant
8  DeShazer was attempting to make an arrest.  He
9  was having difficulty with the -- I believe the
10  mother and daughter.
11    Q    Well, you -- hang on.  You saw
12  this with your own eyes, right?
13    A    Saw what now?
14    Q    What you're describing now.
15    A    Yes, when I arrived on the scene.
16    Q    Okay.  When you say he was making
17  an arrest, let's stop there.  Who was he
18  arresting, and what was happening?
19    A    It appeared he was arresting the
20  mother and daughter.
21    Q    Both of them?
22    A    Well --
23    Q    Okay.
24    A    -- at that point in time, I don't
25  know who he was actually going to arrest or if he

**Page 55**

1  was going to arrest anybody.  I --
2    Q    Just describe to me where
3  everybody was that you saw, okay?  Where was
4  DeShazer, where was Loree McCormick-Rice, and
5  where was Cassidy?
6    A    Okay.  When I arrived, Sergeant
7  DeShazer had the daughter, trying to pull her
8  away from the mother.  They were both on the
9  ground, if I remember correctly.
10    Q    Who's both?  DeShazer and
11  Cassidy --
12    A    No.
13    Q    -- or Loree and Cassidy
14  or . . . .
15    A    I'm getting confused.
16    Q    Mm-hmm.
17    A    Loree is the mother, right?
18    Q    Mm-hmm.
19    A    And Cassidy is the daughter?
20    Q    Correct.
21    A    Well, Loree was holding Cassidy,
22  had her in kind of a grip.
23    Q    Hugging her?
24    A    Hugging her.
25    Q    Okay.  And what was DeShazer

**Page 56**

1  doing?
2    A    He was attempting to separate
3  them.
4    Q    By doing what?
5    A    Well, he was talking to them, and
6  then he had her by the arm.  He was trying to --
7    Q    Had Cassidy by the arm?
8    A    Yeah, the daughter, I believe.
9    Q    And he was pulling on her arm?
10    A    He was -- I don't know what you
11  mean by "pulling."  I mean . . . .
12    Q    Well, what was he doing to
13  separate them?
14    A    Well, he was telling them to --
15  telling the mother to let her go.
16    Q    Okay.
17    A    He ordered -- he specifically
18  told her, Let her go.
19    Q    And did Loree let her go?
20    A    No.
21    Q    Okay.  And what was Cassidy doing
22  at this point?  Was she screaming?
23    A    I don't recall exactly what she
24  was doing.  I don't recall her -- she was
25  screaming, yes.

**Page 57**

1    Q    Okay.  Was she --
2    A    And she was resisting.  She was
3  pulling back away from the officer.
4    Q    Okay.  And what did the officer
5  do at that point?
6    A    He pulled her away from her
7  mother.  He pulled her out of her grip.
8    Q    Did he -- I mean, he must have
9  used some pretty good force to have done that,
10  though, I mean, didn't he?  I mean --
11    A    I don't --
12    Q    -- describe it to me.
13    A    No.  He had her by the arm.
14  Let's back up here one second here.
15    Q    Mm-hmm.
16    A    When I came up on the scene, I
17  put my hand on DeShazer's shoulder, and I says,
18  Do you need help?  He says, Yes.  At that point
19  in time, he had the daughter by the arm, and he
20  pulled her away from the mother.  And there was
21  no excessive force there used whatsoever, in my
22  opinion.
23    Q    Well, did Loree just let go of
24  Cassidy?
25    A    Apparently, she did.  It seemed

15 (Pages 54 to 57)

Page 58

1    like -- 'cause the daughter come up fairly fast
2    away from her grip.  And he got her back up.  And
3    then he put the cuffs on her, but . . . .
4        Q    Was she standing up while she was
5    getting cuffed?  You're talking about Cassidy
6    now?
7        A    The daughter.
8        Q    Yeah, Cassidy.  Was she standing
9    up, and he just said, Turn around, put your hands
10   behind your back, and she did, and he cuffed her?
11   Is that --
12       A    I don't -- I don't recall what he
13   said to her.  He did handcuff her and placed her
14   over by a vehicle, if I remember correctly.  But
15   there was no excessive force used there.
16       Q    Okay.  If I said to you that
17   Cassidy suffered a shoulder injury or an injury
18   to her collar bone, would you have any
19   explanation, based on your observations, as to
20   how that happened?
21       A    I would not.
22       Q    Okay.
23       A    No.
24       Q    All right.  So Cassidy gets
25   placed where?

Page 59

1        A    That, I don't recall.  Placed her
2    over, I believe, by a vehicle.  There was a
3    parked vehicle over there.
4        Q    Okay.  And what was Loree doing
5    at this point?
6        A    At this point in time, she was
7    screaming.
8        Q    What was she screaming?
9        A    "Please help me.  They're calling
10   me a nigger."
11       Q    She's yelling about "Please help
12   me.  They're calling me a nigger" --
13       A    Yeah.
14       Q    -- while Cassidy's getting
15   arrested?
16       A    Yeah, mm-hmm.
17       Q    Okay.  Was anybody calling her a
18   nigger at that point?
19       A    No.  No one was calling her
20   anything.  We've got to back up, 'cause we're
21   getting a little ahead of ourselves here.
22       Q    Okay.
23       A    After he got Cassidy up on her
24   feet and handcuffed, sent her over to the car, he
25   asked me at that point in time to keep Loree Rice

Page 60

1    away from the situation.
2        Q    Okay.  So what did you do?
3        A    I told Ms. Rice to stand over by
4    her car.
5        Q    Okay.  What did she do?
6        A    She complied.  She stood over
7    by -- she went over by her car and stood there.
8        Q    Okay.  And what else happened?
9        A    That was it for me.  That was it.
10       Q    Well, you didn't leave at that
11   point, did you?
12       A    No.
13       Q    What else did you see happening?
14       A    I stood there by the car
15   between -- I don't know.  There was somebody off
16   to my left there.  But I did stand there.  And
17   she went over and got in her -- I think this is
18   an SU -- probably a van.  I don't know what it
19   is, van or SUV.  She did get inside her car.  I
20   was -- I was content with that.
21            I stood there.  And next thing, within
22   minutes, there was a shoulder -- or somebody
23   tapped me on the shoulder and it was a backup
24   officer.  And they said they got it.  And I said,
25   I'm out of here.  And that was the end of it.

Page 61

1        Q    So did you leave, or did you
2    stand back and keep watching?
3        A    No.  No.  I -- no.  I backed off
4    from it.  I have no -- I'm a security guard.  I
5    have no responsibilities whatsoever once the
6    police arrive.
7        Q    Right.  But did you stay there
8    and watch what happened?
9        A    At one point in time I was -- I
10   started back towards the store.  Then I believe
11   Kuebler said something to me, and so I stood
12   there and I turned around.  And at that point in
13   time, they were attempting to have Ms. Rice
14   removed from her vehicle.  They were
15   attempting --
16       Q    And what did you see?
17       A    Other than -- what did I see?  I
18   saw DeShazer trying to remove her from the seat.
19   He was giving her a lawful order to get out of
20   the car.  She refused.  He give her another
21   lawful order, I believe.  And she still continued
22   to disobey the lawful order.
23       Q    Well, how do you know it was a
24   lawful order?
25       A    Anytime a police officer asks you

16  (Pages 58 to 61)

Page 62

1  to do something in the line of duty, I presume it
2  would be a lawful order.
3      Q    Okay.  That's just your
4  presumption, though, right?
5      A    That's my presumption, yes,
6  uh-huh.
7      Q    Okay.  All right.
8      A    Anyway, I don't recall.  As a
9  matter of fact, I believe, if you'll check the
10  videos, I left shortly thereafter.  It was out of
11  my hands now.  Aurora -- Aurora had them.
12      Q    Okay.  During the entire time,
13  from the time you first laid eyes on Loree
14  McCormick-Rice through the last time you saw
15  Loree McCormick-Rice, at any time did you ever
16  see her violate any laws?
17      MR. OSBORNE:  Object as to form
18  and foundation.
19      A    Yeah, I . . . .
20      Q    (BY MR. LANE)  Hmm?
21      A    Thinking here now.  We're going
22  back two years.  I answered no the first time.
23  And I would say no again the second time.
24      Q    Okay.  You understand, based on
25  your training and experience as a police officer,

Page 63

1  that in order to arrest someone, as an officer,
2  you have to have probable cause to believe that
3  they've violated some law, don't you?
4      A    Yes.  The arresting officer
5  better have probable cause, yes, mm-hmm.
6      Q    Based on your observations from
7  beginning to end, you saw no violation of any
8  law?  You've testified to that, right?
9      A    Yes.  In my opinion, I didn't see
10  anything, no.
11      Q    Okay.  Do you have any idea why
12  DeShazer arrested Loree McCormick-Rice or
13  Cassidy?
14      A    I have no idea.  He's a
15  commissioned officer.  I never -- I never did
16  challenge him.  I never did ask him.
17      MR. LANE:  Okay.  Well, we've
18  been going for about an hour.  Why don't we take
19  a short break for like five minutes.
20      (A recess was taken from 10:11 to
21      10:21 a.m.)
22      Q    (BY MR. LANE)  I want you to take
23  a look at the videotape of this case.  You've
24  seen this incident before on the King Soopers
25  video, haven't you?

Page 64

1      A    Yes, sometime.
2      Q    How many times have you seen it?
3      A    I don't exactly recall how many
4  times I saw it, but I . . . .
5      MR. LANE:  Have you started
6  the . . . .
7      MR. MOHAMEDBHAI:  Yeah.
8      MR. LANE:  We don't need all the
9  inside the store stuff.
10      Q    (BY MR. LANE)  Why don't you take
11  a look at it.  We're going to play it.  And I
12  want you to point out to me who you are in the
13  video, okay?  Can you do that?
14      MR. LANE:  Just turn the computer
15  around.  Okay.  Roll it.  Plug it in, Q, 'cause
16  it makes it lighter.
17      MR. MOHAMEDBHAI:  Okay.
18      MR. HIGGINS:  We're talking about
19  a video now.  Are we going to mark this, Dave?
20  Are you going to mark it?  I may want to mark it
21  or just refer to it, and get a copy of it.
22      MR. LANE:  You don't have a copy
23  of this?
24      MR. HIGGINS:  Well, I don't have
25  a copy of yours.  What happened is I gave it to

Page 65

1  the police department.
2      MR. MORALES:  I don't have a
3  copy.  Well --
4      MR. HIGGINS:  What I'd like to do
5  is let's -- I'd like to label this and get a copy
6  of this.
7      MR. LANE:  Well, we can certainly
8  do that.  You can have a copy.  I mean, I thought
9  everybody -- you guys gave us the -- I
10  mean . . . .  Go ahead.
11      MR. MOHAMEDBHAI:  All right.
12      (The videotape was played, during which
13      the following discussion was had.)
14      Q    (BY MR. LANE)  Okay.  Now, tell
15  me where you are.
16      A    Right there.
17      Q    Okay.  You're the first officer
18  who runs up on the scene?  Apparently that's
19  DeShazer with Cassidy on the ground; is that
20  right?
21      A    Yes.
22      Q    Okay.  And you're bent over
23  Cassidy at that point?
24      A    No.  I'm over DeShazer.
25      Q    Right.  You're closest to the car

17 (Pages 62 to 65)

Page 66

1    on the right, to DeShazer's car; is that right?
2         A    I'm right here, if that's what
3    you're referring to.
4         Q    Okay.  All right.  And you told
5    Loree to move away, and she's moving away now; is
6    that right?
7         A    Yes.
8         Q    Now, who did that?  Who's pushing
9    Cassidy down?  Is that DeShazer?
10        A    That's DeShazer.
11        Q    Okay.  Okay.  Now, is DeShazer
12   telling her -- telling Loree to get out of the
13   car?  And where are you?
14        A    I'm here.
15        Q    So you're just behind DeShazer
16   while he's apparently telling Loree to get out of
17   the car; is that right?
18        A    Yes.
19        Q    Okay.  Now where are -- we've had
20   the King Soopers truck blocking our view.  It's
21   now getting out of the way.  Where are you at
22   this point in this video?  We now see DeShazer
23   having the door of the van open.  Where are you?
24   Can you tell me?
25        A    Well, I'm trying to --

Page 67

1         Q    We're at 21:53 on the clock.
2         A    Right there.
3         Q    Okay.  You are still the security
4    officer most to the right.  Now, another
5    officer's walking up, and you seem to be backing
6    off; is that right?
7         A    Yes.
8         Q    Okay.  Somebody has lifted
9    Cassidy up, apparently another police officer.
10   Okay.  Now, are you directly looking into the
11   window of the vehicle at 21:53?
12        A    Apparently so.
13        Q    Okay.  And is Loree McCormick-
14   Rice lying down in the vehicle at that point?
15        A    Best of my knowledge, yes.
16        Q    Okay.  And was that DeShazer who
17   pulled her out?
18        A    I'm not sure who.
19        Q    Where are you at that point?
20        A    Right here, I believe.
21        Q    Okay.  What did they do to Loree
22   McCormick-Rice while she was on the ground?
23        A    You see, I don't recall.  I was
24   walking away from there.
25        Q    Well, but you were watching after

Page 68

1    they pulled her out for a few seconds.  Then they
2    disappeared behind DeShazer's car.  Did you see
3    what happened?
4         A    No.  I don't recall it, other
5    than they pulled her out of the car.
6         Q    Was Loree screaming during this
7    entire incident?
8         A    Yes.
9         Q    Okay.  Would you agree that you
10   were still on scene at 21:55?
11        A    Yes.
12        Q    Okay.  And do you recall them
13   putting Loree McCormick-Rice into a police car?
14        A    You know, that, I don't recall.
15   You see where I'm at.  I . . . .
16        Q    Okay.  You would agree that all
17   the action is basically done at this point, at
18   21:55:45?
19        A    On my part.
20        Q    Well, on pretty much everybody's
21   part; you would agree?  Cassidy's in custody,
22   Loree's in custody.  There's really nothing else
23   going on.  A lot of milling around?
24        A    Yes.
25             MR. LANE:  Okay.  I guess we can

Page 69

1    stop it.
2             (The playing of the videotape was
3             stopped.)
4             MR. LANE:  And obviously, if any
5    of you gentlemen do not have a copy of that disk,
6    we will provide it to you.  And I can't imagine
7    you don't have a copy of that.
8             MR. MORALES:  Well, Dave, the
9    thing is, you have the clearest copy, apparently.
10   We ended up -- I think you -- inadvertently, you
11   may have been given the original, is what it
12   looks like.
13             MR. LANE:  Okay.  Well, if you
14   want another copy, we're happy to provide it.
15             MR. MORALES:  We'd like one.
16             MR. HIGGINS:  Now, we supplied a
17   copy of that.  We're talking about a video.
18   There's also a video afterwards, later on, in the
19   parking lot.  I'm assuming you have that.  That
20   was --
21             MR. LANE:  Do we have that, Q?
22             MR. MOHAMEDBHAI:  I don't think
23   I've seen that.
24             MR. MORALES:  Maybe you're --
25             MR. LANE:  What does it show?

18 (Pages 66 to 69)

## Page 70

1    MR. HIGGINS:  When they come
2  back.
3        MR. MORALES:  Cassidy standing in
4  the parking lot with the mom.
5        MR. HIGGINS:  Cassidy and Loree
6  come back.
7        MR. MORALES:  You've been given a
8  copy of it.  And I also asked you -- I sent you a
9  correspondence about it.
10        MR. LANE:  Okay.  If we have it,
11  then I'm sure we have it.
12    Q    (BY MR. LANE)  Okay.  At any time
13  do you recall DeShazer going through Loree
14  McCormick-Rice's purse on the hood of his car?
15    A    No.  No.
16        MR. LANE:  Oh, thanks, Q.
17    Q    (BY MR. LANE)  Do you feel that
18  you have a strong recollection of some of these
19  events?
20    A    Now, which events are you
21  referring to?
22    Q    Just any of this whole incident,
23  from the time you saw Loree McCormick-Rice
24  through the end.  I mean, how confident are you
25  about your recollections?

## Page 71

1    A    I'm confident as to what I saw
2  and what I testified today, yes.
3    Q    Okay.  All right.  Let me ask you
4  about your reports.  Take a look at Exhibit 1.
5    A    Okay.
6    Q    Is this a report you filled out?
7    A    Yes.
8    Q    Let me just start out with the
9  first line, "Notwithstanding any improprieties
10  subject matter encompasses."  What does that
11  mean?
12    A    It means if I made a mistake, it
13  wasn't intentional, in my writings.
14    Q    Okay.  Who gave you information
15  in paragraph 2 that DeShazer was working off duty
16  on that evening?  Paragraph 2.  Front page,
17  paragraph 2.
18    A    Yeah.
19    Q    "The sergeant was working off
20  duty."  How do you know that?
21    A    Well, that come from the second
22  page, the last paragraph, from Aurora Police
23  Officer Fabzio (phonetic) provided me with the
24  names and so forth.
25    Q    Okay.  Let's look at paragraph 3

## Page 72

1  on the front page.  "Let the reader or receiver
2  fully understand that Kuebler and myself had no
3  affiliation with the subject matter involving use
4  of the (N) word.  The only affiliation" -- what
5  does that say?
6    A    "Came when."
7    Q    -- "came when Kuebler/myself
8  assisted Sergeant during the arrest of
9  McCormick" -- it says, "McCormick and Rice.  That
10  was only to preserve the peace at the scene.
11  Kuebler and I remained clueless on the subject
12  matter of the (N) word.  I never had contact with
13  (McCormick) or Rice until they were arrested."
14        Now, you put all that in for a reason,
15  right?
16    A    Well, yes.
17    Q    And the reason is because you
18  wanted everybody to understand you didn't use the
19  "N" word, you had nothing to do with this whole
20  disturbance.  All you were doing is helping
21  DeShazer arrest her?
22    A    That's -- not arrest her, no.  I
23  don't understand your question there.  You have
24  to run that by me again.
25    Q    Well, you put all this in there

## Page 73

1  just so everybody knew that you weren't using the
2  "N" word, right?
3    A    Yes, sir.
4    Q    Okay.  Because you thought that's
5  important, just to make it very clear that you
6  shouldn't be getting into any trouble from King
7  Soopers for mistreating customers or anything
8  else, right?
9    A    That's not my character.  It's
10  one -- it's a point I tried to make here, yes.
11    Q    Okay.  So then you write,
12  "DeShazer said McCormick's vehicle was parked in
13  the handicap stall, the placard was improperly
14  displayed."  Okay?
15    A    Mm-hmm.
16    Q    Did DeShazer tell you that?
17    A    I believe after the fact, after
18  it was all over, back inside the store before I
19  left.
20    Q    Okay.  And then you say,
21  "Henceforth, McCormick became very vocal with the
22  Sergeant."  And do you recall what DeShazer said
23  she had said to him?
24    A    No.  No.
25    Q    "He then told her she had better

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

## Page 74

1  leave, and now." Did DeShazer tell you that?
2      A    Apparently so.
3      Q    Okay. And when you say, "He then
4  told her she had better leave, and now," you have
5  an exclamation underneath that, right -- or next
6  to the "now," right?
7      A    Yes.
8      Q    So presumably, DeShazer told you
9  that he ordered her in pretty much no uncertain
10  terms that she had better leave now --
11      A    That was --
12      Q    -- in sort of a command kind of a
13  voice, right?
14      A    Yes.
15      Q    Okay. And DeShazer demonstrated
16  that for you, right?
17      A    Demonstrated?
18      Q    Yeah. He told you, I told her
19  she needs to leave, and now?
20      A    Well, apparently that's the way I
21  perceived it, yes.
22      Q    Okay. Then you write, "I have
23  reason to believe that was the beginning of the
24  confrontation between Sergeant DeShazer and
25  Ms. Loree McCormick." Okay. Why do you believe

## Page 75

1  that was the beginning? Did DeShazer tell that
2  you that that was the beginning?
3      A    No. No.
4      Q    That's just what you assume?
5      A    That's my own perception.
6      Q    Okay. "Kuebler and myself were
7  standing at or near the entrance" -- "the
8  entrance" -- what?
9      A    "Circa (2140)."
10      Q    Okay. "We had no knowledge what
11  had transpired between the Sergeant/McCormick."
12  Eastbound vehicle passed by us. Unknown to
13  Kuebler and myself, it was McCormick/Rice inside
14  the vehicle. McCormick stopped the vehicle
15  and" -- what does that say?
16      A    "Yells."
17      Q    -- "yells at the courtesy clerk,
18  told her to go and get the store manager out here
19  now." And you've got another exclamation mark
20  there --
21      A    Yes.
22      Q    -- because she was saying it in
23  sort of an excited way, right?
24      A    Yes. Mm-hmm.
25      Q    "McCormick was very dramatic/

## Page 76

1  demanding in her words." What does that mean to
2  you? She was just very --
3      A    She was pointing from the
4  driver's side, pointing -- waving her hand,
5  pointing all around.
6      Q    Okay. "McCormick waits a second
7  or two, then drives off eastbound. A minute or
8  two" -- it says, "a minute/two McCormick surfaces
9  in the parking lot, walking into the store. She
10  asked who the store manager was. She was asking
11  all the black customers to please help her. They
12  called me the (N) word. Kuebler and myself still
13  remained" --
14      A    "Remained."
15      Q    -- "clueless. McCormick was very
16  dramatic. She contacted (Russ, the head clerk)
17  while Cassidy Rice was recording license plate
18  numbers outside of the store." How do you know
19  Cassidy was recording license plate numbers
20  outside the store?
21      A    'Cause I believe at that point in
22  time she asked someone -- I don't recall, but a
23  plate number. There was a plate number
24  mentioned. So I just had to presume that she was
25  copying plate numbers down.

## Page 77

1      Q    Now, do you know that there's an
2  allegation in this case that Loree McCormick-Rice
3  had gotten a phone number from a witness? And
4  it's our contention that when DeShazer was going
5  through her purse, he found it and took it. Are
6  you aware that that's an allegation in this case?
7      A    No. No.
8      Q    Okay. Did you see Cassidy
9  writing things on that piece of paper with her
10  pencil?
11      A    I saw Cassidy with the paper and
12  pencil standing by the entranceway.
13      Q    Did you ever see her take pencil
14  to paper and write something down?
15      A    I can't say that I did, no.
16      Q    Who told you she was recording
17  license numbers?
18      A    I don't recall. It was someone
19  that was in the store or in or around the
20  entranceway said she was recording plate numbers.
21      Q    Okay. The next page, you say,
22  "Conclusion to this subject matter,
23  Kuebler/myself assisted Aurora Police Officer
24  Sergeant DeShazer during his arrest of
25  McCormick/Rice."

20  (Pages 74 to 77)

## Page 78

1    A    Mm-hmm.
2    Q    "Our role was to preserve the
3  peace at the scene. At no time did I have
4  physical contact with McCormick/Rice." Now, on
5  that videotape, did you see yourself having any
6  physical contact with Loree McCormick-Rice?
7    A    No.
8    Q    Okay. "Sergeant DeShazer
9  requested my assistance when asked by the
10 undersigned. The (N) word was never used by
11 anyone in my presence. McCormick was very
12 emotional. The Sergeant in my opinion acted
13 within the scope of law while making the arrests.
14 (Rice) was resisting and McCormick was
15 obstructing." Now, I'm presuming you're thinking
16 Cassidy is Rice and McCormick is Loree; is that
17 right?
18    A    At that time, there was confusion
19 as to who was who.
20    Q    Right. But when you say, "Rice,"
21 you're referring to Cassidy, right, the daughter?
22 And when you're referring to "McCormick," you're
23 referring to the mother, Loree, right?
24    A    McCormick was -- McCormick is
25 Loree McCormick, right.

## Page 79

1    Q    Okay.
2    A    Was obstructing, yes. Yeah.
3    Q    Okay. What was Cassidy doing to
4  resist arrest? Hugging her mother?
5    A    Well, her mother was, if I recall
6  correctly, was hugging her.
7    Q    Okay. What was Cassidy doing to
8  resist arrest?
9    A    She was pulling back.
10    Q    When DeShazer had her by the hand
11 and was pulling on her, she was trying to pull
12 back?
13    A    Yes. To the best of my
14 knowledge, yes, mm-hmm.
15    Q    Okay. How old did Cassidy look
16 to you, based on your estimation?
17    A    Considering given nighttime and
18 the circumstances, everything else, I would guess
19 her a teenager.
20    Q    Young teenager?
21    A    Hmm, yeah, you know.
22    Q    If I told you she was 12 at the
23 time, would that -- she look about 12?
24    A    She appeared to be a big kid, I
25 recall, you know. She was . . . .

## Page 80

1    Q    Okay. And then you say, "At the
2  no time did Kuebler/myself have/had physical
3  contact with McCormick or (Rice). We only
4  preserved the peace at the scene. The reviewer
5  should have a problem" -- or "If the (reviewer)
6  should have a problem, please research the
7  Colorado State statute (CRS). The reader must
8  keep in mind Sergeant DeShazer (APD) said Yes
9  when asked by the undersigned if he needed help.
10 The senior officer, Vic Morris" -- is that the
11 senior security officer?
12    A    Yes, sir. Yes, sir.
13    Q    From King Soopers?
14    A    Mm-hmm.
15    Q    -- "did not" -- what?
16    A    "Want."
17    Q    -- "want Aurora Police
18 Department/Sergeant DeShazer, to have a copy of
19 (I.R.)"?
20    A    The incident report. The one
21 you're reading now.
22    Q    "He said, 'Write out the incident
23 on an 8X11 sheet of paper.' Aurora Police
24 Department has a similar account of events,
25 however, not as detailed."

## Page 81

1      Okay. Why did -- did Vic Morris tell
2  you why he didn't want Aurora to have a copy of
3  your report?
4    A    No. And I didn't ask, either.
5    Q    What was your conclusion about
6  that? What did you think when he said that?
7    A    Well, it was usually in
8  compliance with the standard operating policy of
9  King Soopers, you know, as far as confidentiality
10 in the releasing of our paperwork. I never
11 questioned his judgment on that.
12    Q    Okay. Don't they usually
13 cooperate with Aurora Police?
14    A    Certainly.
15    Q    Okay. And not giving them a
16 report wouldn't be the most cooperative, friendly
17 act in the world, would it?
18    A    Well, they eventually got the
19 report, yes.
20    Q    Well, but I mean --
21    A    I can't speak for Vic Morris, why
22 he would say that. I just followed an order that
23 night.
24    Q    No. I understand. I'm just
25 trying to get your impression of that order. Did

21 (Pages 78 to 81)

Page 82

1  you think, That's kind of weird?
2      A    No, not at the time, 'cause it's
3  happened in the past. Usually, to my
4  understanding, police departments apply or
5  request something, and they always get it.
6      Q    Okay.
7      A    So this would be no different. I
8  can't speak for Vic Morris's actions that night.
9      Q    Okay.
10     A    I just complied to an order.
11     Q    All right. You then write,
12 "Aurora Police Officer (Fabio) furnished me with
13 the names (Rice) and (McCormick). In the
14 beginning of this incident, we did not have a
15 clue what was transpiring between Sergeant
16 DeShazer, McCormick, and Rice. As far as
17 Kuebler/myself, she was just another valued
18 customer. The names of the parties arrested was
19 furnished to me by (Police Officer Fabio) at the
20 end of the incident." And that concludes that
21 report; is that right?
22     A    That's true.
23     Q    When did you fill that out?
24     A    Well, I'd have to go by the date.
25     Q    Okay. Now, let me ask you this.

Page 83

1  If you look up at the top of the first page, it
2  says Page 1 of 3. Do you see that?
3      A    Yeah.
4      Q    And the very next page says page
5  3 of 3?
6      A    Yeah.
7      Q    Are we missing a page here?
8      A    No. I screwed the numbering up,
9  most likely. It should be 1 of 1, 1 of 2.
10     Q    So it was only a two-page report?
11     A    Right.
12     Q    Okay. Well, let's look at
13 Exhibit 2. Is this yours?
14     A    Yes.
15     Q    Okay. Why did you fill this out?
16     A    This was the one, as you
17 previously asked me, on -- we talked about Vic
18 Morris wanted a separate statement for Aurora.
19     Q    So this was the one that was
20 supposed to go to Aurora; is that right?
21     A    Yeah, the temporary one, I should
22 say.
23     Q    What do you mean, "the temporary
24 one"?
25     A    Well, eventually, we did the

Page 84

1  incident report. But it was my understanding
2  that night in talking to him that you just give
3  them a handwritten statement.
4      Q    Okay. So was Exhibit 2 filled
5  out first, before Exhibit 1 was filled out by
6  you?
7      A    Exhibit 2 went first.
8      Q    What time did you fill out
9  Exhibit 2?
10     A    I can't answer that. I
11 was . . . .
12     Q    Just ballpark me.
13     A    It was --
14     Q    The same night?
15     A    Yeah.
16     Q    How about Exhibit 1? When did
17 you fill out Exhibit 1?
18     A    Probably the next day, maybe.
19     Q    Okay.
20     A    I don't recall. Now, I've got to
21 be careful on that, 'cause I don't recall if I --
22 I don't recall if I --
23     Q    I'm not going to hold it against
24 you.
25     A    Yeah.

Page 85

1      Q    I know you didn't have a clock on
2  this.
3      A    Mm-hmm.
4      Q    All right. So it reads, "Circa
5  (2140 hours) the undersigned observed a black
6  female, later ID's as (Lorie McCormick), yelling
7  at a courtesy clerk in the parking lot in front
8  of the store, go and get the store manager, now.
9  She (McCormick) drove her vehicle into the
10 handicap stall and got out." You didn't see that
11 happen, did you?
12     A    No.
13     Q    Okay. She got out and went into
14 the store. "McCormick was belligerent, using
15 profanity, etc." Okay. When you say she's
16 belligerent, that means what?
17     A    She was yelling and screaming.
18     Q    What was she yelling and
19 screaming?
20     A    "Please help me. They're calling
21 me a nigger."
22     Q    What was the profanity she was
23 using?
24     A    She was using -- she was using
25 words that must have got my attention, because --

22  (Pages 82 to 85)

Page 86

```
 1   I don't recall exact words, other than, 'Please
 2   help me. They're calling me a nigger."
 3        Q    Well, that doesn't -- does that
 4   sound belligerent to you, "Please help me.
 5   They're calling me a nigger"?
 6        A    She -- I guess what I'm basing on
 7   "belligerent" was the way she talked to the
 8   courtesy clerk.
 9        Q    Okay. And you haven't -- you've
10   told us, to the best of your recollection, that's
11   what she was saying, "Please help me. They're
12   calling me a nigger."
13        A    Yes.
14        Q    You've repeated that many times
15   in this deposition, haven't you?
16        A    Mm-hmm. Yes, I have.
17        Q    Okay. At no time have you thrown
18   in any profanity that Loree McCormick-Rice was
19   allegedly using in the store, have you?
20        A    None that I recall.
21        Q    Okay. So when you say in your
22   report she was using profanity and she was
23   belligerent, that sort of gives me an impression
24   of somebody coming in with an attitude, angry,
25   who's ordering people around and, you know,
```

Page 87

```
 1   belligerent, meaning bossy, for example, and
 2   using all kinds of cuss words. That's what I --
 3   my impression is by reading this. Is that the
 4   impression you wanted your reader to get when you
 5   wrote that she was belligerent, using profanity?
 6        A    At that point in time, that's the
 7   way I perceived it. I don't recall her exact
 8   words. That's why I said there was profanity
 9   used. But I can't recall exactly what she said.
10        Q    Okay. "She was claiming unknown
11   parties had called her the 'N' word." You then
12   say, "For the record, I never heard the (officer)
13   or anyone else call her the 'N' word."
14        A    Mm-hmm.
15        Q    Okay. So on the one hand, you're
16   saying an unknown party had called her the "N"
17   word, but then in the same sentence or in the
18   next sentence you say, you never heard the
19   officer call her an "N" word, right?
20        A    Yeah. That's true.
21        Q    So at some point you became aware
22   that she was accusing an officer of calling her a
23   nigger, right?
24        A    I heard it going around, yes.
25        Q    Well, based on what you heard her
```

Page 88

```
 1   saying inside the store, that's when you
 2   concluded, Oh, she's accusing an officer of
 3   calling her a nigger. That's the problem here,
 4   right? That's what you understood her complaint
 5   was?
 6             MR. HIGGINS: I'm going to object
 7   to the form of the question.
 8        Q    (BY MR. LANE) Go ahead and
 9   answer.
10        A    Restate your question again here.
11        Q    Yeah. In your report you say you
12   never heard the officer call her a nigger, right?
13        A    Yes.
14        Q    Okay. Which implies that somehow
15   you had knowledge that the subject matter of her
16   complaint was that an officer had called her a
17   nigger, right?
18        A    Yes, mm-hmm.
19        Q    Okay. And that became clear to
20   you when she was inside the lobby talking to the
21   manager, talking to Russ. You heard her say,
22   That officer out there called me a nigger, or
23   words to that effect, didn't you?
24        A    I never heard her say "that
25   officer out there." I never heard her say no
```

Page 89

```
 1   such thing. She said to me in- -- well, she
 2   didn't say to me inside. She said she didn't --
 3   she implied to Russ that she didn't want any part
 4   of dealing with me.
 5        Q    My point is, somehow you knew,
 6   when you wrote this report, she accused an
 7   officer of calling her a nigger, right?
 8        A    Well, apparently so, yes.
 9        Q    Where did you get that knowledge?
10        A    I don't recall. I don't recall.
11   I know it was -- it was pretty offensive. And I
12   know I never heard any of the officers ever say
13   it.
14        Q    What was pretty offensive?
15        A    The "N" word.
16        Q    You think she was inappropriately
17   using the "N" word?
18        A    I believe -- yes, I believe so,
19   mm-hmm.
20        Q    She shouldn't have been saying
21   the word "nigger"?
22        A    It all depends how you view it.
23   Because the way she was using it --
24        Q    Well, she wasn't calling anyone a
25   nigger, was she?
```

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 90

1       A    No.  She was saying, "Please help
2   me.  They're calling me" . . . .
3       Q    A nigger, right?
4       A    Mm-hmm.  Yes.
5       Q    Well, if that's what they were
6   calling her, then is there something
7   inappropriate about her saying that?
8       A    She -- my perception of it was
9   she was trying to get the attention of only
10  blacks.  And you'll see on your video, she
11  confronted only blacks with this.
12      Q    And is there a problem with that?
13      A    I would say yes.
14      Q    What's the problem with that?
15      A    I believe if she was to be so
16  concerned about being labeled, there was plenty
17  of concerned white customers.  There was Hispanic
18  customers in there.  Well, there wasn't any more
19  of really any name, other than Hispanic and
20  white.  But she had every opportunity to complain
21  to them.
22           And there was -- to the best of my
23  knowledge, there was interest.  I mean, there was
24  customers within the scope of the lobby area.
25      Q    Well, I'm trying to understand

Page 91

1   why you think she was inappropriately using the
2   word "nigger."
3       A    Well, she made her point clear.
4   And at that point in time, I mean, she -- she
5   didn't -- she was trying to solicit -- I don't
6   know what she was trying to do -- the help, or I
7   don't know what -- I can't speak for Loree Rice.
8   But she was only confronting black customers.
9       Q    Okay.  In your opinion, if
10  DeShazer called her a nigger, what should happen?
11      A    I don't quite understand your
12  question.  You're asking me what I would --
13      Q    Let's assume it's true, DeShazer
14  called her a nigger in the parking lot, and
15  everything she said in the lobby was true.  Okay?
16  What is your opinion as to what the response
17  should be by King Soopers?
18      A    Mr. Lane, I cannot answer that,
19  because I don't have that responsibility to make
20  that decision.
21      Q    Understand.  But I'm now
22  appointing you the ultimate boss of all of King
23  Soopers.
24           MR. HIGGINS:  Well, I'm going to
25  object to that.  I don't think he can answer, if

Page 92

1   he says he doesn't know.  I'm going to object.
2           MR. LANE:  Okay.  You've
3   objected.  That's fine.
4           MR. HIGGINS:  If he doesn't know,
5   he can't answer.
6           MR. LANE:  That's correct.
7       Q    (BY MR. LANE)  Okay.  Now I'm
8   asking you, okay?  You are now -- hypothetically,
9   you have just been appointed the super boss of
10  all of King Soopers, and you find out DeShazer
11  called Loree Rice a nigger.  What do you believe
12  to be the appropriate response by King Soopers,
13  you personally, your opinion?
14          MR. HIGGINS:  I think he can
15  answer himself, but not for King Soopers.
16          MR. LANE:  That's what I'm asking
17  him.
18      A    Yeah, I can't answer -- as I said
19  earlier in the statement, I don't -- I can't
20  answer for King Soopers.  That's not my --
21      Q    (BY MR. LANE)  Understand.  I'm
22  asking you, Mr. Sands, what is your opinion on
23  what should happen if DeShazer called her a
24  nigger?
25          MR. HIGGINS:  I'm going to object

Page 93

1   to the form of the question.
2       A    I can't answer that.  I really
3   can't.
4       Q    (BY MR. LANE)  Okay.
5           MR. HIGGINS:  You can ask him his
6   own personal opinion.
7           MR. LANE:  I've asked him that
8   three times.  He says he can't answer it.
9       A    You want my personal opinion?
10      Q    (BY MR. LANE)  Yeah.
11      A    I do not know officer DeShazer.
12  There's two sides to every story.  We'd have to
13  have a number of witnesses and pretty much what
14  we're going through here, statements and so
15  forth.  And I mean, legitimate statements.  And I
16  would have to, obviously, notify Aurora Police
17  Department, their command, get their viewpoints,
18  what their policy is on it, and what King
19  Soopers -- I know pretty much what their policy
20  would be, I think.  It wouldn't be tolerated, and
21  I know Aurora wouldn't tolerate it.  I would have
22  to have some kind of official hearing and --
23  which I think Aurora had.  I'd follow those
24  guidelines that Aurora did and call in the
25  witnesses.

                                    24  (Pages 90 to 93)

Page 94

```
 1        Q    Okay.  Well --
 2        A    And hear two sides to each story.
 3        Q    All right.  Now, this report is
 4   designed -- both of these reports, Exhibit 1 and
 5   2, are designed to do what?  What is the
 6   purpose --
 7        A    Tell the story.
 8        Q    Okay.  Did you view yourself as
 9   in the role of an investigator at all in writing
10   these reports?
11        A    Investigator?
12        Q    Mm-hmm.
13        A    No.  No.
14        Q    Did you ever ask DeShazer, Did
15   you call her a nigger?
16        A    No.  I never asked him that at
17   all.
18        Q    Okay.  In your report on Exhibit
19   2, you say, "She was attempting to insight (sic)
20   a disturbance."
21        A    Yes.
22        Q    What do you mean, "She was
23   attempting to insight a disturbance"?
24        A    She was running up to customers
25   and saying, "Please help me.  They're calling me
```

Page 95

```
 1   a nigger.  Please help me, they're calling me a
 2   nigger."
 3        Q    Correct.
 4        A    She would go from one black
 5   customer to another, hoping that she could spark
 6   something out there.
 7        Q    Spark what?
 8        A    A disturbance.
 9        Q    What, a riot?  They're going to
10   burn down King Soopers?
11             MR. HIGGINS:  I'm going to object
12   to the form of the question.
13        A    No, no, no.
14        Q    (BY MR. LANE)  What kind of
15   disturbance?
16             MR. HIGGINS:  I'm going to object
17   to the form of the question.
18        Q    (BY MR. LANE)  Go ahead and
19   answer.
20             MR. HIGGINS:  If you can answer.
21        Q    (BY MR. LANE)  What kind of
22   disturbance?
23        A    Beg your pardon?  Disturbance.
24   My idea of a disturbance would be the fact that
25   she was trying to get blacks to rally around her.
```

Page 96

```
 1        Q    To do what?
 2        A    I can't say what they want to do,
 3   but that was my perception.  I don't know what
 4   they would do.  But she wanted -- she was
 5   soliciting only blacks.
 6        Q    Right.
 7        A    She was completing (sic), in my
 8   opinion, a disturbance, hoping --
 9        Q    What is a disturbance, is what
10   I'm asking.  What do you consider a disturbance?
11        A    Get other customers' attention
12   within the store.
13        Q    And that's a disturbance?
14        A    Well, yes.  When you disturb
15   other customers and they come up to the head
16   clerk and they want to know what's going on, and
17   you've got bystanders standing around looking at
18   the situation, I would say that's -- that's not
19   normal procedure.
20        Q    Right.  But is there anything
21   wrong with that?
22        A    Certainly is.
23        Q    What's wrong with that?
24        A    Well, we normally don't have
25   somebody running around the parking lot or the
```

Page 97

```
 1   store soliciting people for their aid and,
 2   "Please help me.  They're calling me a nigger."
 3   There's a time and place for that.
 4        Q    Where is the time and the place
 5   for that?
 6        A    Well, I would say away from the
 7   store or else back in the office or out of the
 8   way, out of the view of the customers.
 9        Q    Well, she did try to talk to the
10   manager about that, right?
11        A    Well, that, I don't know what
12   their conversation was about it, too, there.
13        Q    Well, you've talked to Russ since
14   then.  You know that that was the subject matter
15   of what she was talking to Russ about, yes?
16        A    Subject matter, yes, I know that.
17        Q    Okay.
18        A    But details I don't know.
19        Q    Okay.  So there's a time and a
20   place to gather people to help you when you're
21   being called a nigger in the parking lot of King
22   Soopers.  But in your view, that's not at King
23   Soopers when it's happening?  That's not the
24   appropriate time or place to rally support or try
25   to get witnesses or tell people to help?  Is that
```

25  (Pages 94 to 97)

**Page 98**

1  what you're saying?
2       MR. HIGGINS:  Well, I'll object
3  to the form of the question.
4       Q    (BY MR. LANE)  Go ahead.
5       MR. HIGGINS:  That's compound
6  questions.  It's five or six different questions,
7  require different answers.
8       Q    (BY MR. LANE)  Go ahead.  Does
9  that require different answers?  You're saying
10 where she was trying to gather help --
11      A    Mm-hmm.
12      Q    -- that was not the appropriate
13 time or place to be bathering help?  That's your
14 testimony; is that right?
15      A    In my opinion, yes, she was
16 creating a disturbance.  People did not want to
17 be bothered by it.  They were trying to get away
18 from her.
19      Q    Did anybody tell you that they
20 were disturbed by Loree Rice?
21      A    I believe there was other
22 complaints.
23      Q    Those would have been recorded,
24 then, wouldn't they?
25      A    That, I couldn't tell you.

**Page 99**

1       Q    Well, isn't that King Soopers'
2  policy, based on your experience with King
3  Soopers, when a customer complains, there's a
4  written note made by somebody that a customer has
5  complained about something?
6       A    I would say that's a true
7  statement, yes.
8       Q    Okay.  Have you ever seen any
9  customer complaints about Loree Rice in the lobby
10 asking people for help and a customer complained?
11      A    I believe, if we -- I did read
12 one.  I believe you'd have to do --
13      MR. LANE:  Do you have that?
14      A    I'm not sure, but . . . .
15      Q    (BY MR. LANE)  Well, did you tell
16 her to leave because she was creating a -- trying
17 to incite a disturbance?
18      A    No, I don't think I recall
19 telling her to leave.
20      Q    Do you know if anybody told her
21 to leave 'cause she's creating a disturbance?
22      A    To my knowledge, she left on her
23 own.
24      Q    Okay.  You then write, "As
25 McCormick and her daughter Rice, Cassidy, were

**Page 100**

1  driving off, westbound, I heard one of the
2  individuals yell out, 'Fuck you.'"
3       A    Right.  Yes.
4       Q    You didn't say you heard Loree
5  yell "Fuck you" or Cassidy?  You just said you
6  heard "Fuck you"; right?
7       A    Which paragraph is it?
8       Q    The last paragraph on the first
9  page of Exhibit 2 -- Exhibit 2.
10      A    Okay.
11      Q    "I heard one of the
12 individuals" --
13      A    Okay.
14      Q    -- "yell out 'Fuck you.'"
15      A    Okay.  That, as I testified
16 earlier, that was -- it appeared to come from the
17 driver's side.
18      Q    Okay.  But you didn't put that in
19 your report?
20      A    I don't recall if I did or not.
21      Q    Well, you said you "heard one of
22 the individuals."  You didn't say you heard the
23 driver yell out "Fuck you."  You didn't say, I
24 heard the passenger yell out "Fuck you."  You
25 wrote, "One of the individuals yelled out 'Fuck

**Page 101**

1  you,'" right?
2       A    I haven't read the first exhibit,
3  but the second exhibit, I heard out -- yeah,
4  exactly what I said.  No, I didn't specify the
5  driver, but . . . .
6       Q    Okay.  "Sergeant DeShazer went
7  after the McCormick vehicle at the time."  What
8  is that number?  It looks like a "71" on top of
9  "the time."
10      A    That's not mine.  I don't know.
11      Q    Okay.  "Several customers came
12 upon the scene saying the Aurora officer
13 (Sergeant DeShazer) was needing help, with
14 (McCormick and Rice) at or near Chambers Circle,
15 (S.W.) corner of the store.
16      "Jeff Kuebler (King Soopers security
17 officer) and the undersigned arrived on the
18 scene.  I asked the Sergeant if he needed 'help.'
19 He replied, Yes.
20      "Sergeant DeShazer pulled the daughter
21 away from the mother, at that time, and took
22 control of the mother" -- or excuse me.  "I took
23 control of the mother, keeping her away (sic) the
24 sergeant and Ms. Rice.  Both parties were very
25 combative towards the Aurora officer."

26 (Pages 98 to 101)

Page 102

1      Okay.  Both parties were very combative
2  toward the Aurora officer.  What did Cassidy Rice
3  do that was combative toward the Aurora officer?
4      A    Oh, she was -- in my opinion, was
5  definitely not cooperating with the officer.
6  They were yelling and screaming.  I don't know
7  exact words.  She was resisting.  The officer had
8  asked her to stand up.  They were refusing to
9  stand up.  The mother was grasping the daughter.
10     Q    Okay.  And Loree Rice was
11 combative in what way?
12     A    Loree Rice.  When she got back
13 up.
14     Q    Or Loree McCormick-Rice, I should
15 say.
16     A    Okay.  Loree McCormick --
17     Q    The one in the vehicle, the
18 mother.
19     A    Right.  Right.
20     Q    What was she doing that was
21 combative?
22     A    She was yelling and screaming.
23 And at that point in time, she had ahold of her
24 daughter, hanging on to her.  And I viewed that
25 as a form of a combative situation there.

Page 103

1      Q    Okay.
2      A    They were struggling against the
3  officer.
4      Q    Loree Rice says you put your
5  hands on her at one point.  And you say you did
6  not.  Are you aware of the fact that she says you
7  put your hands on her?
8      A    No.
9      Q    Okay.  But you deny ever touching
10 either Loree or Cassidy?
11     A    I never touched either Loree or
12 Cassidy or any of that -- of the subjects there.
13 Never touched them.
14     Q    Okay.  Let me talk to you about
15 your counterclaim here.  What sort of damages are
16 you seeking against Loree Rice?
17     A    I'd have to refer that to the
18 legal end of it, my legal end of it.
19     Q    Well, you want something out of
20 this case, right?
21     A    Justice.
22     Q    Okay.  And what would justice be?
23     A    Well, definitely exonerate me,
24 'cause I never touched them.  I never did
25 anything to the two ladies.

Page 104

1      Q    Okay.  All right.  But you're
2  suing them, okay?  So what do you want a jury to
3  do?
4      A    What do I want a jury to do?
5      Q    Mm-hmm.
6      A    To understand that they're not
7  telling the truth.
8      Q    Okay.  And then do you want money
9  from Loree Rice?
10     A    Well, at this point in time, I
11 probably want the same treatment you're giving us
12 or -- you know, yes, there's damages.
13     Q    Okay.  And how much money do you
14 want?
15     A    I haven't given it much thought
16 at this point in time.  Money don't seem to be
17 the biggest issue.
18     Q    Okay.  So a dollar and an
19 exoneration would be satisfactory for you?
20     A    I'm not so sure that would be the
21 best answer for me to give you right at this
22 point in time.
23     Q    Well, what would be the best
24 answer for you to give me at this point in time?
25     A    I don't quite understand where

Page 105

1  you're coming from with this here.
2      Q    I just want to know what you're
3  after.
4      A    What I'm after.
5      Q    You want something from my
6  client.  What do you want?
7      A    I would like to have her,
8  obviously, stop spreading lies --
9      Q    Mm-hmm.
10     A    -- and admit to it.
11     Q    Okay.
12     A    And I'd like to know why she's
13 doing this.
14     Q    But you're asking for money here.
15 I want to know how much.  What do you want?
16     A    To cover all my damages, then.
17     Q    Give me a dollar.  Give me a
18 dollar figure.  What do you want?
19     A    A million dollars.
20     Q    You want a million dollars?
21     A    Mm-hmm.
22     Q    Okay.
23     A    You have to have a number, I'm
24 giving you a number.
25     Q    Well, you know what?  The jury's

27 (Pages 102 to 105)

Page 106

1  going to want a number.
2       A    Mm-hmm.
3       Q    And so I just want to know what
4  that number's going to be.  Okay.  How do you get
5  to a million dollars?
6       A    How do I get --
7       Q    Mm-hmm.
8       A    -- damages, so forth?
9       Q    Mm-hmm.
10      A    I think I'll leave that up to the
11 attorneys to decide that.  You asked me for a
12 number.  I give you a round number here.
13      Q    Right.  But you know what?  I'm
14 going to be asking you these questions on the
15 witness stand at this trial, okay?
16      A    Mm-hmm.
17      Q    So your attorneys can argue for
18 $38 billion dollars to the jury.  They can argue
19 for $1 to the jury.
20      A    Mm-hmm.
21      Q    What your attorneys are going to
22 be arguing to the jury is up to your attorneys,
23 with you, okay?  But you're going to be on the
24 witness stand, okay?  And when you're on the
25 witness stand, I'm going to say to you,

Page 107

1  Mr. Sands, you want money, don't you?  What's
2  your answer?
3       A    Yes.
4       Q    How much?
5       A    I just gave you the figure.
6       Q    A million bucks?
7       A    (Deponent nodded.)
8       Q    And my question then is going to
9  be in front of the jury, How do you get to that
10 number?
11      A    Well, I'll have to come up with
12 the situation here where I'm --
13      Q    Okay.  Well, come up with it.  If
14 you don't know now, then you don't know.  Is it
15 just a wild guess, or what?  I mean, where are
16 you coming up with this money?
17      A    No.  You asked me for a figure.
18      Q    Right.
19      A    And that's what I give you.
20      Q    Okay.  Are you asking Loree Rice
21 to write you a check for a million dollars to
22 compensate you for your damages in this case?  Is
23 that what you want?
24      A    Yes.  I would presume, if she was
25 capable of it.

Page 108

1       Q    Okay.
2       A    Primarily, the humiliation, the
3  degradation, the death threats.
4       Q    Now, has Loree Rice been giving
5  you death threats?
6       A    In May -- we want to go into
7  that?
8       Q    Yeah.
9       A    Oh, certainly.  Okay.  I believe
10 it was May of '07, I was working Store 10.  They
11 were outside protesting.
12      Q    Who's "they"?
13      A    "They" would be, I believe, Loree
14 Rice, her people who were --
15      Q    Well, who are "her people"?
16      A    The people that are affiliated
17 with her on this protest.
18      Q    So Loree Rice was protesting, and
19 there were a group of other people out there
20 protesting with her?  Is that what you're telling
21 me?
22      A    This particular -- I don't have a
23 particular date and time, but this particular
24 Saturday, got a phone call.  I answered the phone
25 and asked --

Page 109

1       Q    Where were you?
2       A    I was inside the store.
3       Q    Mm-hmm.
4       A    And they were protesting out in
5  the parking lot.
6       Q    Well, who's "they"?
7       A    They could have been Loree Rice
8  and --
9       Q    Could have been or was?
10           MR. HIGGINS:  Counsel, I'd ask
11 you to let her -- let him finish his questions --
12 his answers when you ask him.  I don't think
13 you're letting him.
14      Q    (BY MR. LANE)  You said, "could
15 have been Loree Rice."  Was it or wasn't it, or
16 do you know?
17      A    I do not know.  All I know is
18 that they were out in support of Loree Rice,
19 okay.
20      Q    How do you know that?
21      A    With their signs and their
22 pamphlets and so forth.
23      Q    What did their signs and
24 pamphlets say?
25      A    I can't tell you offhand what

28  (Pages 106 to 109)

## Page 110

```
 1    they said at this point in time.
 2        Q    Just give me a summary.
 3        A    Well, that Ernie Sands is a
 4    racist.  King Soopers is racist.  Don't shop King
 5    Soopers.
 6        Q    Okay.  Did you ever see Loree
 7    Rice hold one of those signs or --
 8        A    I certainly did.
 9        Q    -- one of those pamphlets?
10        A    I certainly did.
11        Q    When was that?
12        A    I'd have to go back and check my
13    records.
14        Q    Ballpark me.
15        A    All of last year, within --
16        Q    Ballpark me.
17        A    You said ballpark?
18        Q    Mm-hmm.
19        A    Most of the time that I was at
20    Store 10, she was out on the street holding up a
21    sign.  I can't give you exact dates.
22        Q    Most of the time when you were at
23    Store 10.  How many hours a week do you work at
24    Store 10?
25        A    40.
```

## Page 111

```
 1        Q    Okay.  And most of that time,
 2    from the time of this incident through when, was
 3    she out there?
 4        A    Only on a Saturday.
 5        Q    On one Saturday?
 6        A    Oh, more than one Saturday.
 7        Q    Approximately how many Saturdays?
 8        A    Maybe 70, 75 Saturdays.
 9        Q    75 Saturdays?
10        A    Mm-hmm.
11        Q    So every day for about a year and
12    a half, every Saturday for a year and a half,
13    Loree McCormick-Rice was out in front of that
14    store?
15        A    I don't know if she was out there
16    directly, but the times I've seen her, she was
17    out there, yes.
18        Q    Okay.  And you saw her holding a
19    sign saying you are a racist?
20        A    I saw one sign, yes, said that --
21    she was on the blow horn.  And there was other
22    supporters that were holding up the signs.
23        Q    Saying what about you?
24        A    That I was a racist.
25        Q    Your name?
```

## Page 112

```
 1        A    Mm-hmm.
 2        Q    Ernie Sands is a racist?
 3        A    She used my name, yes.
 4        Q    On a sign?
 5        A    Beg your pardon?
 6        Q    On a sign?
 7        A    Pamphlets.
 8        Q    In pamphlets?
 9        A    Mm-hmm.
10        Q    Do you have a pamphlet where your
11    name is used?  Did you collect one?
12        A    Yes, there is.
13            MR. LANE:  Do we have those?
14            MR. MOHAMEDBHAI:  No.
15        Q    (BY MR. LANE)  Okay.  So do you
16    have one right now, one of those pamphlets?
17        A    In my possession?
18        Q    Yeah.
19        A    No, not now I don't, no.
20        Q    Did you give it to your lawyers?
21        A    It went to 893.  That's our
22    security office.
23        Q    Do you know if your lawyers --
24    did you ever give your lawyers a copy of that
25    pamphlet with your name on it?
```

## Page 113

```
 1        A    Most of the stuff -- all of the
 2    stuff, I should say, not most.  All of it goes to
 3    893 for distribution to the lawyers.
 4        Q    Okay.  Do you know who prepared
 5    that pamphlet?
 6        A    I don't have a clue who prepared
 7    it.
 8        Q    Do you know if Loree Rice had
 9    anything to do at all with the preparation of
10    that pamphlet?
11        A    I can't speak for Loree Rice.  I
12    don't know what she did.
13        Q    Did you ever hear Loree Rice or
14    see Loree Rice -- well, withdrawn.
15            Your testimony -- you saw Loree Rice
16    holding a pamphlet that used your name and called
17    you a racist?
18        A    She was distributing them, yes.
19        Q    Okay.
20        A    And her supporters were right
21    along there with her.
22        Q    Okay.  I'm trying to distinguish
23    between her and her supporters, okay?  At any
24    time did you ever take any pictures of these
25    protests?
```

29  (Pages 110 to 113)

Page 114

1    A    Yes.
2    Q    Did you give those pictures to
3  your lawyers?
4    A    Yes.
5    Q    Okay.
6        MR. LANE:  Well, we would ask for
7  those pictures in discovery.  And in fact, I
8  think we've already asked for all photographs
9  relevant to this case.
10       So can I get a statement from any
11 counsel regarding the status of any photographs
12 of protests?
13       MR. HIGGINS:  Yes, I have some
14 photographs.
15       MR. LANE:  You have photographs?
16       MR. HIGGINS:  I have
17 surveillance, daily surveillance photographs.  Do
18 you want to look --
19       MR. LANE:  Have you provided
20 those to us?
21       MR. HIGGINS:  No.  Collecting
22 them all, so no.
23       MR. LANE:  Okay.  Any particular
24 reason why we don't have those?
25       MR. HIGGINS:  Well, let me tell

Page 115

1  you, we've done surveillance on this case, all
2  right?  The store has done surveillance.  We have
3  done surveillance.  We'll disclose all those
4  tapes of your client in her protests.
5        MR. LANE:  You say you have
6  disclosed them?
7        MR. HIGGINS:  No, we have not.
8  We will disclose those.
9        MR. LANE:  Why not?
10       MR. HIGGINS:  'Cause they're
11 surveillance.
12       MR. LANE:  So?
13       MR. HIGGINS:  You're asking me
14 now.  We'll give you the surveillance.
15       MR. LANE:  I'm just asking you,
16 we asked for photographs relative to the case.
17       MR. HIGGINS:  You did.  We didn't
18 give you the surveillance tapes, okay?  Your
19 client is still actively protesting at the store,
20 so . . . .  We will give you those tapes.
21       MR. LANE:  Okay.
22       MR. HIGGINS:  And we'll give you
23 the tapes that have -- we have tapes that are
24 security tapes.  There was surveillance of the
25 parking lot.  You can look -- I don't know if you

Page 116

1  want -- if you want all of them, every box of
2  them.
3        MR. LANE:  You know, I want
4  the -- what I don't want is you give me the
5  haystack and tell me, Go look for the needle,
6  okay?
7        MR. HIGGINS:  I don't.  These are
8  all related to your client.
9        MR. LANE:  Okay.  I'm just kind
10 of curious why we haven't gotten those previous
11 to this, but I suppose that will be the subject
12 matter of the appropriate process.
13       MR. MOHAMEDBHAI:  It's not even
14 what you said, though.  "Please produce any and
15 all documents related to King Soopers' internal
16 investigation of the incidents."  And you said,
17 "All documents have been produced."
18       MR. HIGGINS:  I did.
19       MR. MOHAMEDBHAI:  So you're not
20 even saying.
21       MR. HIGGINS:  These are King
22 Soopers investigations.
23       MR. MOHAMEDBHAI:  "All King
24 Soopers internal investigations to you."
25       MR. MORALES:  "Of the incident."

Page 117

1        MR. HIGGINS:  "Of the incident."
2  You're asking about the incident of --
3        MR. MOHAMEDBHAI:  "Of the
4  incident involved."
5        MR. HIGGINS:  Let me tell you, if
6  your client just keeps protesting after this,
7  that's not the internal investigation.
8        MR. MOHAMEDBHAI:  Wow.
9        MR. HIGGINS:  This counsel was --
10 is giving it.
11       MR. MOHAMEDBHAI:  That's how
12 you're splitting it up, between --
13       MR. LANE:  Okay.  All right.
14       MR. MORALES:  That's how I split
15 it up.  One thing's an incident, and the other
16 thing is ongoing activities every Saturday.
17       MR. MOHAMEDBHAI:  Okay.  So we'll
18 ask that.
19       MR. MORALES:  Yeah, I guess you'd
20 better.
21       MR. MOHAMEDBHAI:  It makes it
22 seem like you've produced everything.
23       MR. HIGGINS:  About the internal
24 investigation of the incident.  That's it.
25 That's as much as there is.

30 (Pages 114 to 117)

Page 118

1    Q    (BY MR. LANE) Okay.  Now, have
2 you sought any counseling as a result of your
3 emotional distress from these protests?
4    A    Counseling?
5    Q    Yes.
6    A    What do you mean?  Lawyer or --
7    Q    No.
8    A    -- or doctor?
9    Q    Psychological counseling.
10    A    I saw my doctor, yes, Dr. Hollar.
11    Q    And who is your doctor?
12    A    Dr. Hollar.
13    Q    Spell that, please.
14    A    I believe it's H-o-l-l-a-r.
15    Q    Okay.  And where is Dr. Hollar
16 located?
17    A    He's located down on South
18 Yosemite, probably 7300 South Yosemite.  That's
19 not the exact address, but . . . .
20    Q    What did you see Dr. Hollar for?
21    A    Stress-related, subject matter.
22    Q    Is he a psychologist?
23    A    No.  I haven't got that far.  You
24 know, that -- I was telling him about it, and he
25 seemed to have the right answers, so I'm going to

Page 119

1 stick with Dr. Hollar.
2    Q    Okay.  And what were his answers?
3    A    He was concerned about my health,
4 about being stressed out over this whole
5 situation, which is very, very stressful.  I am
6 worried about my family.  I worry about me being
7 followed home after the death threats, which by
8 the way, we've got to get back to that.
9    Q    We'll go back to that.
10    A    Yeah.  And it just got to the
11 point where he give me -- I don't recall the type
12 of medication, but it's -- it's -- what am I
13 trying to say here?  Lack a bit of words for
14 medical.  But it's for kind of a antidepressant.
15    Q    Okay.  And how often do you take
16 that?
17    A    Well, I usually take it after I
18 get off duty.
19    (Mr. Morales left the deposition room.)
20    Q    Every day?
21    A    Yes, every other -- yeah, that
22 one every other day.
23    Q    And so how long have you been
24 taking antidepressants?
25    A    They were issued to me, I don't

Page 120

1 recall, about six months, maybe seven months.  I
2 don't have the exact dates.
3    Q    Six or seven months ago from
4 today?
5    A    I'm trying to think of a date.
6 It was probably mid/late summer of '07.
7    Q    Okay.  So how many times have you
8 had that prescription refilled; do you remember?
9    A    I never had it refilled.  It was
10 sample copies give me, or samples.
11    Q    So have you been taking samples
12 ever since?
13    A    No.  I discontinued that probably
14 right around maybe Christmas or January.
15    Q    I'm just trying to get a sense of
16 for how long every day were you taking this
17 medication?
18    A    Once every 24 hours, I believe.
19    Q    For how many days?
20    A    Days?  I can't answer that.
21    Q    Weeks or months?
22    A    Whatever the samples were.  I'm
23 going to guess and say six weeks, seven weeks,
24 maybe, eight weeks in there.
25    Q    Okay.  And then why didn't you

Page 121

1 get the prescription filled up?
2    A    Because I'm not a medication guy.
3    Q    Okay.  All right.  Let's go back
4 to the protests.  Tell me, how many people
5 generally would participate in these protests?
6    A    My opinion what I witnessed?
7 Anywhere from three to maybe fifteen.  That's a
8 ballpark figure.
9    Q    Okay.  Now, tell me about --
10 other than just making a lot of noise in front of
11 the store on a Saturday -- first of all, how long
12 would these protests go on?  They'd start at what
13 time and end at generally what time?
14    A    Oh, all depends on the weather.
15    Q    Okay.  On a regular, normal day.
16    A    Regular good, solid summer day,
17 maybe two hours.
18    Q    Okay.  Was King Soopers, to your
19 knowledge, losing any business as a result of
20 these protests?
21    A    They don't confront me on what
22 they're losing and what they're making.
23    Q    But you see people talking to the
24 protestors and turning around and leaving without
25 ever going into King Soopers?

31 (Pages 118 to 121)

Page 122

1    A    That, I couldn't tell you,
2 because I'm inside the store --
3    Q    Okay.
4    A    -- or in front of the store.
5    Q    Okay.  So tell me about the
6 threats that have occurred to you.
7    A    Okay.  I believe it was in -- I
8 can't give you the exact date at this point in
9 time, but in May of '07, I got a call where they
10 were protesting out there.  And when I say
11 "they," it was the Rice-McCormick protest.
12    Q    Was Loree Rice there?
13    A    You're putting me on the spot
14 there.  I don't know if she was there or not.
15    Q    Okay.
16    A    I do know her supporters were out
17 there.
18    Q    Mm-hmm.
19    A    And I can say this.  Most of the
20 time she's there when the supporters are.
21    Q    Okay.
22    A    Got a call that said, "Security
23 101."  That's our extension line.  So I pick it
24 up.  And they said, Is this the old security
25 guard?  And I thought somebody was having a sense

Page 123

1 of humor.  And I've got gray hair.  There's no
2 hiding that.  And so I said, Yeah.  They said, If
3 you don't leave, we're going to put a bullet in
4 your head.  End of conversation.
5    So I turned it in.  We made a police
6 report of it and everything else and turned it
7 over to Aurora.  I left the store out the back
8 door.  My car was brought around to me, and I
9 departed the store.
10    Q    Okay.  Did you make the police
11 report at the store before you left?
12    A    I didn't make the police report.
13 They did it for me.
14    Q    Okay.  Anything happen as a
15 result of that?
16    A    No.  I'm still alive.  I mean,
17 I'm still at the store.
18    Q    Any arrests made?
19    A    That, I couldn't tell you.
20    Q    Any investigation done?
21    A    That, I couldn't tell you.
22 Aurora handled it.
23    Q    Okay.  You have absolutely no
24 knowledge that Loree Rice had anything whatsoever
25 to do with that, do you?

Page 124

1    A    You're asking me to --
2    Q    You're not accusing her -- are
3 you accusing Loree Rice of making that death
4 threat to you?
5    A    I would say no.  I have no idea
6 who -- anybody could have made it, but . . . .
7    Q    Okay.  All right.
8    (Mr. Morales reentered the deposition
9 room.)
10    Q    (continuing)  You are assuming
11 that it's connected to the Loree Rice protests?
12    A    That's the only death threat I
13 ever got and the only protest going on that ever
14 occurred.  I'm. . . . .
15    Q    Did the death threat occur during
16 one of the protests?
17    A    Yes.
18    Q    Okay.  Tell me what King Soopers
19 has done to you since this incident that has had
20 some impact on your life relevant to what
21 happened on the night in question.  Did they
22 transfer you?  Did they demote you?  Did they
23 promote you?  Did they give you a raise?  Did
24 they get you a pay cut?  Anything at all?
25    A    No.  King Soopers has been

Page 125

1 outstanding.  I have no problems with King
2 Soopers on this whole matter.
3    Q    Okay.  So King Soopers did
4 nothing that negatively impacted your life?
5    A    No.  Why should they?  I didn't
6 do anything wrong.
7    Q    Right.  No.  I understand that.
8    A    Yeah.
9    Q    So you have no complaints about
10 King Soopers doing anything to you at all?
11    A    You say no complaints?
12    Q    Yeah.  I mean, King Soopers
13 treated you perfectly acceptably, didn't they?
14    A    Yes, they did, mm-hmm.  Yes.
15    Q    Okay.  Does DeShazer continue to
16 work at that King Soopers store?
17    A    I'm not --
18    MR. HIGGINS:  I'm going to object
19 to the form of the question.
20    Q    (BY MR. LANE)  Go ahead and
21 answer.
22    A    I have not seen DeShazer in --
23 since the night of the incident and the motions
24 hearing and the city hearing.  So I'm going to
25 say no.  I have not seen him at the store at all,

Attorneys Service Center
475 Seventeenth Street, Denver, CO  80202

Page 126

1  at all.
2      Q    Okay.  And you've been at that
3  store continuously since before this incident
4  through the present; is that right?
5      A    No.  I bidded Store 93.  That's
6  the summer of '07.
7      Q    You bidded for Store 93?
8      A    Well, yeah.  We --
9      Q    Understand.
10     A    -- have bids for the stores.
11     Q    And where is Store 93?
12     A    28th and Staple- -- actually,
13  28th and Quebec.  Stapleton Plaza.
14     Q    I know that.  All right.  Did you
15  get it?
16     A    Yeah.
17     Q    So you transferred?
18     A    Uh-huh.
19     Q    But you wanted to do that, right?
20     A    Yeah.
21     Q    Okay.  Having nothing to do with
22  Loree Rice; is that right?
23     A    No.  No.  I'm going to say no,
24  not at this point in time.  I had -- no.
25     Q    And you've been at Store 93 now

Page 127

1  for a couple of years?
2      A    No.  I stayed there for three
3  months, and then I bidded another shift, which
4  was weekends off.  And then after that, I bidded
5  back to 10 where -- Store 10 where this whole
6  thing . . . .
7      Q    So you're back at 10?
8      A    I was.  Now I got bumped this
9  time out of Store 10 by an individual senior to
10  me.
11     Q    Do you have anybody that you know
12  of that you plan to call as a witness to talk
13  about the stress you've been under as a result
14  this whole thing?
15     A    Well, I could most likely --
16  well, not most likely.  I will call Dr. Hollar.
17     Q    How many times did you talk to
18  Dr. Hollar about all of this?
19     A    Oh, I'm guessing maybe three,
20  four times.
21     Q    Okay.
22     A    Four being the max.
23     Q    Okay.  Anybody else?
24     A    I mean, I don't quite understand
25  your question.  You mean professional or

Page 128

1  just . . . .
2      Q    Professional or people you know.
3  Friend who says, Oh, gee, he's been depressed,
4  he's been stressed.  Anybody like that?
5      A    Well, I would say at this point
6  in time I would have to say no to that, because I
7  do not really relate my problems to other people.
8      Q    Are you married?
9      A    Beg your pardon?
10     Q    Are you married?
11     A    No.  I'm single.
12     Q    Okay.
13     A    Mm-hmm.
14     Q    Were you ever in the military?
15     A    Yes.
16     Q    I think you did mention that.
17  What branch of the service were you in?
18     A    I was in two, United States Navy,
19  United States Marine Corps.
20     Q    And when were you a Marine?
21     A    From '77, discharge date in '80.
22  Reserve.  Reserve.
23     Q    How about in the Navy?
24     A    April of '65 through January of
25  '67.

Page 129

1      Q    Okay.
2      A    Both honorably discharged.
3      Q    Any combat experience?
4      A    In what way?  There's many types
5  of combat.
6      Q    Well, I know.  Were you ever
7  getting shot at?  I know you probably -- were you
8  off coast in -- offshore in Vietnam?
9      A    Yes.  I was aboard the carrier
10  Enterprise.
11     Q    So you were doing maintenance
12  supply, whatever, support, air support kind of
13  things?
14     A    Well, CVA in '65 was an attack
15  ship, yeah.
16     Q    Okay.
17     MR. LANE:  Okay.  Let's take two
18  minutes.  I may be done.  Thanks.
19     (A recess was taken from 11:27 to
20     11:29 a.m.)
21     MR. LANE:  Okay.  We're all done.
22  I have no further questions.  Thank you.
23     MR. HIGGINS:  You guys have any?
24     MR. OSBORNE:  No.
25     MR. HIGGINS:  I have a few

33 (Pages 126 to 129)

Page 130

1  follow-up questions.  Not follow-up, but my own
2  questions.
3         E X A M I N A T I O N
4  BY MR. HIGGINS:
5         Q    Did you ever know Officer
6  DeShazer before this incident?
7         A    No.  No.
8         Q    Had you ever talked to him before
9  this incident?
10        A    Not to my knowledge, no.  No.
11        Q    Did you know that he was
12  patrolling the lot prior to seeing his car in
13  front of the King Soopers on this date?
14        A    No.
15        Q    Did he work for King Soopers?
16        A    No.  No.
17        Q    When he asked you to keep an eye
18  on Loree McCormick-Rice, was he doing that, do
19  you believe, in an official capacity?
20        A    Yes, mm-hmm.
21        Q    As a police officer?
22        A    Yes, mm-hmm.
23        Q    And you recognized him as an
24  Aurora police officer?
25        A    Yes.

Page 131

1         Q    The statement that you have been
2  referring to, Exhibit 2, appears to have a
3  witness at the station, at the bottom, of Officer
4  Fazio?
5         A    Uh-huh.
6         Q    Did the Aurora Police Department
7  ask you to fill out this statement?
8         A    This statement here?
9         Q    Yes, Exhibit 2.
10        A    No.  No.
11        Q    But he witnessed it; is that
12  correct?
13        A    Apparently so, yes.  Uh-huh.
14        Q    And the information you got on
15  the Rice name, Cassidy Rice, Loree Rice, and
16  Officer DeShazer, that all came from this Aurora
17  officer?
18        A    Yes.
19        Q    The names?
20        A    Yes.
21        Q    And when you were asked about
22  your damages in this case, you don't really have
23  a calculation?  The million dollars was just a
24  guess at this point; is that correct?
25        A    Yes, mm-hmm.

Page 132

1         Q    Does it bother you that Loree
2  Rice conducts these Saturday protests in front of
3  the store?
4         A    Yes, it does, mm-hmm.
5         Q    Why does it bother you?
6         A    Because it's an insult to my
7  integrity.  It's not true, what she's saying.
8  And it's a blatant lie.  And therefore, you know,
9  it just really -- really upsets me, 'cause I'm
10  not a racist.  I'm not any things that she's
11  saying I am.
12        Q    Has she in these protests, to
13  your knowledge, stated that you brutally attacked
14  her and her daughter?
15        A    Yes, I believe that's . . . .
16        Q    Have you had to defend yourself
17  in front of customers regarding these
18  allegations?
19        A    Oh, yes.  Several of the
20  customers come in that I know and affectionately
21  refer to as a fan club.  And they are black, most
22  of them are.  A good percentage are black.  And
23  ask me what's transpiring, and they have said to
24  me that We know that's not true, because they
25  know me.

Page 133

1         Q    Does that happen often, that you
2  have to explain that you had nothing to do with
3  this?
4         A    Yes.  Yes.  It -- at the time I
5  was there last summer and now -- it even occurred
6  when I bidded back to the store.
7         Q    If your supervisors knew that
8  someone was calling someone else a nigger in the
9  parking lot, would that be acceptable behavior of
10  a customer?
11        A    No.  Definitely not, no.
12        Q    King Soopers would not want that
13  to happen at their store, would they?
14        A    No.  Definitely not, no.
15        Q    I believe you were transferred
16  from the store for a period of time, is that
17  correct, after this incident?
18        A    Yes.  Uh-huh.  I believe -- I
19  went to 93.
20        Q    Okay.  Are you saying that that
21  was not -- did they tell you that you ought to
22  transfer somewhere?
23        A    They suggested, and I
24  transferred.
25        Q    Is that because of this incident?

34  (Pages 130 to 133)

## Page 134

1    A    Yes.
2    Q    And so you bid at another store?
3    A    Yes. I went to 93. I bid.
4    Q    And how long a period of time was
5    that?
6    A    I left 10 roughly the summer of
7    '07, and I didn't -- I went from 93 to Store 5,
8    downtown, Store 1, and shortly before
9    Thanksgiving, I returned to Store 10.
10   Q    Did you really want to do that?
11   A    Yes. Store 10, yes.
12   Q    I mean, did you really want to
13   transfer?
14   A    The first time?
15   Q    Yes.
16   A    No. No, I did not.
17   Q    Is that because you know a lot of
18   people at the store?
19   A    Yes. Mm-hmm.
20   Q    And are you aware -- as part of
21   your damages, are you claiming that Loree Rice
22   and her daughter are claiming that you should be
23   fired as a racist?
24   A    Yes. That is what -- I should be
25   fired from my job.

## Page 135

1    Q    And were you in open court when
2    Loree Rice accused you of brutally beating her?
3    A    Yes, motions hearing.
4    Q    Does that bother you?
5    A    It definitely does. It was
6    completely embarrassing.
7    Q    Are you embarrassed by the fact
8    that you've been sued in federal court?
9    A    Yes, I've never been sued before
10   in my life. This is an embarrassment.
11   Q    These pamphlets that are handed
12   out, are these people handing out pamphlets in
13   front of the store to customers that are coming
14   in?
15   A    Yes. And customers even coming
16   in with their vehicles in the driveway as well.
17   Q    They're handing them to customers
18   in the driveway?
19   A    Yeah, they're -- as a matter of
20   fact, they're interfering with traffic. At one
21   point in time an individual complained on that,
22   banged on his window and was attempting to hand
23   him a pamphlet.
24   Q    Okay. And you have actually seen
25   some of these pamphlets?

## Page 136

1    A    Yes, mm-hmm.
2    Q    And you believe that these
3    protests are still continuing, to have you fired
4    and accusing you of being a racist?
5    A    Yes, mm-hmm. Yes. The -- yeah.
6    I -- every time I come in, I'm just a little
7    fearful what's going to happen. But the good
8    outweighs the bad here, because all the
9    customers -- they're fantastic. I mean, I would
10   say, just for the record, that would be 50 to 60
11   percent of our customers are black, and we have a
12   good rapport with them. I have a good rapport
13   with them.
14   Q    At any time did you ever
15   physically contact either Cassidy Rice or Loree
16   McCormick-Rice?
17   A    Never physically had contact
18   whatsoever.
19        MR. HIGGINS:  That's all I have.
20        MR. LANE:  Okay.  We're done.
21   Thank you.
22        (The deposition concluded at
23        11:36 a.m.)
24
25

## Page 137

1        A F F I D A V I T
2
3    STATE OF COLORADO     )
                          ) ss.
4    COUNTY OF DENVER      )
5        I have read my deposition, and the same
6    is true and accurate, save and except for changes
7    and/or corrections, if any, as indicated by me on
8    the amendment sheet(s) attached hereto as
9    indicated.
10
11   Amendment sheet(s) attached [ ]
12   No changes; no amendment sheet attached [ ]
13
14
15   _____
         ERNEST D. SANDS
16
17   SUBSCRIBED AND SWORN TO before me on this
18   _____ day of _____, 2008.
19   My commission expires: _____.
20
21
22   _____
         NOTARY PUBLIC
23   in and for the State of _____.
24   kd
25

                          35 (Pages 134 to 137)

Page 138

CERTIFICATE

1
2
3
4    STATE OF COLORADO    )
                          ) ss.
5    COUNTY OF DENVER      )
6
7        I, Kathy L. Davis, Certified Realtime
     Reporter and Notary Public in and for the State
8    of Colorado, duly appointed to take the
     deposition of ERNEST D. SANDS, certify that prior
9    to the examination the deponent was duly sworn to
     testify to the truth in the matters in
10   controversy between the parties herein; that the
     deposition was taken in shorthand by me at the
11   time and place aforesaid and was thereafter
     reduced to typewritten form by me and processed
12   under my supervision, the same consisting of 137
     pages; and that the same is a full, true, and
13   complete transcription of my machine shorthand
     notes.  I further certify that I am not related
14   to, employed by, nor counsel to any of the
     parties herein, nor otherwise interested in the
15   events of the within cause.
16       A transcript review of this deposition
     was requested and is available to the deponent as
17   notified by me.
18       IN WITNESS WHEREOF, I have affixed my
     notarial seal this 12th day of February, 2008.
19   My commission expires April 29, 2009.
20
21
22
         _____
             Kathy L. Davis
23         Certified Realtime Reporter
24
25

36 (Page 138)